**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY**
**INJUNCTION**

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

-------------------------------------------------------------------x

COMMON CAUSE OF COLORADO, on behalf of itself :
and its members; MI FAMILIA VOTA EDUCATION :
FUND; and SERVICE EMPLOYEES INTERNATIONAL :
UNION, on behalf of itself and its members, :

                              :     Civil No. _____

            Plaintiffs, :

            :

       vs. :     **APPLICATION FOR**

            :     **TEMPORARY**

MICHAEL COFFMAN, in his official capacity as :     **RESTRAINING ORDER**
Secretary of State for the State of Colorado, :

            :

         Defendant. :

-------------------------------------------------------------------x

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTS ...................................................................................................................... 3

I.    Plaintiffs .......................................................................................................... 3

A.    Colorado Common Cause ................................................................ 3

B.    Service Employees International Union ........................................... 5

C.    Mi Familia Vota ............................................................................... 6

II.   The National Voter Registration Act ....................................................... 7

III.  Colorado's 20-Day Notification-Cancellation  Procedure ..................... 8

IV.   Colorado's Purge Of Voter Rolls During the 90-day November  General
      Election Window ............................................................................... 10

A.    Defendant's Public Statements ...................................................... 11

B.    Data provided by Defendant in Response to Public Records Requests ............ 13

V.    Colorado's Purge of Voter Rolls During the 90-day August Primary
      Election Window ............................................................................... 14

A.    Expert Analysis .............................................................................. 16

B.    Eligible voters were purged ........................................................... 17

C.    Summary ......................................................................................... 19

ARGUMENT ........................................................................................................... 19

I.    Plaintiffs Are Entitled to Immediate Injunctive Relief ......................... 19

A.    Plaintiffs Have An Overwhelming Likelihood of Success On The Merits Of
      Their Claims. ................................................................................. 19

B.    Plaintiffs Will Suffer Irreparable Harm Unless This Court Acts to Halt
      and Reverse Unlawful Disenfranchisement .................................. 32

C.    The Balance of the Hardships Favors Issuance of an Injunction .......... 34

D.      *Enforcement of the NVRA and Protection of Plaintiffs' Rights Serves the Public Interest*.......................................................................................... *35*

**II.     This Action is Not Barred by the NVRA's Notice Requirement .........36**

**III.    Plaintiffs Have Standing. .......................................................................37**

A.      *All Plaintiffs Have Standing To Sue On Their Own Behalves*............................ *37*

B.      *Plaintiffs Common Cause Of Colorado And SEIU Have Associational Standing To Sue On Behalf Of Their Members.* ................................................... *38*

**CONCLUSION** ...........................................................................................**39**

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs Colorado Common Cause, Mi Familia Vota Education Fund, and Service Employees International Union seek a limited order barring the Secretary of State of Colorado from depriving thousands of Colorado citizens of their right to cast their a ballot that will be counted in the 2008 general election, as a result of (a) systematic purges of voter rolls after the federally-mandated deadline for such purges to end and (b) cancellation of voter registrations based on nothing more than returned mail. Absent the requested relief, thousands of qualified Colorado voters could be disfranchised without notice and no meaningful opportunity to cure before they attempt to cast their ballots.

Colorado's practices clearly violate the protections for registered voters laid out in the National Voter Registration Act of 1993 ("NVRA"). Among other things, the NVRA strictly limits voter purges within 90 days of a federal primary or general election. In this case, the deadline for completing such purges before the general election was August 4, and for the primary election was May 13, 2008. The NVRA also prohibits purges based on returned mail except unless they follow detailed procedures. The Secretary of State has admitted that such purges have taken place and, after that admission, the State Attorney General issued an opinion ratifying this decision in contravention of federal law. There now are indications the Secretary of State has been asked to carry out another

large-scale purge before Election Day.  Not only has Colorado violated the NVRA, it has continues to purge qualified voters from its rolls in derogation of their fundamental right to vote.

First, Colorado is improperly implementing a systematic program to purge voters from the list of eligible voters within ninety days of a general election.  The reasons for such a prohibition run to the heart of our democratic institutions.  Section 8 of the NVRA provides that within 90 days of an election a state may only purge voters who have withdrawn their registration, died, been convicted of a felony or found incompetent during the 90-day period.  This provision exists because within the final 90 days before an election, there is too little time to avoid or cure inappropriate purges of qualified voters.  There is simply too much at stake and too much uncertainty to be sure that none of the voters purged are actually qualified voters.  The franchise is fundamental and through the NVRA, Congress has mandated that as an election approaches, states must take the most prudent approach and purge only those voters who are unquestionably ineligible and could not have been purged earlier.  Colorado has abandoned that quite sensible approach.  This Court should order Colorado to reverse its course.

Second, Colorado has been cancelling voters' registration when that voter's notice of registration is returned as undeliverable.  The NVRA sets a high standard for purging the list of eligible voters based on returned mail at any time, and this practice  falls far short of that standard.

Absent a preliminary injunction, Defendant will continue to engage in these unlawful practices and will cause severe and irreparable harm to Plaintiffs and their

constituencies.  Because the November 4 election is only 11 days away and early voting

is already underway, the time for any remedy is very short.  Once Election Day passes,

there is no way to give a voter back her right to vote in this election.  The only remedy

that plaintiffs have is to seek this immediate injunctive relief to prevent

disenfranchisement now.  While this relief may be immediate and extraordinary, it is also

necessary to preserve the franchise for thousands of Colorado citizens.

Because Election Day is so near, Plaintiffs in this motion seek only to ensure that

no additional voters are wrongfully removed from the voter rolls before November 4 and

that wrongfully purged be reinstated so that they can cast ballots that will count.

Ultimately, plaintiffs seek to enjoin Defendant from continuing to undertake purge

programs that do not adhere to the protections mandated by the National Voter

Registration Act of 1993 ("NVRA").

## FACTS

I.    PLAINTIFFS

A.    **Colorado Common Cause**

Colorado Common Cause ("Common Cause") is a non-profit organization whose

mission is to "promote fair and honest elections" and "to protect the civil rights of all

Americans."  Decl. of Jennifer Flanagan ¶ 2.  Common Cause has 4,000 dues-paying

members and 8,000 online members within the state of Colorado, many of whom are

registered Colorado voters and who regularly vote in Colorado elections.  Id. ¶ 4.  As part

of its goal to promote open, honest and accountable government, Common Cause is

committed to ensuring that every American, and Common Cause member, has the right to vote and the opportunity to exercise that right. Id. ¶ 3.

Among other voter protection programs, in advance of the 2008 general election Common Cause implemented a program called "Just Vote Colorado" with the aim of monitoring the 2008 election and writing a post-election report about how Colorado's election laws impacted the race. Id. ¶ 3. Common Cause also works with election officials and organizations to resolve problems that may plague Coloradan's ability to vote. Id. ¶ 3. The purges that are ongoing in Colorado thus directly impact the mission, time, energy, and resources of Common Cause. Common Cause's resources are limited, and the amount of time our staff is needed to investigate and take measures to counteract the State's unlawful purges forces us to divert necessary resources from our voter protection and education activities. Id. ¶ 7.

The purges also injure Colorado Common Cause by unlawfully purging our individual members from the rolls, or by subjecting them to imminent risk that they will be purged unlawfully from the rolls and not permitted to vote in the upcoming November 4, 2008 general election or subsequent elections. Id. ¶ 6. The injury has the potential to continue, furthermore, after the November 4, 2008 election if the State's purging practices are not discontinued, because our members may be unlawfully stricken from the rolls in the future. Id. ¶ 8. *See* Ex. 1, Decl. of Jennifer Flannagan.

4

B.      **Service Employees International Union**

Plaintiff Service Employees International Union ("SEIU") is a labor union representing employees working in the fields of healthcare, property services and the public sector. *See* Ex. 2, Decl. of Steven K. Ury ¶ 3.  SEIU has approximately 10,000 members in Colorado and represents workers throughout the State. *Id.* ¶ 5.  SEIU is committed to ensuring that every American, including every SEIU member, has the right to vote and the opportunity to exercise that right. *Id.* ¶ 3.

Over the course of the last year, SEIU has devoted significant time, energy and resources to registering voters in Colorado. *Id.* ¶ 6.  SEIU and its staff assisted in registering substantial numbers of new voters in Colorado during this past year. *Id.*

SEIU and its members are harmed by Colorado's unlawful purges of eligible voters from the voter rolls in several ways.  First, the unlawful purges harm SEIU because they undermine the organization's efforts to register eligible voters and to conduct voter education activities. *Id.* ¶ 8.  SEIU has limited resources, and Defendant's actions have required SEIU to expend its resources investigating and taking measures to counteract the erroneous purges, diverting resources from other planned voter education activities. *Id.* ¶ 10.  Second, SEIU is harmed because the unlawful purges cast a cloud of uncertainty over SEIU's registration efforts that adversely affects SEIU's ability to engage newly registered voters in the political process and its future efforts to register new voters. *Id.* ¶ 7.  Finally, SEIU is harmed by Colorado's unlawful purges because there is an imminent threat that, as a result of the State's actions, some eligible voters who are SEIU members or were registered by SEIU staff, will be or have already been

purged unlawfully from the rolls and not permitted to vote in the upcoming November 4, 2008 general election. *Id.* ¶ 8.

### C.   **Mi Familia Vota**

Plaintiff Mi Familia Vota ("Mi Familia") is a non-partisan civic engagement campaign working with the Latino and immigrant families to bring positive change to their communities and improve their lives. *See* Ex. 3, Decl. of Grace Lopez ¶ 3.  Part of Mi Familia's mission is to empower members of the Latino and immigrant communities by registering eligible citizens to vote and encouraging registered voters to participate in the electoral system. *Id.* ¶ 4.

Mi Familia has expended significant resources and staff time on voter registration activities in advance of the November 4, 2008 general election. *Id.* ¶ 5.  These activities have included outreach through churches and community organizations, outreach to newly sworn-in citizens, and door-to-door canvassing. *Id.*  In the past six months, Mi Familia has registered approximately 2,300 persons to vote. *Id.*

Mi Familia is harmed by Colorado's unlawful purges of eligible voters from the voter rolls.  Specifically, the State's unlawful purges harm Mi Familia because they undermine the organization's efforts to register eligible voters and to conduct voter education activities. *Id.* ¶ 7.  The unlawful purges create an uncertainty about the lawfulness of the entire registration process, which will make it more difficult for Mi Familia to fulfill its mission of registering and engaging voters in the democratic process. *Id.*  Additionally, Mi Familia has limited resources, and any resources and time spent to

counteract the unlawful purges will divert resources from planned voter education efforts. *Id.* ¶ 9. Finally, there is a possibility that some eligible voters who were registered by Mi Familia staff or volunteers will be or have already been purged unlawfully from the rolls, and will not be permitted to vote in the upcoming November 4, 2008 general election. *Id.* ¶ 8. This harms Mi Familia by diluting its efforts to register eligible voters and by making it more difficult for Mi Familia to fulfill its organizational goals of registering voters. *Id.* ¶ 7.

II.    **THE NATIONAL VOTER REGISTRATION ACT**

The National Voter Registration Act of 1993 sets forth mandatory procedures for state election officials that further several goals, including to "increase the number of eligible citizens who register to vote in elections for Federal office…; to protect the integrity of the electoral process; and to ensure that accurate and current voter registration rolls are maintained."  42 U.S.C. § 1973gg(b) (2008).

Toward that end, the NVRA requires States to "ensure that any eligible applicant is registered to vote in an election" if they submit, through one of several means, a valid voter registration form within thirty days before the date of a federal election.  42 U.S.C. §1973gg-6(a)(1).  When a valid voting registration form is received, the NVRA requires the state to notify the registrant of the disposition of the application.  42 U.S. C. §1973gg-6(a)(2).  Once a voter is registered, Section 6 of the NVRA imposes strict safeguards against the improper or unfair removal of voters from the official list of eligible voters. The NVRA provides that "the name of a registrant may not be removed from the official

22842069v9

list of eligible voters except (A) at the request of the registrant; (B) as provided by State law, by reason of criminal conviction or mental incapacity;" or (C) pursuant to a general program to remove the names of ineligible voters from the voter rolls by reason of the registrant's death or change in residence. 42 U.S.C. § 1973gg-6(a)(3) and (4). Election officials may not remove registrants from the rolls under the NVRA based on returned mail unless the voter has requested removal; or the voter both (a) has failed to respond to a cancellation notice issued pursuant to the NVRA *and* (b) has not voted or appeared to vote in the two federal general elections following the date of notice.

The NVRA's safeguards against removing eligible voters, however, are particularly stringent in the period leading up to a federal election. Specifically, states must "complete, *not later than 90 days prior to the date of a primary or general election for Federal office*, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 42 U.S.C. § 1973gg-6(c)(2)(A) (emphasis added). The only exceptions to this provision occur upon the request of the registrant, criminal conviction, a determination of incompetence, or the death of the registrant during this period. *Id.* § 1973gg-6(c)(2)(B).

III.    **COLORADO'S 20-DAY NOTIFICATION-CANCELLATION PROCEDURE**

Colorado employs a practice of cancelling new registrants' registration upon the return of the single mailed registration notice – without waiting to see whether the registrant appears to vote in even one election.

Consistent with the NVRA, Colorado law provides that the county clerk and recorder must ensure that a person is registered if a valid registration application is filed in person or by mail in a timely manner as defined by statute. C.R.S. § 1-2-508(1) (2008). When an application is received, the county clerk and recorder verifies that it is "complete and accurate," at which point the county clerk and recorder must "notify the applicant of the registration." C.R.S. §1-2-509(2).   *See* 42 USC 973gg-6(a)(2) (requiring states to provide "notice of disposition" once an application is received and determined to be valid).

Contrary to the NVRA, however, Colorado law creates a mechanism for cancellation of a registration after the point at which the registration application has been deemed to be valid and timely filed, that is, after a voter is registered – on the basis of a single piece of returned mail.

As noted, the notice of disposition under § 1-2-509(2) is mailed after election officials verify that the application is "complete and accurate," and the notice constitutes a notice "registration." C.R.S. §1-2-509(2).   Under the NVRA, the voter's name can thereafter be removed from the rolls based on returned mail only under the limited circumstances described above: when the voter requests removal or when the voter both (a) has failed to respond to a cancellation notice issued pursuant to the NVRA *and* (b) has not voted or appeared to vote in the two federal general elections following the date of notice.  See 42 U.S.C. § 1973gg-6.

Nevertheless, in Colorado, if the notice of registration is returned to the county clerk as undeliverable within twenty business days of receipt of the application by the

9

clerk, Colorado law provides that the voter is then deemed "not registered" and the name is removed from the registration rolls.  See C.R.S. § 1-2-509(3).

IV.    **COLORADO'S PURGE OF VOTER ROLLS DURING THE 90-DAY NOVEMBER <u>GENERAL</u> ELECTION WINDOW.**

As detailed above, subject to very limited exemptions, the NVRA prohibits states from purging voters from the lists of eligible voters less than 90 days before the date of a primary or general election.  *See* 42 U.S.C. § 1973gg-6(c)(2)(A) ("the 90 day window").[1] The 90-day window for the November 4 election began on August 5, 2008, and the last day on which states could lawfully purge voters would have been August 4, 2008.  By Defendant's own express public admission, however, Colorado has purged at least 2,454 voters since the 90-day period began.  On October 9, Defendant issued a public statement asserting that 12,157 voter names were removed during that period and the corresponding 90 period before the August primary.  *See* Ex. 4, Nagler Dec., App. D.

Defendant has also provided data in response to a public document requests that further confirms the existence of large-scale purges within the current 90-day window. That data reveals that 10,779 voters were purged from the rolls after the beginning of the 90-day period, preceded by another 22,900 illegal purges in the 90 days preceding the

---

[1] The full text of the provision reads "A state shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  42 U.S.C. § 1973gg-6(c)(2)(A).  The exceptions to this provision are that a state may still purge a voter who (1) requests to be removed; (2) is removed because she was convicted of a felony or found to be mentally incapacitated; or (3) has deceased.  *Id.* § 1973gg-6(c)(2)(B).

10

Primary Election.  In addition an expert report by a political scientist who analyzed data provided by the state suggests that the actual scope of the purge within the current and ongoing 90 day period is significantly greater than the numbers provide by the Secretary. In short, Defendant's own admission and data maintained and provided by his office leaves no doubt of the existence of very substantial numbers of purges during the period in which such conduct is prohibited by the NVRA.

### A.    **Defendant's Public Statements**

On October 8, 2008 the *New York Times* reported that, in Colorado, 37,000 voters had been purged from the rolls between  July 21 and August 11, 2008, although only 7,500 voters had either moved out of state or died.[2]

Immediately after the *New York Times* story broke, Defendant issued a statement disputing the numbers reported in the newspaper.  *See* Mike Coffman, Coffman Responds to NY Times Articles Inaccuracies (Oct. 9, 2008) ("October 9 Press Release") [attached as Appendix D of Exhibit 1, Nagler declaration].  The October 9 Press Release indicated that a total of 14,049 voters were purged between July 21, 2008 and October 9. Defendant's explanation for those purges is summarized in the following table.

| Reason | Number Purged |
|---|---|
| Moved out of County or State | 6,572 |
| Duplicate | 4,434 |
| Failed 20-Day Period | 1,136 |

---

[2] *See* Ian Urbina, *States' Actions to Block Voters Appear Illegal*, New York Times, October 8, 2008, at (http://www.nytimes.com/2008/10/09/us/politics/09voting.html?_r=1&ref=us&oref=slogin), attached as Ex. 5.

| | |
|---|---|
| Deceased | 1,145 |
| Convicted Felon | 544 |
| Withdrawn | 203 |
| Not a Citizen | 13 |
| Voter Fraud | 2 |
| **TOTAL** | 14,049 |

The Secretary did not specify how many of the total cancellations occurred after August 5, the start of the 90-day window before the general election. Defendant did state, however, that 2,454 duplicate voter records were cancelled within the 90-day window. *See Mike Coffman Press Release*, attached as Ex. 6; *see also Coffman: Voter-Purge Article 'Way Off'*, The Denver Post, Oct. 9, 2008, attached as Ex. 7.) Notably, however, because Colorado held a federal primary on August 12, all the purges described there occurred within time periods forbidden by the NVRA. And on October 20, Defendant stated in a newspaper editorial that 3,069 voters had been purged as "duplicates" since August 1, 2008. Mike Coffman, *Working to Ensure Fairness*, Rocky Mountain News, Oct. 20, 2008 ( "October 20 Editorial"), attached as Ex. 8.

At Defendant's request, on October 14, 2008, Colorado Deputy Attorney General Maurice G. Knaizer issued an "informal opinion" on the following question: "May the State remove duplicate names from the computerized voter registration list within ninety days prior to the date of a primary or general election for Federal office." *See* Legal Opinion of the Colorado Deputy Attorney General Regarding Removal of Duplicate Signatures on the Registration Rolls Within Ninety Days of the Election, October 14, 2008 ("Deputy AG's Opinion"), attached as Ex. 9. Despite the NVRA's prohibition to

the contrary, Mr. Knaizer concluded that NVRA permits the State to remove duplicate names from the voter list at any time.

### B. Data provided by Defendant in Response to Public Records Requests

In response to a public records request, the Secretary of State provided plaintiffs with a list of all 129,727 voters purged from the voter rolls between August 2007 and September 25, 2008, broken down according to the purported reason for the purge.[3]  The reasons listed by the Defendant were: conversion (data did not match the state list), moved, duplicated, failed 20 day, felon, withdrawn, inactive citizen, not a citizen, voter fraud.[4]

Plaintiffs sorted the data to identify the purges between August 5 and September 25, 2008, and identified a total of 10,779.  which breaks down according to purported reason as follows :

| COLORADO PURGES BETWEEN AUGUST 5, 2008 AND SEPTEMBER 25, 2008 | | |
| --- | --- | --- |
| Reason | Raw Number | Percentage of Total |
| Conversion | 1,256 | 11.6% |
| Moved | 4,371 | 40.5% |
| Duplicated | 1,847 | 17.1% |
| Deceased | 1,649 | 15.2% |
| Failed 20 Day | 886 | 8.2% |

---

[3] The state provided plaintiffs with .txt files, which, in order to be readable the plaintiffs converted into Excel spreadsheets, attached as Ex. 10.

[4] The data provided by the Secretary of State did not elaborate on these reasons beyond the terse titles given to the files that they transmitted.  For this reason, plaintiffs cannot say what criteria Defendant used to determine if a voter "moved" nor can they explain what "conversion" entails in any detail.

13

| | | |
|---|---|---|
| Felon | 595 | 5.5% |
| Withdrawn | 153 | 1.7% |
| Inactive Citizen | 25 | 0.2% |
| Not a Citizen | 7 | 0.06% |
| Voter Fraud | 0 | 0% |
| **TOTAL** | 10,779 | |

As the above chart indicates, the Secretary's data shows that only 2,397 –
approximately 23 percent – of the voters purged *within* the 90-day window before the
general election were purged because they died, were convicted of a felony, or withdrew
their registrations.  The remaining 8,383 were purged in violation of the NVRA's 90 day
rule.

V.      COLORADO'S PURGE OF VOTER ROLLS DURING THE 90-DAY AUGUST PRIMARY
        ELECTION WINDOW

        On August 12, 2008, Colorado held its primary election for United States Senator
and for all seven of its Representatives to the United States Congress (the "August
Election").  The August election qualifies under the NVRA as "a primary ... election for
Federal office" within the meaning of 42 U.S.C. § 1973gg-6(c)(2)(A).  Ninety days prior
to August 12, 2008 was May 13, 2008.  Because the 90-day windows for the August and
November elections overlap, any systematic removal of names of voters from the official
lists, at any time from May 13, 2008 to November 4, 2008 ("the overlapping 90-day
window") is prohibited under the NVRA, subject only to the exceptions listed in 42
U.S.C. § 1973gg-6(c)(2)(B).

14

Sorting the same data referenced above, provided by the Defendant, plaintiffs isolated the period between May 13, 2008 and August 4, 2008.  The following table summarizes this information.

| COLORADO PURGES BETWEEN MAY 13, 2008 AND AUGUST 4, 2008 | | |
|---|---|---|
| Reason | Raw Number | Percentage of Total |
| Conversion | 2,841 | 10.23% |
| Moved | 8,599 | 40% |
| Duplicated | 9,637 | 34.7% |
| Deceased | 3,717 | 13.4% |
| Failed 20 Day | 1,415 | 5.1% |
| Felon | 962 | 3.5% |
| Withdrawn | 176 | 0.6% |
| Inactive Citizen | 411 | 1.5% |
| Not a Citizen | 5 | 0.02% |
| Voter Fraud | 8 | 0.03% |
| TOTAL | 27,771 | |

The numbers clearly indicate that approximately 22,900- more than 82% of the total - voters were purged during the August Election 90-day window for reasons other than withdrawal, conviction, and death.[5]

Viewing the two overlapping 90-day periods in tandem, the state's list of cancelled voters indicates that 38,550 voters' names were purged between May 12 and September 25, of whom only 7,252 were purged for the possibly permissible reasons of death, conviction, or withdrawal.  The remaining 31,298 purges were conducted in violation of the NVRA

_____

[5] Plaintiffs' analysis of the numbers indicates that more than 29,000 votes were purged between May 13 and the August 12 primary.

A.   **Expert Analysis**

After the *New York Times* story was published, plaintiffs requested additional data from the state and retained an expert to conduct an analysis. Plaintiffs engaged an expert in elections and quantitative methodology, Professor Jonathan Nagler, a political scientist at New York University. *See* Ex. 4, Nagler Decl.  Professor Nagler was asked to investigate whether the State of Colorado was engaged in purging  its voter registration records within 90 days of the upcoming federal election, i.e., during the period of August 5 to November 4, and if so what types of purge were occurring.

Working with data from the state, Professor Nagler conducted two separate analyses to investigate whether the state was removing voter names from the registration lists after August 5.  Professor Nagler compared the registered voter lists made available by the state for October 13, 2008 (Ex. 4, App. B and August 15, 2008 (Exhibit 4 App. C), the closest date to August 5 for which complete registration files were made available. Each file is like a snapshot of the state's voter registration records on a particular date. By comparing the records in the two data sets Professor Nagler was able to discover whether particular voter records were present on August 15 and no longer present on October 13. Then, in order to investigate potential purging activity in the 10 days between August 5 and August 14, Professor Nagler compared the voter registration total available on the Colorado Secretary of State's website for July 31, 2008 (Ex. 4, App. E) with registration information gleaned from the August 15 registered voter list (Ex. 4, App. C).  From these two analyses, Professor Nagler found  that the state was removing voter records from the rolls throughout the period of July 31 to October 13, 2008.

16

Professor Nagler concluded that, between August 5 and October 13, Colorado removed between 14,859 and 26,931 voter entries from its registration rolls.[6] *Id.* ¶ 22. Of that number, he estimated (relying on figures provided by the Defendant) that 1,892 of those voter names were removed for death, conviction or withdrawal. Thus, taking the lower number of Professor Nagler's estimate – 14,859, some 12,967 voter names were removed after August 5, in violation of the NVRA.

B.      **Eligible voters were purged**

In the course of these purges, eligible voters, including a number identified by Plaintiffs, were removed from the rolls. None of the registrants identified by Plaintiffs were given any notice that they had been removed from the rolls. For example, Crystal Newberry, a resident of Boulder County moved to Colorado in August 2006. She has resided at the same address ever since. She first registered in 2007 and updated her registration in September 2008 from the permanent mail-in ballot list. She retains the receipt given to her from this transaction. Yet, her name dropped off the Colorado registration list between August 15 and October 13, as confirmed by Professor Nagler's analysis. See Ex. 4. When she telephoned the county clerk's office, a clerk confirmed

---

[6] Professor Nagler identified a further 12,072 voters who were purged between July 31 and August 15. It is unclear, based on the available registration lists, whether those voters were purged after August 5, which is the start of the 90-day period for the November Election. However, because July 31 is well within the 90-day period for the August Election, plaintiffs conclude that a minimum of 26,931 voters have been illegally purged in violation of the NVRA.

that her registration had been "cancelled" for an unknown reason. The clerk then told her that she would be "reinstated." *See* Ex. 11, Decl. of Crystal Newberry.

John Patrick Joyce, a resident of Larimer County moved to Colorado in June 2008. In August, he registered to vote during a voter registration drive. He is eligible to vote. He is not aware of any trouble with mail delivery at his residence. Nevertheless his name appeared on the list the state provided of registrations cancelled between August 2007 and September 25, 2008 with a notation indicating a failed 20-day notice as the reason. *See* Ex. 12, Decl. of John Patrick Joyce.

Linda and James Johnson are residents of El Paso County. The moved to Colorado from Mississippi in January 2008. In May the Johnsons registered to vote at a shopping mall. They subsequently received their voter registration cards in the mail. Though they never received any notice of a problem with their voter registrations, the Johnson's names disappeared from the state's registration roles between August 15 and October 13, as confirmed by Professor's Nagler's analysis. *See* Ex. 4. When Mr. Johnson telephoned the county clerk, he was told that he and his wife were not registered to vote. According to the clerk, they had been "purged from the list" because "they didn't have any address on file." The Johnsons went to the County Clerk's office where a staff member looked up their records, determined that they were not registered and "reinstated" them. *See Exs.* 13 and 14, Decls. of Linda Townsend Johnson and James Edward Johnson.

C.      **Summary**

There can be no dispute that Colorado purged voters after the start of the current 90-day period, and also during the 90-day period prior to the primary election.  That fact – itself dispositive as to the existence of an NVRA violation – was specifically and publicly announced by Defendant himself, and confirmed in data provided by his office from computerized databases maintained by his office.  The result was that thousands of eligible voters – among them the individual declarants described above – were stricken from the rolls at a time and in a manner prohibited by federal law

## ARGUMENT

I.      PLAINTIFFS ARE ENTITLED TO IMMEDIATE INJUNCTIVE RELIEF

The four factors this Court should consider in determining whether a TRO is appropriate are met here.  Plaintiffs can establish that (1) they have a substantial likelihood of success on the merits, (2) they will suffer irreparable injury unless the injunction issues, (3) the threatened injury outweighs any injury the relief would cause to Defendant, and (4) the injunction is not adverse to the public interest.  *See Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1083 (10th Cir. 2004).

A.      **Plaintiffs Have An Overwhelming Likelihood of Success On The Merits Of Their Claims.**

Plaintiffs bring this claim under 42 U.S.C. § 1983 as well as Section 11(b) of the NVRA.  The NVRA provides a private right of action for "a person who is aggrieved by a violation of this Act."  42 U.S.C. § 1973gg-9(b)(1).  To establish a claim under 42

19

U.S.C. § 1983, two elements must be satisfied: (1) there was a deprivation of a right secured by the Constitution or the laws of United States and (2) that deprivation was caused by a person acting under the color of state law. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498 (1990).

As discussed below, Defendant, acting for the Department of State in his official capacities, have violated the NVRA by purging voters from the rolls during the 90-day window and by cancelling registrations through procedures and for reasons not permitted by the NVRA.   Defendant has admitted to the facts that establish these statutory violations; only the number of voters who have been purged are in dispute.   For that reason, plaintiffs' likelihood of success is overwhelming.

1.       *Defendant's 20-Day Cancellation Process Clearly Violates the NVRA*

The NVRA prohibits states from removing registered voters from the rolls based on a change in address except under two circumstances: if the voter (1) has confirmed in writing his or her change of address to outside the jurisdiction; or (2) has failed to respond to a forwardable notice *and* has not voted or appeared to vote in two consecutive general elections following that notice. 42 U.S.C. §1973gg-6(a)(4)(B), (c)(1)(b)(ii), (d)(1). Despite this clear prohibition of purging based on address except pursuant to such procedures, Colorado has removed registered voters from the rolls when a non-forwardable notice is returned in the mail as undeliverable.

Section 8(a)(1) of the NVRA imposes an obligation on states to "insure that any eligible applicant is registered to vote" if a "valid voter registration form" is submitted

within 30 days of an election. Section 8(a)(2) then requires states to send the voter a notice of disposition concerning their registration. No further action by the voter is contemplated by the NVRA, nor is the state given room to impose additional requirements. *See* 42 U.S.C. § 1973gg-6(a).

Once that application is processed, Section 8(3) prohibits a state from removing the name of any "registrant" from the voter rolls except for reasons specified by the statute, and pursuant to stringent procedures provided therein. In particular, Section 8(d) of the NVRA provides explicit protection to a voter should the state believe that voter has changed addresses or is no longer reachable at the address included in his initial application. Once a registrant is in on the rolls, the state can only remove that voter under limited and prescribed circumstances.[7] In particular, if the state believes the voter has changed addresses, the state can only purge the voter if the voter confirms in writing his change of address to outside the jurisdiction, or the voter fails to respond to a notice confirming the change of address, sent by the registrar via *forwardable* mail and enclosing a prepaid, pre-addressed, return envelope, *and* fails to vote in two consecutive general federal elections. *See* 1973-gg(6)(d)(1)(B)(i)-(ii) (emphasis added).

Under Colorado law, a voter is "registered" when a valid mailed voter application is received by a county clerk and processed. At that point, the voter is "notified of the *registration*." Colo. Rev. Stat. § 1-2-509(2). If the application is filed in the wrong county, the statute directs the clerk to forward the application to the correct clerk who

---

[7] States are also authorized to remove voters from the rolls based on the death or felony conviction of the registrant. 42 U.S.C. §1973gg-6(a)(4)(A), (g).

then processes it and notifies the voter of the "registration." Colo. Rev. Stat. § 1-2-509(1)-(2).  Such a voter is also registered and on the rolls.[8]  Thus, once an application has been processed by the state, state and federal law deems that voter to be a "registrant," and his name can be removed from the rolls only in a manner consistent with the stringent procedures of § 8(d).  *See U.S. Student Ass'n Found. v. Land*, 2008 U.S. Dist. LEXIS 80704, at *31 (E.D. Mich. Oct. 13, 2008) (holding that a voter "is a 'registrant' under the NVRA the moment the state processes his or her registration.") (attached as Ex. 15).

Yet in direct violation of the clear provisions of the NVRA prohibiting a state from removing registrants from the rolls except under certain circumstances and following certain procedures, Colorado seeks to do just that where a notice of registration is returned in the mail within 20 days. *See* Colo. Rev. Stat § 1-2-509(1)-(2).  The NVRA prohibits any such removals.

Plaintiffs in this case helped others to register to vote in a timely fashion. Their applications were processed by the appropriate county clerk and sent notices of their registration. At that point, these registrants were entitled to the full protections of § 8(d) of the NVRA. Their names could not be removed from the rolls unless they failed to respond to a forwardable notice *and* they failed to vote in two consecutive general

---

[8] If the voter application is missing information, the application is still processed and the "voter record" is "tagged" for further review. See 8 Colo. Code Regs. 1505-1 § 30.3.2 (emphasis added).

elections. Neither condition was met here. The state practice of purging these registrants, thus, is illegal, and flatly in violation of the NVRA.[9]

The 20-day cancellation process threatens to threatens unlawfully to disenfranchise thousands of eligible, properly registered voters without providing them any notice of a problem with their registration, and thus with no without any opportunity to cure the problem or seek legal redress. Indeed, under the State's rationale, the voter would be purged every time the U.S. Postal Service made an error, every time a State employee mis-entered an address into the State's database, every time the data base produced a faulty address label for the notice, and every time the notice simply got "lost in the mail." Many plaintiffs are long-time registered voters who have changed addresses since the last election and now face disenfranchisement due to the state's illegal 20-day cancellation policy.

Many thousands of valid voters may thus show up to vote on election day, unaware that, through no fault of their own, they had purged from the rolls. Such chaos, and such a significant threat to citizens' right to vote, are *precisely* the harms the NVRA sought to avoid. Under the NVRA, the State must treat all valid applicants as registrants who are fully protected by § 8(d) and whose names can only be removed from the rolls consistent with that Section's provisions.

---

[9] It is no defense to assert that voters disenfranchised through operation of the 20-day cancellation process were not "registered" (and therefore not protected by the NVRA) until 20 days had passed since the notice was sent without it being returned. Neither state nor federal law leaves any doubt that, once the applications were processed by the clerk, the voters were registered – they were sent "notices of registration."

2.      *Defendant's Purging Within 90 Days of the November 4, 2008
Election Violates Section 8(c) of the NVRA*

Section 8(c) of the NVRA requires that: "A state shall complete, not later than 90

days prior to the date of a primary and general election for Federal office, any program

the purpose of which is to systematically remove the names of ineligible voters from the

official lists of eligible voters." 42 U.S.C. § 1973gg-6(c)(2)(A).  Defendant's own

admissions establish that this provision has been violated because registered voters have

been purged pursuant to a systematic program and the reasons for the purging do not fall

under any of the NVRA's exceptions.

Section 8(c)(2) serves as a fundamental protection against possible

disfranchisement in the lead-up to an election.  One of the core purposes of the NVRA is

to "establish procedures that will increase the number of eligible citizens who register to

vote in elections for Federal office." 42 U.S.C. 1973gg(b)(1); *see also* 42 U.S.C. §

1973gg(a)(2) ("[I]t is the duty of the Federal, State, and local governments to promote the

exercise of [the fundamental] right [of citizens to vote]").  The 90-day window is an

indispensable part of meeting that goal.  By requiring that states must complete their

purging programs prior to the 90-day window, Congress expressed a concern that, should

systematic purges be allowed to continue in the three months before an election, there

would be a risk and even a likelihood that eligible voters would be removed from the

registration list and thereby precluded from voting.  This provision effectively mandates

that state election procedures and the officials that implement them err on the side of

enfranchisement in the months before an election. [10]   Systematic purges by definition do not entail specific, personal confirmation that a voter is no longer eligible and are highly likely to result in some eligible voters being erroneously purged from the rolls.   And large-scale purges conducted in the period before an election – when election officials are at their busiest, the likelihood of error at its highest and the time and resources to correct error at their lowest – pose particular jeopardy to the goals of the NVRA.

There are only three specific exceptions to the prohibition on purges within the 90-day window:  removal at registrant's request; removal by reason of criminal conviction or mental incapacity during the period; or death of the registrant during the period.  *Id.* § 1973gg-6(c)(2)(B)(i).  Significantly, purging a voter registration due to a voter's change in residence is not included among the exceptions.  *See* 42 U.S.C. § 1973gg-6(c)(2)(B)(i)(including §§ 1973gg-6(a)(3)(A)&(B) and 1973gg-6(a)(4)(A), but not 1973gg-6(a)(4)(B), among the exemptions).  In addition to these specific exceptions, the 90-day window also does not preclude "correction of registration records pursuant to this subchapter."  *Id.* § 1973gg-6(c)(2)(B)(ii).

These exceptions to the 90-day rule are express and limited.  The Federal Election Commission ("FEC"), in its guide to interpreting and implementing the NVRA, constitutes the government's contemporaneous understanding of what purges are permitted during the 90-day window.  The FEC's interpretation of the exceptions to the 90-day window prohibition are limited to the reasons enumerated in 42 U.S.C. § 1973gg-

---

[10] Section (c)(2)(B) refers to §§ 1973gg-6(a)(3)(A)&(B) and 1973gg-6(a)(4)(A).

6(c)(2)(B)(i).  No other exceptions are recognized. [11]  National Clearinghouse for

Election Administration, Federal Election Commission, *Implementing the National Voter*

*Registration Act of 1993: Requirements, Issues, Approaches, and Examples*, January 1,

1994 at 5-15 (emphasis added) ("FEC Guide"), attached as Ex. 16.

There is thus no question that voters in Colorado who were qualified and

registered to vote were purged from the rolls for reasons not permitted under the NVRA.

The purged voters who filed declarations attached to the complaint in this case were all

eligible to vote.  Defendant has admitted voters were purged during the 90-day window

for reasons such as moving and duplicate records.  Indeed, less than a quarter of the more

than 10,000 voters identified by Defendant who were purged within the 90-day window

for the general election were purged for the three reasons permitted under Section

8(c)(2)(B).  Put simply, the record is clear that Colorado has purged voters from the lists

of eligible voters as part of a systematic program during the 90-day window.  As such,

plaintiffs have conclusively established a high probability of success on the merits of

their purging claim.

---

[11]  "[C]orrection of registration records" is permitted during the 90-day period.  The
statute's use of "correction," as opposed to "removal," makes it clear that these voters
may not be removed from the rolls; rather, their records may be amended to reflect
changes of address within the jurisdiction.  The FEC Guide explains that the FVRA
does not "apply the [90-day] deadline to changing the address information of a
registrant who has changed voting residence within the registrar's jurisdiction."  FEC
Guide at 5-15 (emphasis added).  That is, § 8(c)(2)(B)(ii) does not allow for purges
outside of the narrow rationales of § 8(c)(2)(B)(i), but rather applies to changes of an
existing registrant's information that do not affect the registrant's status as registered.

    (a)    <u>The Purges of Colorado Voters, Admitted by the Colorado</u>
<u>Secretary of State, Violated the 90-Day Rule</u>

The Secretary of State has acknowledged in public statements that 14,049 voters were purged from Colorado's voter roles since July 21, 2008, a portion of the period encompassed by the overlapping 90 day windows.  Of that number, only 1,892 were removed because voters had died, were convicted of felonies, or withdrew their registrations.  These numbers alone constitute acknowledgment that at least 12,157 votes were purged in violation of the NVRA.

But data provided by Defendant indicates that those numbers are actually far higher.  The Secretary's own data shows that at least 10,779 voters were purged since August 5, of whom at least 8,382 were purged for reasons prohibited within the NVRA's 90-day window.[12]  An additional 27,771 voters were evidently purged in the 90 day window prior to the August 12 primary, of whom only 4,855 were purportedly removed on account of death, conviction, or withdrawal, leaving 22,916 unaccounted for under the NVRA exceptions.

The likelihood that some of these voters were mistakenly purged is quite high.[13]  Purging so many voters over a very short period of time dramatically increases the

---

[12] This number is based on the data received from the Defendant.  See Table of Colorado Purges Between August 5, 2008 and September 25, 2008.  Because nearly a month has passed since the end point of the period covered by the data, it is of course very likely that the actual numbers are far higher.

[13] These purges of voters within the 90-day window cannot be justified under § 8(c)(2)(B)(ii) of the NVRA as the "correction of registration records."  As noted above, "correction of registration records" does not allow for removal of records during the 90-day window, but merely permits corrections of registrant information

27

likelihood of error, and it is precisely the sort of practice that the NVRA was enacted to prevent.

These removals prima facie violate the NVRA.  Moreover, this prima facie violation is supported in part by the Secretary's own admissions, and show that plaintiffs have a very high likelihood of success on their § 1983 and NVRA claims.

(b)    Purges of Duplicate Voters Violate 8(c)

*Purges of Duplicates Constitute a "General Program":*  Defendant has acknowledged that 2,454 of the recently purged voters were removed from the rolls since August 5 because they were duplicates. *See* Ex. 6, Coffman Press Release.  In addition, he has admitted that 4,434 registration records were removed as duplicates within the overlapping 90-day windows of the primary and general elections.  Other data provided by the Secretary reveal that, between May 13 and September 25, 11,484 registration records have been removed as duplicates.  Although the Secretary has publicly asserted his conviction that those purges were appropriate, see October 20 Editorial, his interpretation of the law is plainly incorrect.

Colorado's method for identifying and eliminating duplicate voters is precisely the sort of systematic program contemplated by Section 8(c) of the NVRA, which makes clear that, subject to limited exceptions, "any program the purpose of which is to

---

that do not affect the voter's registration status.  Most importantly, it does not allow for the removal or "correction" of registration records for voters who have "moved out of county or out of state," and indeed, it does not allow *removal* of registration records for *any* reason other than those listed in § 8(c)(2)(B)(i), namely, death, felony conviction, or voter request.

28

systematically remove the names of ineligible voters" should be "complete" not later than 90 days prior to the date of a primary or general election for Federal office.  42 U.S.C. § 1973gg-6(c)(2)(A).

Colorado relies on a statewide computer registration system known as SCORE (State of Colorado Registration and Election) to identify and purge duplicate voters. SCORE operates to check for duplicate voters by "collect[ing] the social security number, the date of birth, the last name, the first name, and initials (if necessary) and analyzes various combinations of this information.  If the program discerns some duplication, it notifies the appropriate county clerk." *See* Deputy AG's Legal Opinion, Ex. 9.

The likelihood of error in SCORE's systematic method for identifying duplicate voters is very high.  The system is meant to operate statewide, and to evaluate and compare the data of tens of millions of voters simultaneously.  This is the first year it has been fully operational, and it has been riddled with technical problems since it was first launched.  In a 10-day Colorado statewide mock election conducted between April 21 and May 2 of this year, clerks in some counties had trouble accessing the SCORE database from polling locations and "[e]lection officials in several counties said they didn't trust the system, and planned to…use printed poll books on Election  Day rather than access the central database in real time."  Kim Zetter, Voter Database Glitches Could Disenfranchise Thousands, Wired (Sept. 17, 2008), attached as Ex. 17.

The primary goal of the 90-day rule – the avoidance of mistaken purges – is completely subverted by Colorado's duplicate purging system.  Even if SCORE were to

operate perfectly, the very real likelihood of human error would remain. After SCORE

flags likely duplicates, Colorado election officials must make the final determination as

to whether to purge them. But Colorado's state statutes offer little guidance as to which

identifying characteristics should be used, and what degree of approximation is

permitted. The risk of error would be high under the best of circumstances, but it is

unacceptably high during the 90-day period prior to an election. Generally, election

officials are busiest in the 90 days preceding an election: they must process new

registrations, update registration records, identify polling locations, prepare voting

materials, and more, and without the time to exercise due care, data entry and other

mistakes are more likely. Myrna Perez, Voter Purges (Brennan Center 2008), attached as

Ex. 18. This year, Colorado's election officials are no exception. *See* Myung Oak Kim,

*Election Workers Find Thousands of Errors on Records*, Rocky Mountain News, Oct. 9,

2008 (Denver county officials have been "deluged" with voter registration forms and

mail ballot requests, about 10 percent of which are faulty or incomplete in some way, and

there are "scores of election workers trying to resolve problems"), attached as Ex. 19.

　　　The Deputy Attorney General attempts to draw an artificially bright line between

purging a voter from the rolls and merely removing a duplicate entry. *See* Deputy AG's

Opinion ("A person whose name is removed from the registration list cannot vote," while

removal of duplicates "merely ensures that the voter will not receive or cast multiple

ballots"). In reality, the system by which Colorado attempts to purge duplicates from its

voting registers is very likely to mistakenly purge eligible voters in the process. *See*

Nagler Decl ¶ 18 (stating that the likelihood of two people in a pool of over 3 million registered voters sharing the same name and birth year is extremely high).

*HAVA Does not Permit the Elimination of Duplicates within the 90-Days Window*:  Contrary to the Deputy AG's Legal Opinion, HAVA does not authorize Colorado's removal of potential duplicate entries from the voter registration list within the 90 day period prior to an election.  HAVA was passed in the wake of the contested 2000 presidential election to establish minimum election standards and to ensure uniform treatment of voters within a state.  In order to facilitate the achievement of this goal, HAVA mandated that each state establish a state-wide computerized list of registered voters.  42 U.S.C. § 15483(a) (2008).  HAVA requires the states to maintain these lists regularly, but where such maintenance requires purging of voters from the list, the purges must be performed "in accordance with the provisions of the National Voter Registration Act."  *Id.* § 15483(a)(2)(A)(i).  This provision expressly requires compliance with § 8(c)(2) of the NVRA.  *Id.* § 15483(a)(2)(A)(i).  Section 303(a)(2)(B) of HAVA permits states to remove duplicate names from the voter lists, but nothing in the statute suggests that such removals are exempt from the requirements of the NVRA.

The Deputy AG's Legal Opinion bases its contrary contention in neither the language nor the structure of the statute.  Instead, the Deputy AG relies on the faulty argument that the purpose of the NRVA to prevent erroneous removal of legitimate voters is not served by prohibiting removal of duplicate entries.  The Deputy AG appears to assume, with no justification, that although computer matches to postal queries, death records, or motor vehicle databases during the 90-day window may be faulty, computer

identification of duplicate voters are not.  In fact, the voter registration databases is just as

subject to inaccuracies and errors as these other computer system and, given the short

time the Colorado SCORE system has been in place, the minimal testing it has received

and the issues that testing uncovered, possibly more so.  Accordingly, systematic purges

of computer-identified potential duplicates is just as likely to result in the erroneous

disenfranchisement of legitimate voters as other forms of systematic removal.  As the

Assistant AG recognizes, it was precisely to prevent such errors that the NVRA's 90-day

no-purge period was established.  Likewise, it is for precisely this reason that HAVA

expressly incorporated the NVRA's time limit in its voter list maintenance provisions.

Thus HAVA does not justify or authorize the Secretary's acknowledged removal within

the 90 day window of suspected duplicate entries from the voter roles.

B.   **Plaintiffs Will Suffer Irreparable Harm Unless This Court Acts to Halt and Reverse Unlawful Disenfranchisement**

Plaintiffs will immediately and irreparably be harmed if the requested injunctive

relief is not provided. The right to vote is fundamental, and threat of it's denial poses an

undeniable and serious harm. *See Reyonlds v. Sims*, 377 U.S. 533, 554-55 (1964). Where

such pivotal constitutional rights are at stake, "most courts hold that no further showing

of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir.

2001) (internal quotation marks omitted).  Indeed, the violation of a citizen's right to vote

is the quintessential injury justifying injunctive relief.  *See Touchston v. McDermott*, 234

F.3d 1133, 1158-59 (11th Cir. 2000) ("[B]y finding an abridgement to the voters'

32

constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made").

As discussed, Defendant's unlawful purge practices and 20-day cancellation practice directly threaten the voting rights of many thousands of Coloradans, including members of plaintiffs Common Cause and SEIU. Without immediate injunctive relief, this foundational right will be abridged. Moreover, most of those stripped of their statutory protections will be left with no remedy or opportunity to cure, as the State's procedures provide no notice to voters whose registrations are being unlawfully purged.

Such circumstances present precisely the sort of immediate and irreparable harm that counsel in favor of issuing a preliminary injunction. *See Touchstone*, 1158-59; *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003) (*rev'd on other grounds* 344 F.3d 914 (9th Cir. 2003) (en banc)) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury") (internal quotations omitted).

Moreover, where plaintiffs allege violation of a statute which itself provides for injunctive remedies, no further showing of irreparable harm is necessary. *See Kikumura*, 242 F.3d at 963 ("When the evidence shows that the Defendant are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.").

Here, Plaintiffs face the very real and immediate threat of irreparable harm from the direct violation of the NVRA, a statute which provides for injunctive relief as a remedy for its violation.

C.      **The Balance of the Hardships Favors Issuance of an Injunction**

The balance of hardships weighs heavily in Plaintiffs' favor. Absent relief, the thousands of Coloradans who have been unlawfully purged from the voter registration rolls will be unable to vote, despite being eligible to do so and having timely and properly registered. *See Reynolds*, 377 U.S. at 554-55.

By contrast, the relief sought in this motion will impose only minimal burden upon the State. Plaintiffs are of course mindful of the closeness of the election – indeed, that is why they seek emergency relief – and of the administrative burdens upon election officials during this period. Yet the particular relief at issue will not add materially to those burdens. In addition, Plaintiffs do not seek to impose extraordinary duties beyond those that Defendant is required and expected to perform; they request only that Defendant perform tasks that are mandated by federal and state law. By incorporating an injunctive remedy into the NVRA, Congress clearly indicated its intent that any hardships imposed on voters weigh heavily against a State's hardships in complying with the statute. *See Burlington N.R.R. Co. v. Bair*, 957 F.2d 599, 601-602 (10th Cir. 1992) ("[I]t is not the role of the courts to balance the equities between the parties [where] Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the Defendant is engaged in . . . any activity which the statute prohibits.").

In this case, where the voting rights of tens of thousands are at stake, compared to the state's *de minimus* costs of compliance, the balance of the hardships strongly weighs in favor of the plaintiffs.

### D.    Enforcement of the NVRA and Protection of Plaintiffs' Rights Serves the Public Interest

Protecting an individual's right to vote is "without question in the public interest," *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also, Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), *citing Reynolds*, 377 U.S. at 562 (referring to the right to vote as a "a fundamental political right, . . . preservative of all rights") (internal quotations omitted); *Duprey v. Anderson*, 184 Colo. 70, 76 (1974) ("the fundamental elements of liberty include[e] the right of every citizen to vote").  Granting injunctive relief that protects that right to vote for thousands of Coloradans therefore strongly serves the public interest.

Congress enacted the NVRA based on its findings that the right to vote is fundamental, and that it is the duty of Federal, State and Local governments to promote the exercise of that right.  42 U.S.C. § 1973gg(a).  The statute is meant to increase the number of eligible citizens who register to vote in elections for Federal office; to ensure that accurate and current voter registration rolls are maintained; and to "protect the integrity of the electoral process." *Id.,* § 1973gg(b).  Particularly in this election at this time – with record numbers of voters registering for the first time and expected record turnout – advancement of those purposes is of the utmost importance.

II.     **THIS ACTION IS NOT BARRED BY THE NVRA'S NOTICE REQUIREMENT**

Section 9 of the NVRA generally requires injured parties to provide the chief election officer of a state with notice. That requirement does not apply to or bar this suit, however, for two reasons.

First, no notice is required for where the violations occur within 30 days of a federal election. See 42 U.S.C. § 1973gg-9(b)(3). In this case, the by Defendant's own admissions, illegal purges continued through at least October 9 – a mere 27 days before the election. See Ex. 6 ("Coffman's office presented data that only 14,049 voters had been removed from July 21 through today") (emphasis added).

Second, even if the notice requirement did apply, the Defendant's statements make clear that such notice would be futile. The notice requirements is meant to "provide states … an opportunity to attempt compliance before facing litigation." *Ass'n Cmty.. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). In this case, Defendant has made it clear that he has no intention to attempt compliance, and indeed has publicly asserted his belief that the purges fall "within the federal law." [October 20 Editorial.] Under such circumstances, enforcing the notice requirement would not serve its stated purpose, and therefore should not bar direct action. See, e.g., *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 912 F.Supp. 976, 982-3 (W.D. Mich. 1995), (failure to provide notice irrelevant where Defendant stated in a press release "that they were refusing and would continue to refuse to comply with the NVRA"); Condon v. Reno, No. 3:95-192-0 (D.S.C. Nov. 20, 1995) (unpublished) (notice under section 9 of NVRA "is not required when it would clearly be futile…).

III.    **PLAINTIFFS HAVE STANDING.**

An organization may have standing to sue in its own right, and may have "associational standing" to sue on behalf of its members. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).  Here, plaintiff Mi Familia has standing to sue in its own right, and plaintiffs SEIU and Colorado Common Cause have standing to sue on their own behalf and on behalf of their members.[14]

### A.    All Plaintiffs Have Standing To Sue On Their Own Behalves

An organization has standing to sue in its own right when it satisfies the traditional Article III test for standing, meaning that (*i*) it has suffered an "actual or imminent" injury in fact which is (*ii*) "fairly traceable to the challenged action of the Defendant," and which (*iii*) "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61.  An organization has an injury sufficient for standing purposes where challenged practice will frustrate the organization's mission and efforts, or force it to devote significant resources to address the challenged practice. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

---

[14] There is no question that organizations are permitted to bring suit under the NVRA. Section 9 of the NVRA permits any "person aggrieved by violation" of the Act, including any organization, to bring suit. *See* 1 U.S.C. § 1 (2000) (term "person" includes "corporations"); *Ass'n of Comm. Organizers v. Fowler*, 178 F.3d 350, 364, 365 (5th Cir. 1999) (applying 1 U.S.C. § 1 to the NVRA and finding that Congress, in providing for private right of action under the NVRA, "intended to extend standing under the [NVRA] to the maximum allowable under the Constitution").

22842069v9

All three plaintiffs satisfy this standard. Colorado Common Cause, Mi Familia and SEIU all have as part of their missions the goal of encouraging civic participation, including by encouraging voter registration and education. *See* Ex. 1, Flanagan Decl. ¶¶ 2-3; Ex. 3, Lopez Decl. ¶¶3-5; Ex. 2, Ury Decl. ¶¶3-4, 6. The State's unlawful purge of many thousands of voters inflicts an "actual or imminent" injury on Plaintiffs because it adversely affects their ability to carry out their voter registration and education goals. See Ex. 1, Flanagan Decl. ¶¶ 6-6; Ex. 2, Lopez Decl. ¶¶ 7-8; Ex. 3, Ury Decl. ¶¶8-10. *See Havens Realty Corp.*, 455 U.S. at 379 (finding "concrete and demonstrable injury to the organization's activities" where challenged practices impaired organization's ability to provide counseling and referral services). The injury is directly traceable to Defendant's conduct, and the relief Plaintiffs request – correction of past purges and cancellations and prevention of further such conduct – will remedy this harm.

B.     **Plaintiffs Common Cause Of Colorado And SEIU Have Associational Standing To Sue On Behalf Of Their Members.**

SEIU also has associational standing to seek the injunctive relief requested. As an association, SEIU has standing to bring suit on behalf of its members when (*i*) "its members would otherwise have standing to sure in their own right," (*ii*) the interests it seeks to protect are "germane to the organization," and (*iii*) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt*, 432 U.S. at 342-43. SEIU, for example, has approximately 10,000 members in

Colorado, many of whom are registered to vote or who have sought to register to vote. *See* Ex. 2, Ury Decl. ¶ 5.

Members of both organizations face a real and imminent threat of disenfranchisement. *Id.* ¶ 8; *see NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (where associational plaintiff seeks prospective relief from threatened government action, the plaintiff need not "name names, because *every* member faces a probability of harm in the near and definite future"); *see also Sandusky v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (where association asserts voting rights claims on behalf of membership, it is "inevitable" that one or more of the organization's members will be directly injured, absent relief); *U.S. Student Ass'n Found. v. Land*, Case No. 2:08-cv-14019, 2008 WL 4559549, at *13 (E.D. Mich. Oct. 13, 2008) (association bringing NVRA claims had standing for purposes of preliminary injunction where it pled existence of member suffering, or at risk of suffering, wrongful disenfranchisement as result of complained of practices). The federal voting rights that this lawsuit seeks to vindicate are at the very core of Common Cause's institutional mission, and are undoubtedly germane to SEIU's mission (*see* Ex. 2, Ury Decl. ¶¶ 3-4), and there is no need for the participation of individual members in the lawsuit.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully seek a temporary restraining order granting the following relief pending a trial on the merits:

22842069v9

1.   *enjoining and restraining Defendant from removing or cancelling the names of any voters from the official list of eligible voters for any reason not provided for in 42 U.S.C. § 1973gg-6(c)(2)(B);*

2.   *enjoining and restraining Defendant from removing or cancelling the names of any voters from the official list of eligible voters in violation of 42 U.S.C. § 1973gg-6(d);*

3.   *requiring Defendant to reinstate the names of any and all voters who were removed or cancelled from the official list of eligible voters since May 13, 2008 for any reason not provided for in 42 U.S.C. § 1973gg-6(c)(2)(B); and*

4.   *requiring Defendant to reinstate the names of any and all voters who were removed or cancelled from the official list of eligible voters in violation of 42 U.S.C. § 1973gg-6(d).*

Dated: October, 24, 2008

Common Cause of Colorado
1536 Wynkoop St. # 102
Denver, CO 80202

Mi Familia Vota Education Fund
2525 West Alameda Avenue
Denver, CO 80219

Service Employees International Union
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036

Respectfully Submitted,

By _____ /s/  S. Gale Dick
_____
James E. Johnson
S. Gale Dick
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel: 212-909-6000
Fax: 212-909-6836
jejohnsn@debevoise.com
sgdick@debevoise.com

41

Richard Rosenblatt
RICHARD ROSENBLATT & ASSOCIATES,
L.L.C.
8085 East Prentice Avenue
Greenwood Village, Colorado 80111
Tel: 303-721-7399 x11
Fax: 720-528-1220
rrosenblatt@cwa-union.org


Penda D. Hair
Elizabeth S. Westfall
Jessie Allen*
ADVANCEMENT PROJECT
1730 M Street, NW #910
Washington, D.C. 20036
Tel: 202-728-9557
Fax: 202-728-9558
phair@advancementproject.org
ewestfall@advancementproject.org
jessieallen101@gmail.com
* Not admitted in the District of Columbia


Wendy Weiser
Myrna Pérez
Jennifer Rosenberg
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
161 Avenue of the Americas
12th Floor
New York, New York 10013
Tel: 212-998-6284
Fax: 212-995-4550
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
jennifer.rosenberg@nyu.edu

Stephen P. Berzon
Stacey M. Leyton
Barbara J. Chisholm
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel: 415-421-7151
Fax: 415-362-8064
sberzon@altshulerberzon.com
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com


Karen Neuman
Sarah Brannon
FAIR ELECTIONS LEGAL NETWORK
1730 Rhode Island Avenue, NW
Suite 712
Washington, D.C. 20036
Tel: 202-331-0114
Fax: 202-331-1663
kneuman@fairelectionsnetwork.com
sbrannon@fairelectionsnetwork.com


*Attorneys for Plaintiffs Common Cause of
Colorado, Mi Familia Vota Education Fund,
and Service Employees International Union*

42