# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil No. 08-CV-2321-JLK

COMMON CAUSE OF COLORADO, on behalf of itself and its members;
MI FAMILIA VOTA EDUCATION FUND; and
SERVICE EMPLOYEES INTERNATIONAL UNION, on behalf of itself and its members,

        Plaintiffs,

vs.

BERNIE BUESCHER, in his official capacity as Secretary of State for the State of Colorado,

        Defendant.

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

### PRELIMINARY STATEMENT

This case concerns Colorado's ongoing and systematic removal of eligible, registered voters from its voter rolls in violation of the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act ("HAVA").  Plaintiffs initially brought some of these claims and moved for preliminary and injunctive relief in advance of the November 2008 federal election.  Following a hearing, this Court approved a Stipulated Preliminary Injunction (the "Stipulation") that provided temporary relief that allowed voters impacted by Defendant's conduct to cast ballots and have their votes counted in that election.  The Stipulation did not, however, permanently enjoin Defendant's unlawful practice or permanently restore the registration status of most of the voters who had been unlawfully purged.

Plaintiffs Amended Complaint challenges the same practices as its original complaint, as well as several additional, independent violations of the NVRA and HAVA.  Defendant has moved to dismiss the Amended Complaint on grounds of standing, pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

In the months leading up to the 2008 federal elections, Defendant cancelled more than 46,000 names from the lists of eligible votes pursuant to practices Plaintiff alleges are unlawful.  Plaintiffs allege, and Defendants admit, that some of those cancellations removed eligible and properly registered voters from the rolls.  And Defendant's brief concedes that at least some of those purged voters would not have had their ballots counted in the November election but for the relief Plaintiffs obtained at the Preliminary Injunction phase of this litigation.

Defendant recites these facts and claims that "the system worked."  Def. Br. at 4-5.  In fact, precisely the opposite is true.  At the very least, hundreds of eligible, registered voters would likely not have had their votes counted had Defendant's unlawful conduct gone unchallenged.  Those votes were counted only under standards and procedures imposed by the Stipulated Preliminary Injunction approved by the Court on October 29, 2008.

More importantly, it is clear from the factual allegations on this motion that – in just the 2008 election – the number of voters who were deprived of their votes or unlawfully stricken from the voter rolls is far higher, likely in the thousands or tens of thousands.  And these estimates are based on data relating only to voters who were purged in the months prior to the 2008 federal elections and all voters cancelled as a result of the so-called 20-day rule. Defendants' unlawful conduct began long before the recent election cycle, is ongoing, and includes several violations in addition to the 20-day rule.

As discussed below, Plaintiffs have asserted facts and supplied evidence sufficient to show Article III standing to sue in their own right and on behalf of their members. Likewise, Plaintiffs have alleged facts sufficient to state a cognizable claim for relief as to the counts of their Amended Complaint.[1]  Accordingly, Defendant's Motion to Dismiss pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure should be denied.

## ARGUMENT

I.   **STANDARD OF REVIEW.**

Defendant moves to dismiss Plaintiffs' Amended Complaint both for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for lack of standing under Fed. R. Civ. P. 12(b)(1). When reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).  The complaint need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the alleged facts "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).[2]

---

[1] Plaintiffs intend to file forthwith a voluntary dismissal of their Fifth Cause of Action, which relates to the cancellation of voter registration records of individuals convicted of felonies or under supervision by the Department of Corrections.

[2]   Notwithstanding Defendant's attempt to portray them as fundamentally changing the standard applicable on a motion to dismiss, *Twombly* and *Iqbal* do not discard "the bedrock principle that a judge ruling on a motion to dismiss must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven." *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. Okla. 2008).

Likewise, "[a] facial attack on the complaint's allegations regarding subject matter jurisdiction [under Rule 12(b)(1)] questions the complaint's sufficiency and requires the court to accept the allegations as true." *Smith v. United States*, 561 F.3d 1090, 1097-1098 (10th Cir. 2009) (citing *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005)); *see Riggs v. City of Albuquerque*, 916 F.2d 582, 584 (10th Cir. 1990) (when reviewing a motion to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(1), "courts treat all material allegations in the complaint as true and construe the complaint in favor of the plaintiff.").[3]

## II.   STANDING.

### A.   *Factual Background.*

#### 1.   The Unlawful Conduct Challenged In This Action Required Plaintiffs To Divert Resources From Other Planned Activities.

##### a.   *Common Cause.*

Plaintiff Common Cause of Colorado ("Common Cause") has approximately 2,000 dues-paying members and 4,000 online members within the state of Colorado, many of whom are registered to vote and regularly vote in Colorado.  Supplemental Declaration of Jennifer Flanagan, July 15, 2009 ("Flanagan Supp. Decl."), ¶ 2.  As of March 2009, Common Cause has employed two full-time individuals and one part-time legal intern.  *Id.* ¶ 3.  During the fall of 2008, Common Cause employed five individuals and two legal interns.  *Id.*

---

[3]   Here, although Defendant makes numerous unsupported factual assertions in his challenge to Plaintiffs' standing, his motion to dismiss challenges the legal sufficiency of the Amended Complaint's allegations and not their veracity.  Thus, his 12(b)(1) motion constitutes a facial attack on the complaint's jurisdictional allegations, and the court should accept the allegations of the complaint as true.  *Smith*, 561 F.3d at 1097-1098.  Nevertheless, in an abundance of caution, Plaintiffs have provided declarations and other evidence in support of their allegations as to standing.

After the *New York Times* publicized the voter purges challenged in this litigation, Common Cause devoted substantial resources to counteracting Defendant's unlawful conduct.  For example, Common Cause's offices were flooded with calls from members concerned about the purges and their own registration status.  *Id.* ¶¶ 14-15.  Common Cause also worked on purge-related issues with members of Just Vote Colorado, a coalition supervised by Common Cause devoted to voter support and election monitoring in Colorado. *Id.* ¶¶ 12-13, 18-20.  But for Defendant's unlawful voter purges, the staff time devoted to this work would have been available for other important election reform activities on Common Cause's agenda for 2008, such as addressing the technical operation of SCORE, educating voters about where to drop off mail-in ballots (a subject of substantial confusion), and making the voter protection hotline more effective and useful to voters.  *Id.* ¶¶ 40-43.  The resources devoted to responding to calls from members, briefing the members of the Just Vote Colorado coalition, and taking other actions to respond to the purges of voters were devoted to Plaintiffs' broader voter protection and education efforts—not to preparing this litigation.  *Id.*¶¶ 15, 17, 19-20, 22.

Similarly, in January of 2009, the Secretary of State introduced and lobbied for a bill that would provide for the cancellation of millions of allegedly duplicate registration records by merging them into certain existing registration records.  *Id.* ¶ 27.  Common Cause devoted considerable time and resources to opposing the passage of the bill, arguing that the inadequate protections for voters in the bill would likely violate the NVRA, lobbying legislators and the governor of Colorado, and putting forth amendments to this bill that would provide adequate protections to voters.  *Id.* ¶¶ 28-32.  But for Defendant's efforts to pass this legislative initiative and many other statutory and regulatory initiatives which Common

Cause believes violate the NVRA, Common Cause would have devoted these resources to other important election issues on its agenda. *Id.* ¶¶ 33-40, 44-46.

        b.    *SEIU.*

SEIU is a labor union representing employees working in the fields of healthcare, property services and the public sector. Declaration of Steven K. Ury, Oct. 23, 2008 ("Ury Decl."), Ex. B to Declaration of S. Gale Dick, July 15, 2009 ("Dick Decl."), ¶ 3. SEIU has several locals in Colorado and approximately 10,000 members across the state, including many who are registered to vote or who have sought to register to vote in Colorado. *Id.* ¶ 5.

Voter protection, education and registration are integral SEIU organizational goals and activities, and SEIU has devoted significant time, energy and resources to these activities in Colorado, including by registering substantial numbers of new Colorado voters. *Id.* ¶¶ 3, 4, 6.

In the fall of 2008, SEIU staff member Laurel Webb went to Colorado to assist in SEIU's election-day voter support, turnout, and education efforts. Supplemental Declaration of Laurel Webb, July 14, 2009 ("Webb Supp. Decl."), ¶ 3. Instead, Webb spent substantial time addressing concerns related to Defendant's voter purges, including handling calls to the Just Vote Coalition's Voter Protection Hotline from individual voters concerned about their registration status. *Id.* ¶ 5; *see also* Supplemental Declaration of Steven K. Ury, July 14, 2009 ("Ury Supp. Decl."), ¶ 4. These resources were diverted from other voter protection and education efforts SEIU had planned for the period leading up to 2008 election, which are detailed in ¶ 6 of Webb's supplemental declaration. Webb Supp. Decl. ¶ 6; Ury Supp. Decl. ¶ 4. The time and resources devoted to responding to voter calls related to Defendant's conduct were unanticipated, were not expended in preparation for this litigation, and continued after this action was initiated. Webb Supp. Decl. ¶¶ 7; Ury Supp. Decl. ¶ 5.

c.   *Mi Familia Vota.*

Plaintiff Mi Familia Vota is a non-partisan civic engagement organization working with Latino and immigrant families to bring positive change to their communities and improve their lives.  Declaration of Grace Lopez, Oct. 23, 2008, ("Lopez Decl."), Ex. C to Dick Decl., ¶ 3.  Part of Mi Familia Vota's mission is to empower members of the Latino and immigrant communities by registering eligible citizens to vote, educating voters about their rights, and encouraging registered voters to participate in the electoral system.  Lopez Decl. ¶¶ 3-4; Supplemental Declaration of Grace Lopez, July 13, 2009 ("Lopez Supp. Decl."), ¶ 2.

In advance of the November 4, 2008 election, Mi Familia Vota expended significant resources and staff time on voter registration activities, registering approximately 2,500 persons.  Lopez Supp. Decl. ¶ 3.  Mi Familia Vota has continued to be engaged in voter registration efforts since the 2008 election.  *Id.* ¶ 6; Declaration of Jessie Ulibarri, July 13, 2009 ("Ulibarri Decl."), ¶ 3.  In the fall of 2008, Mi Familia Vota devoted resources to addressing issues related to Defendant's purges, including responding to inquiries from members of the Latino and immigrant community concerned about their registration status. Lopez Supp. Decl. ¶ 4.  The devotion of resources was over and above any resources expended in pursuit of this litigation and continued after the Complaint was filed in this action.  *Id.* ¶¶ 4-5.  Mi Familia Vota has limited resources and has been required by Defendant's conduct to divert such scarce resources from its planned voter registration and education efforts.  Lopez Decl. ¶ 9.

2.   <u>Members Of SEIU And Common Cause Were Purged From The Colorado Voter Registration List.</u>

In November 2008, Plaintiffs gained access to several lists created by Defendant's office identifying voters whose registrations had been cancelled by Defendant (the "Purge

Lists"):  One list included the names of voters purged by operation of the 20-day rule; a second included the names of all voters whose records were cancelled from May 14, 2008 through November 4, 2008;[4] and a third contained the names of voters whose records were cancelled from August 2007 through September 2008.  Flanagan Supp. Decl. ¶ 48; Declaration of Andrew Supe, July 14, 2009 ("Supe Decl."), ¶ 3, 6.

SEIU compared the Purge Lists with SEIU's own databases to identify any voters who both (a) were purged by the 20-day rule or within 90 days of a federal election and (b) were members of SEIU, state employees represented by SEIU, or registered to vote through any of SEIU's voter registration drives.  Supe Decl. ¶¶ 4, 6.  This analysis showed that 11 members of SEIU, 20 state employees represented by SEIU, and 15 individuals registered by SEIU during its voter registration drive were removed from the lists of eligible voters within 90 days of the 2008 federal primary or general election.  *Id*. ¶¶ 5, 7-8.  Common Cause also compared its membership lists and the Purge Lists, and determined that 67 of the cancelled records listed a name and address that matched the name and address of a Common Cause member, and of those, eleven listed a matching phone number.  *See* Flanagan Supp. Decl. ¶¶ 49-56.  Common Cause has subsequently begun contacting these members to confirm these matches correspond to the same individual, and to further determine the nature and extent of the burden that having their registration record cancelled placed on them.  *Id.*¶ 52.  These efforts, like discovery in this matter, are ongoing, but to date, Common Cause can confirm that at least 6 Common Cause members have had their registration records cancelled.  *Id.*

Most of Defendant's unlawful purge practices began well before the period covered by the Purge Lists, and have continued since that period ended, and so it is likely that even

---

[4]   These dates encompass the 90 day periods preceding Colorado's August 12, 2008 general primary election and November 4, 2008 Presidential Election.

more SEIU and Common Cause members have been unlawfully purged from the rolls than have so far been identified.  The Amended Complaint asserts claims related to the purges conducted outside the period covered by the Purge Lists as well those carried out within it, but Plaintiffs do not yet have data regarding these purges.

>    **B.**    ***Plaintiffs' Allegations Establish Standing To Seek The Relief Requested In The Amended Complaint.***

The Amended Complaint alleges that the Secretary's unlawful actions have injured Plaintiffs and their members by making their voter registration efforts less effective and more expensive, by causing them to divert resources from other activities to addressing and counteracting Defendant's unlawful purges, and by cancelling SEIU's and Common Cause's members' voter registration records from the Colorado voter registration database.  These allegations show a sufficiently concrete injury to Plaintiff organizations themselves and to their members to meet Plaintiffs' burden to establish standing under the liberal standard applicable at this stage of the proceedings.

Moreover, Plaintiffs have already produced significant evidence to Defendant demonstrating their standing, including declarations from each plaintiff organization filed in October 2008 in support of the Motion for Temporary Restraining Order, as well as a declaration from SEIU identifying specific members and persons SEIU registered to vote whose registrations were cancelled pursuant to the challenged policies.  *See* Ury Decl.; Lopez Decl.; Declaration of Laurel Rose Webb, Dec. 3, 2008 ("Webb Decl."), Ex. A to Declaration of Jessie Allen, July 14, 2009 ("Allen Decl."); Declaration of Jennifer Flanagan, Oct. 24, 2008 ("Flanagan Decl."), Ex. A to Dick Decl.; Allen Decl. ¶¶ 3-5.  This information goes beyond the allegations in the Amended Complaint, and, along with the affidavits filed in

support of this Opposition, establishes Plaintiffs' standing to assert each of the causes of action in this case.

In order to establish standing to sue, a plaintiff must show (i) that it has suffered "injury in fact;" (ii) that the injury is traceable to the actions of the defendant; and (iii) that the requested relief will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[E]ach element [of the standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotations marks and citation omitted); *accord Glover River Org. v. U.S. Dep't of Interior*, 675 F.2d 251, 254 n.3 (10th Cir. 1982) ("In cases reviewing the grant or denial of a motion to dismiss for lack of standing, it is sufficient for standing purposes that the plaintiff merely allege a concrete injury.").

All three plaintiff organizations have alleged, and have provided evidence to show, that they have diverted some of their limited resources to counteracting the challenged practices. In addition, SEIU and Mi Familia Vota have alleged and offered evidence establishing that their voter registration efforts have been harmed and that persons they have registered to vote have been and/or may in the future be unlawfully purged from Colorado's voter registration rolls, while SEIU and Common Cause have alleged and submitted evidence showing that their members have been harmed by being subjected to Defendant's unlawful policies and by being purged from the voting roles. As explained below, these allegations and evidence are sufficient to establish all three organizations' standing to assert the claims in

the Amended Complaint in their own right and for Common Cause and SEIU to assert the

claims as associations on behalf of their members.[5]

Accordingly, Defendant's 12(b)(1) motion to dismiss on standing grounds must be

denied.

      1.    <u>Plaintiffs Have Organizational Standing To Assert The Claims On Their Own Behalf.</u>

The Supreme Court has "recognized that organizations are entitled to sue on their own

behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

n. 19 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Where the defendant's

"practices have perceptibly impaired [the organizational plaintiff's] ability to provide [the

services it was formed to provide] . . . there can be no question that the organization has

suffered injury in fact." *Havens*, 455 U.S. at 379. In order to satisfy this standard, an

organization must point to a "concrete and demonstrable injury to [its] activities." *Id.*

There are two ways an organization can demonstrate a concrete injury to its activities

for standing purposes. First, it can show that the defendant's conduct has made it more

burdensome for the organization to carry out its activities. *See Metropolitan Wash. Airports*

*Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 265 (1991) ("*CAAN*")

(organization has standing where challenged statute makes it more difficult for it to achieve

its goal of reducing noise at National Airport in Washington). Second, it can show that it

"devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty.*

*Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) (citing *Havens*).

Plaintiffs have sufficiently alleged both forms of injury.

---

[5]    Plaintiff Mi Familia Vota is not a membership organization and does not assert associational standing on behalf of its members.

a.      *Defendant's Voter Purges Frustrated Mi Familia Vota And SEIU's Voter Registration Drives, Inflicting Concrete Injury.*

An organization has standing to sue on its own behalf where the defendant's conduct has made it more difficult for the organization to achieve its goals, *CAAN*, 501 U.S. at 265, including non-economic goals such as political advocacy and encouraging political participation.  *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990) (finding injury to organization's interest in encouraging open housing sufficient to create standing). In one recent case involving claims closely similar to those asserted here, the court found that a voting rights organization could show injury in fact if its expenditures of time and money on voter registration drives "have been rendered a waste in any significant measure because the voters they registered at those drives were unlawfully taken off the rolls."  *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 934 (E.D. Mich. 2008), *aff'd*, 546 F.3d 373 (6th Cir. 2008) ("*Land*").

Plaintiffs' Amended Complaint plainly alleges a sufficient injury of this sort. Plaintiffs allege that Defendant's actions have injured SEIU and Mi Familia Vota by causing voters they registered to be improperly purged from the rolls.  Amended Complaint ("Am. Compl.") ¶¶ 11, 13.  Plaintiffs further allege that Defendant's ongoing purge of eligible voters will continue to impair SEIU's and Mi Familia Vota's voter registration efforts.  *Id.*[6] SEIU also has submitted (and long ago provided to Defendant) evidence of fifteen individual voters registered by SEIU whose registrations were cancelled pursuant to the challenged

---

[6]     These allegations are amplified in the declarations of Steven K. Ury and Grace Lopez filed in support of Plaintiffs' Application for Temporary Restraining Order in October 2008, which Defendant neglects to mention in his motion to dismiss.  *See* Lopez Decl. ¶¶ 7; Ury Decl. ¶¶ 8.

policies. *See* Webb Decl. ¶¶ 5-6.[7] Such a "concrete and demonstrable injury to [their] activities" is sufficient to establish SEIU's and Mi Familia Vota's standing to assert the claims in this case. *Havens*, 455 U.S. at 379.

> b. *Defendant's Purges Forced All Three Plaintiffs To Divert Resources To Counteract Them, Conferring Concrete Injury.*

"[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009), *cert. denied*, 174 L. Ed. 2d 271 (June 8, 2009) (internal citations and quotations marks omitted). The plaintiff in *Common Cause/Georgia* had standing where it would have had to divert resources to assist voters in complying with the challenged voting requirements. *Id*. Similarly, in *Crawford v. Marion County Election Board*, the Supreme Court affirmed the Seventh Circuit's standing analysis, which held that the Democratic Party would sustain injury in fact by being compelled "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the [challenged] law from bothering to vote." 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1610, 1615 n.7 (2008).[8] This rule has been embraced by every circuit to address the issue, including the Fifth Circuit in the case on which Defendant relies most heavily. See *Fowler*, 178 F.3d at 360 (organization has

---

[7] Mi Familia Vota does not maintain complete records of the persons it registered, and therefore these records, which are kept by Defendant, must be obtained through the discovery process. *See* Ulibarri Decl. ¶ 2. Once Defendant provides this information, Mi Familia Vota will be able to carry out the detailed matching necessary to identify the specific voters it registered who were purged from the voting rolls.

[8] Both the lead opinion in *Crawford*, signed by a three justice plurality, and Justice Souter's dissent, signed by two justices, or a total of five justices, expressly affirm the court of appeals' standing analysis. 128 S. Ct. at 1615 n.7, 1627 n.2. In addition, insofar as Justice Scalia's concurrence and Justice Breyer's dissent address the claims on the merits, they implicitly affirm the Seventh Circuit's holding that standing existed.

standing in its own right if it can show "a 'drain on its resources' resulting from counteracting the effects of the purportedly" unlawful conduct); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (organization had standing where it devoted resources to investigating the defendants' allegedly unlawful practices); *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1992) ("The allegation that the EOIR's policy . . . requires the [plaintiff] organizations to expend resources in representing clients they otherwise would spend in other ways is enough to establish standing."); *Spann*, 899 F.2d at 27-29 (organization had standing where it devoted resources to educate black home buyers and renters who were steered away from real estate opportunities); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination."); *Pacific Legal Found. v. Goyan*, 664 F.2d 1221, 1224 (4th Cir. 1981) (organization alleged sufficient injury due to increased time and expense necessary for it to monitor FDA activities under new agency regulation).

All three Plaintiffs in this case have alleged that they have diverted and continue to divert limited resources to counteracting Defendant's unlawful purges, resources which would otherwise have been used for other purposes.  Am. Compl. ¶¶ 8, 11, 13.  Plaintiffs also have submitted affidavits describing the activities to which they have been forced to divert resources, as described above.  These allegations and the evidence submitted with this opposition go well beyond asserting simple harm to Plaintiffs' abstract organizational interests and goals; they establish a concrete impairment of Plaintiffs' ability to carry out specific activities and show harm to the organizations themselves, and are sufficient to overcome Defendant's motion to dismiss on standing grounds.

c.      *Defendant Misapplies ACORN v. Fowler.*

Defendant relies on the Fifth Circuit's *Fowler* decision to argue that the diversions of resources suffered by Plaintiffs are "exclusively and directly related to this litigation" and as such are insufficient to support standing.  Def. Br. at 15-16.  However, Defendant misconstrues *Fowler* and misreads the Amended Complaint.

*Fowler* arose on a summary judgment motion, not a motion to dismiss, a fact the *Fowler* court expressly noted distinguished the case from *Havens*.  178 F.3d at 357.  The court specifically noted that at the pleading stage, in contrast to the summary judgment stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" and courts must "presume that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* (citations and internal quotation marks omitted).[9]  Defendant wholly ignores this standard of review, and instead asks the Court to draw inferences in its favor, based on unspecified and irrelevant "appearances at the preliminary injunction hearing," that the Plaintiffs' efforts in opposing his unlawful practices relate exclusively to this litigation.

When viewed under the proper standard, Plaintiffs' allegations satisfy the organizational standing test set forth in *Fowler*.  Unlike in *Fowler*, the Amended Complaint

---

[9]     Furthermore, Plaintiffs have not yet had access to significant information they have requested in discovery that is pertinent to determining the extent of their injuries, notwithstanding Defendant's contrary insinuation in his portrayal of the limited data he has provided thus far.  While the parties have engaged in an informal exchange of information that has been very useful, this process has focused solely on Defendant's procedures.  It has not addressed in the least the actual effect of these procedures on voters and their rights.  Under the current stipulated schedule, the parties will not respond to formal discovery on these issues until August 4, 2009.  Plaintiffs, therefore, have insufficient information available to determine the nature and extent of the injuries sustained by Plaintiffs and their members as a result of the unlawful cancellations, and it would be premature at this stage in the proceedings for the Court to evaluate those injuries.

here does not allege, and no evidence establishes, that the resources Plaintiffs dedicated to countering Defendant's unlawful practices were diverted exclusively into this litigation. Under the Fifth Circuit's own reasoning, this alone distinguishes this case from the very different burdens and evidentiary record upon which *Fowler* was based.  In addition, the evidence submitted by Plaintiffs makes clear that they were forced to expend resources on non-litigation activities in response to Defendant's unlawful conduct.  *See* Flanagan Supp. Decl. ¶ 39-42; Webb Supp. Decl. ¶¶ 3-8; Ury Supp. Decl. ¶ 4-5; Lopez Supp. Decl. ¶ 4-5; Lopez Decl. ¶ 9.  The Amended Complaint also specifically alleges, and the evidence in record shows that the resources devoted to counteracting the Secretary's purges would otherwise have been used for other organizational purposes.  Am. Compl. ¶¶ 8, 11, 13; Flanagan Supp. Decl. ¶ 39-43; Webb Supp. Decl. ¶¶ 3-8; Ury Supp. Decl. ¶ 4-5.  These allegations and evidence are sufficient to establish standing under *Fowler*'s reasoning.

Defendant asserts that these diversions of resources are not "state[d] with any specificity."  Def. Br. at 14-15.  At the pleading stage, however, no such specificity is required.  Fed. R. Civ. P. 8(a)(2).  Likewise, the Secretary's argument that "Plaintiffs fail to allege that such actions [to which resources were diverted] were unrelated to . . . this lawsuit" (Def. Br. at 14-15), cannot serve as the basis for a motion to dismiss.  *See Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007) ("Any decision declaring 'this complaint is deficient because it does not allege X' is a candidate for summary reversal, unless X is on the list in Fed. R. Civ. P. 9(b)." (internal quotation marks omitted)).

Accordingly, all three plaintiff organizations have standing in their own right to bring the claims asserted in this case and to seek the requested relief.

2.      Plaintiffs Common Cause And SEIU Have Associational Standing To Bring The Claims On Behalf Of Their Members.[10]

An association has standing to bring suit on behalf of its members when (i) "its members would otherwise have standing to sue in their own right," (ii) the interests it seeks to protect are "germane to the organization's purposes," and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342-43 (1977), *abrogated by statute*, The Worker Adjustment and Retraining Notification Act, 102 Stat. 890, 29 U.S.C. § 2101 *et seq*.

Plaintiffs SEIU and Common Cause meet all three of these requirements.  Both associations have alleged that some of their members have been unlawfully purged from the voting rolls or otherwise adversely impacted by Defendant's violations of HAVA and the NVRA, and that their members continue to be subjected to these unlawful policies and face an imminent threat that they will be purged from the voter registration list prior to the next federal election.  Second, both SEIU and Common Cause have alleged that they have an organizational purpose involving voter registration, election monitoring, and increasing political participation.  Finally, the individual participation of an organization's members is "not normally necessary when an association seeks prospective . . . relief for its members."  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996).

---

[10]   Plaintiffs do not assert third-party standing in this case, and Defendant's argument on this point is therefore misplaced.

      a.    *Plaintiffs' Allegations And Evidence Of Injury To Their Members Are Sufficient To Establish Standing.*

Defendant contends that Plaintiffs should have used the Purge Lists to make more specific allegations identifying by name those members whose registration records have been cancelled.  This argument is founded on a gravely incomplete recitation of the factual exchanges between the parties in this case and is wholly unsupported by any legal authority.

Defendant has identified not a single case holding that merely because more specific facts are available, Plaintiffs are required to plead them.  *Twombly* and *Iqbal*, cited by Defendant, do not fundamentally alter the notice pleading standard of the Federal Rules of Civil Procedure and do not impose a heightened pleading requirement that would require the detailed factual allegations Defendant demands.  SEIU's and Common Cause's allegations that their members have been unlawfully purged from Colorado's voter registration list by Defendant and that their members continue to be subject to Defendant's unlawful ongoing violations of the NVRA and HAVA are factual assertions, and even if they are general and stated on information and belief, as Rule 8 allows, they are not legal conclusions as Defendant contends.

Moreover, insofar as Plaintiffs seek to prevent imminent future harm to their members by the ongoing application of the challenged provisions of Colorado law, they need not, indeed cannot, identify in the complaint specific members who will be harmed.  *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).  Nor must Plaintiffs wait until an identified member has been struck from the voting rolls before filing suit.  "In order to satisfy the 'injury in fact' requirement of standing, a plaintiff need not wait for an injury to occur.  An allegation of future injury satisfies this prong of standing so long as the alleged injury is 'imminent' or 'real and immediate.'"  *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) (internal citations omitted).  A future injury is imminent

"when the threatened acts that will cause injury are authorized or part of [a governmental] policy," because "it is significantly more likely that the injury will occur." *Id.* at 1266. Here, as in *Sandusky*, it cannot be known in advance which voters will be impacted by Colorado's ongoing voter registration and list maintenance procedures. *Sandusky*, 387 F.3d at 574 ("[A] voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker . . . .  It is inevitable, however, that there will be such mistakes.").

     *Summers v. Earth Island Institute* does not assist Defendant.  *Summers* dealt with a challenge to U.S. Forest Service regulations exempting certain Forest Service projects from the notice and comment procedures required under federal statute.  Observing that members of the plaintiff organizations were "not [themselves] the object of the government action or inaction," the Court held that plaintiffs must identify a member threatened with concrete harm by the failure to provide notice and comment.  129 S. Ct. 1142, 1149 (2009) (quoting *Defenders of Wildlife*, 504 U.S. at 562).  The Court then concluded that because the plaintiffs had "identified no other application of the [challenged] regulations that threatens imminent and concrete harm to the interests of their members," they lacked standing.  129 S. Ct. at 1150.  *Summers* is inapplicable to the present litigation for three reasons.  First, in contrast to *Summers*, here, Plaintiffs' members are directly impacted by the challenged provisions of Colorado's voter registration law.  For example, every member of SEIU or Common Cause who registers to vote in Colorado will be sent a non-forwardable registration card under the 20-day rule in violation of the NVRA, and any member could have her registration improperly identified as a duplicate.  Second, here, unlike in *Summers*, Defendant acknowledges that it continues to apply some of the challenged regulations on a daily basis, such as the 20-day rule, and that it has every intention of applying others, such as the 90-day

cancellations, during the next federal election cycle.  Finally, there can be no question here that Defendant's actions have impacted identifiable members of SEIU and Common Cause. As explained below, SEIU long ago provided Defendant with a list of members whose voter registration records were in fact improperly cancelled under the challenged regulations, and Common Cause has submitted with this Opposition a list of members identified to date whose registrations were cancelled prior to the November 2008 election.  Discovery as to voters purged since the election will likely allow Plaintiffs to identify additional members who have been injured by the ongoing NVRA violations.  Thus, the uncertainty that the challenged regulations will be applied in a way that may impact an identifiable member of one of Plaintiff organizations does not exist here as it did in *Summers*.

Moreover, Defendant's argument rests on unsupported factual assertions that would be inadequate on summary judgment, much less a motion to dismiss where Plaintiffs' allegations are what matters.  Not only are Defendant's contentions unsupported, they are based on a highly misleading and incomplete description of the information exchanged by the parties and available to Plaintiffs.  Indeed, as explained below, Defendant's claims of factual deficiency only serve to highlight the need for discovery in this case.

*First*, Plaintiffs have provided evidence identifying specific members who were purged from Colorado's voting roles as a result of Defendant's unlawful practices.  Although Defendant makes much of the assertion that Plaintiffs have had access to the Purge Lists since November 2008, he neglects to mention that SEIU, on December 3, 2008, provided him with a declaration identifying eleven SEIU members and fifteen persons registered by SEIU who were on the list of purged voters provided by Defendant.  *See* Webb Decl. ¶¶ 2-7; Allen Decl. ¶¶ 3-5; *see also* Supe Decl. ¶¶ 4-8.  Plaintiff Common Cause similarly confirms that members of Common Cause have had their registration records unlawfully cancelled under

the 20-day rule, as alleged duplicates, or within 90 days of a federal election.  *See* Flanagan

Supp. Decl. ¶¶ 52.

*Second,* the limited information provided by Defendant to date is not sufficient to

allow Plaintiffs to allege additional facts with the specificity Defendant (wrongly) demands.

For example, the Purge Lists only contain the names of voters whose records were unlawfully

cancelled within 90 days of the 2008 federal elections and under the 20-day rule.  They do

not include the names of most voters cancelled before the 90-day periods related to the 2008

elections, or of <u>any</u> names associated with records cancelled since the November election,

including the many thousands of names subject to the merge process.  The Amended

Complaint alleges that these purges, as well as those documented in the Purge Lists, violate

the NVRA, and until Plaintiffs gain access to the names of the affected voters, they cannot

determine whether their members were among them.

*Third,* the limited information provided by Defendant does not allow Plaintiffs to

determine the nature and extent of the injuries sustained even by individuals whose names

appear on the Purge Lists.  According to Defendant, of the 46,069 voters whose names

appeared on the Purge Lists, 8,470 cast ballots in the 2008 Presidential Election, and of those,

570 were forced to vote a provisional ballot while 7,633 voted a regular ballot.[11]  Defendant

further asserts that 108 of the 570 provisional ballots were rejected by the county clerks, that

Defendant reversed all but 45 of those rejections under the procedures established by the

Preliminary Injunction, and that Plaintiffs agreed with all but three of those rejections.

Defendant contends that these numbers show that there has been no real injury here.  These

unsupported factual assertions have no place in this motion to dismiss.  Moreover, and no

---

[11]    Defendant offers no account of the other 267 voters whose names appeared on the Purge
     Lists and whom it contends successfully cast a ballot.

discovery has been conducted regarding these voters.  Plaintiffs thus cannot yet determine if any of their members or any persons they registered to vote were among these voters or whether these voters experienced any difficulties in casting their ballots as a result of being purged, regardless of whether they were ultimately able to cast a ballot.

Moreover, Defendant makes the unwarranted inference that all 37,599 voters who appeared on the purge list and did not cast a ballot merely chose not to vote or were properly removed from the rolls rather than having been effectively disenfranchised by Defendant's conduct.  This factual inference in Defendant's favor must be rejected on a motion to dismiss, or, at the very least, the court must permit jurisdictional discovery to determine whether these individuals attempted to vote, what their voting experiences were, and whether any of Plaintiffs' members were among them.

Thus, even if Defendant had bothered to submit evidence to support his factual claims, a complete record would show that, as Plaintiffs alleged in their Amended Complaint, identifiable individual members have been subjected to Defendant's unlawful policies and have been purged from the registration list as a result.

        b.    *The Alleged Burden On The Right To Vote Is Sufficient Injury To Establish Standing.*

Defendant next asserts that only where an individual is actually prevented from voting has she incurred a cognizable injury sufficient to establish standing.  Defendant cites no law in support of this assertion, and similar arguments have been rejected in other courts.  For example, in *Common Cause/Georgia*, the Eleventh Circuit found that the alleged burden on the right to vote posed by the requirement that an individual plaintiff secure or even produce at the polls an acceptable form of identification was sufficient for standing purposes.  554 F.3d at 1351-1352; *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (poll tax infringes voting rights "whether the citizen . . . has $1.50 in his pocket or nothing at

all, pays the fee or fails to pay it"); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) (noting "a plaintiff need not have the franchise wholly denied to suffer injury" for standing purposes). "The slightness of their burden also is not dispositive . . . a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Common Cause/Georgia*, 554 F.3d at 1352 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). "Moreover, where an alleged injury is to a statutory right, standing exists 'even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.'" *Cox*, 408 F.3d at 1352 (quoting *Warth*, 422 U.S.at 514).

In this case, Plaintiffs have alleged that Defendant unlawfully purged voters, including members of SEIU and Common Cause, from Colorado's voting rolls and that it continues to carry out such purges in violation of the NVRA and HAVA. Am. Compl. ¶¶ 76, 79-81, 86-89, 92-94, 101. These purges burden these members' right to vote even if they do not ultimately result in disenfranchisement. Once a voter's registration record has been unlawfully purged, her name no longer appears on any poll list either for voting on Election Day at her precinct or voter center or for early voting, and she will no longer receive her mail-in ballot. *See* 8 COLO. CODE REGS. § 1505-1, Rule 2.20.2(b) ("Cancelled status or cancelled record voters'. . . names will not appear on the poll book, they will not be sent a ballot in a mail ballot election and they will not be sent election notice mailings.").

Individuals in these circumstances often have no choice but to vote a provisional ballot. Voting a provisional ballot is a burden on a voter: it takes time and effort, even after which the voter's ballot may not be counted. A voter typically will have to spend considerably more time to cast a provisional ballot than a regular ballot. Voters do not learn that they must cast a provisional ballot until after they have waited in line to cast a regular

ballot; once they discover they have been removed from the registration list and will not be allowed to cast a regular ballot, they must often wait in an additional line if they wish to cast a provisional ballot.  Flanagan Supp. Decl. ¶ 25.  In addition, provisional voters must fill out an extensive form before being allowed to cast a provisional ballot, while regular voters needed only to show identification and sign their name.  *Compare* Colo. Rev. Stat. § 1-8.5-103, 1-7-110; 8 Colo. Code Regs. § 1505-1, Rules 26.5.1 and 26.5.2, *with* Colo. Rev. Stat. § 1-7-110.  Moreover, if a provisional voter does not fill out the provisional ballot affidavit properly, his or her vote will not be counted, an issue not faced by those voting a regular ballot.  Finally, the provisional voter is not provided with any assurance that her vote will be counted, and in many instances, provisional ballots are in fact not counted.  8 Colo. Code Regs. § 1505-1, Rule 26.5.4.

In some circumstances, a voter whose registration record is cancelled may be able vote a regular ballot through emergency registration at the County Clerk's office on Election Day.  *See* Colo. Rev. Stat. § 1-2-217.5.  While this option does allow certain voters to avoid voting a provisional ballot, it creates its own burdens.  To take advantage of this option a voter must travel to the County Clerk's office after having already waited in line to vote at the polling place where she would have been able to vote had she not been purged from the voter rolls.  Beyond the travel time itself, the voter may have to wait in line to register and vote at the County Clerk's office.  On Election Day in 2008, for example, most County Clerk's offices had considerable lines throughout the day.  Flanagan Supp. Decl. ¶ 26.

Thus, the mere fact that members have had or may have their voter registration records cancelled creates a considerable risk that these individuals will have more difficulty voting or may be dissuaded altogether from voting, and thus sustain an injury.  The allegations that members of the Plaintiff organizations had their registration records cancelled

as a result of Defendant's unlawful activity and were injured thereby are sufficient at this stage to establish standing as the Court must accept all factual allegations pled in the Amended Complaint as true.[12]  Even if more were required at this stage of the proceedings, the evidence submitted by Plaintiffs in support of this Opposition establishes injury in fact to members of SEIU and Common Cause.

            c.     *Plaintiffs' Success In Securing Relief Under The Preliminary Injunction Supports A Finding Of Standing.*

Defendant next contends that because the procedures established by the Preliminary Injunction resulted in most, but not all, of the voters who were wrongfully purged as a result of the challenged registration and list maintenance procedures ultimately having their votes counted, no members of Plaintiff organizations could have suffered a cognizable injury.  This argument, at best described as disingenuous, is flawed for several reasons.

While the Secretary of State did eventually count 53 out of the 108 provisional ballots cast by purged voters and rejected by the county clerks, these ballots were only counted because the Secretary conducted a second review of these ballots pursuant to the Preliminary Injunction.  Moreover, the Preliminary Injunction required the county clerks themselves to review the provisional ballots under a heightened standard, presumably resulting in more votes being counted.  In the future, no such heightened standard will apply and no second review of provisional ballots will be conducted and, therefore, there is a threat of harm to

---

[12]    Even if Defendant were correct that Plaintiffs had to show actual disenfranchisement of voters to establish standing, this motion to dismiss should be denied.  As noted, Defendant has conceded that 37,599 voters who appeared on the purge lists provided to Plaintiffs did not vote, and dismissal on standing grounds would be inappropriate before the factual question of whether these individuals were disenfranchised or failed to vote for some other reason (for example, because they could not come to the polls in person and they were unable to vote early or by mail because of their purge, or they were unable to take the additional time to vote at the County Clerks office or by provisional ballot) has been resolved.

individuals purged pursuant to the challenged procedures, including members of SEIU and Common Cause.[13]

That step forward did not remedy the harm caused by Defendant's policies does not deprive Plaintiffs of standing.  Indeed, similar reasoning was rejected by the Eleventh Circuit in *Cox*. 408 F.3d at 1352 n.3.  There, the defendant Secretary of State of Georgia had refused to accept voter registrations submitted by mail by plaintiff organization.  A preliminary injunction issued ordering the registrations to be accepted and processed.  On appeal, the Eleventh Circuit explained that its standing analysis was not affected by the fact that, as a result of the injunction, the plaintiff's registration form had been processed for purposes of the prior election, stating, "Standing . . . is not altered by events unfolding during litigation." *Id*. (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003)).  Here, too, the fact that the Preliminary Injunction resulted in some of the wrongfully purged voters having their provisional ballots counted in an "election[] occurring during this suit's pendency," *Cox*, 408 F.3d at 1352 n.3, does not affect Plaintiffs' standing to challenge the ongoing practices that lead to those wrongful purges in the first instance.

In fact, that the Preliminary Injunction secured by Plaintiffs in this case resulted in nearly every contested vote being counted only heightens, rather than diminishes, the case for standing here.  Indeed, in pressing this argument, Defendant has effectively conceded that a large number of the voters purged from voter registration list as a result of the challenged policies were in fact entitled to vote.  In addition, Defendant's argument presupposes that

---

[13]   Additionally, Defendant's argument ignores the considerable efforts Plaintiffs put into restoring purged voters to the rolls prior to the election.  *See* Flanagan Supp. Decl. ¶¶ 18-22; Lopez Supp. Decl. ¶¶ 4-5.  In addition to showing that Plaintiffs diverted resources to correct Defendant's unlawful purges, these efforts likely reduced the number of provisional ballots cast, further undermining Defendant's assertion that "the system worked."

Plaintiffs satisfy the redressibility prong of the standing analysis:  Insofar as he argues that the Preliminary Injunction procedures averted the disenfranchisement of many erroneously purged voters, Defendant acknowledges that the harm threatened by the purges can be redressed by the relief sought in this case, namely restoring those voters to the voting rolls and enjoining further application of the unlawful policies.

> d.    *Protecting Their Members' Voting Rights Is Germane To The Organizational Purposes Of SEIU And Common Cause.*

Finally, Defendant contends that voting rights are insufficiently germane to SEIU's and Common Cause's organizational purposes to satisfy the second prong of the *Hunt* test. Defendant's unreasonably stringent reading of the "germaneness" prong of the associational standing test has been rejected by every court to address the issue.  Thus, in *National Lime Association v. EPA*, the D.C. Circuit held that the "requirement of germaneness is 'undemanding'; 'mere pertinence between litigation subject and organizational purpose' is sufficient."  233 F.3d 625, 636 (D.C. Cir. 2000) (quoting *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)).

More recently, the Second Circuit, in *Building & Construction Trades Council of Buffalo v. Downtown Development, Inc.*, held with respect to the germaneness test that "[t]he proper inquiry at the pleading stage is . . . a limited one."  448 F.3d 138, 149 (2d Cir. 2006). Finding it "significant that the *Hunt* Court used the word 'germane,' rather than the phrase 'at the core of,' or 'central to,' or some word or phrase indicating the need for a closer nexus between the interests sought to be protected by the suit in question and the organization's dominant purpose," the court rejected the defendant's argument that the organization must be established "for the purpose of" vindicating the rights at issue.  *Id.* at 148.  The court concluded, "[a] court must determine whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in

joining the association."  *Id.* at 149 (citing *Humane Society*, 840 F.2d at 56).  On the basis of this rule, the court found that the plaintiff trade union had standing to pursue claims under a number of federal environmental statutes.[14]  *Id.* at 150.

Here, the allegations in the Amended Complaint easily satisfy this test.  The Amended Complaint alleges that SEIU is committed to ensuring that "every eligible SEIU member . . . has the right to vote and the opportunity to exercise that right" and cites SEIU's 2008 Constitution and Bylaws, which establish that one of SEIU's purposes is to "build political power" to ensure its members interests are represented "at every level of government."  Am. Compl. ¶ 12.  Ensuring that its members voting rights are not infringed is "germane" to this purpose.  Likewise, the Amended Complaint alleges that Common Cause has as its purpose "to strengthen public participation . . . in our institutions of self-government" and "to promote fair elections," purposes to which protecting the voting rights of its members are much more than merely germane.  Beyond the allegations of the Amended Complaint, the declarations submitted by SEIU and Common Cause further explain how the rights at issue in this case are germane to their organizational purposes.  *See* Ury Decl. ¶¶ 2-6; Flanagan Decl. ¶¶ 2-4.

For the foregoing reasons, this Court should find that all three Plaintiffs have standing in their own right to bring the claims asserted in this case and that SEIU and Common Cause have associational standing on behalf of their members.[15]

---

[14] *Northeast Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999 (6th Cir. 2006), the sole case relied on by Defendant, provides no support for the argument that Plaintiffs' organizational purposes must "specifically" encompass "voter registration activities."  Def. Br. at 12-13.  Contrary to Defendant's suggestion, *Blackwell* required no such exact overlap between an organization's purpose and the interests at stake in the litigation.  Rather, *Blackwell* held that the plaintiff organizations could not establish associational standing because they had not alleged any injury to their members.  467 F.3d at 1010.  Its passing suggestion that there were "substantial questions" about whether the plaintiffs had satisfied the germaneness prong of the standing test was based on the vagueness of the plaintiffs' allegations regarding their organizational purposes.  *Id.*

III.   **THE AMENDED COMPLAINT STATES A CLAIM FOR RELIEF
SUFFICIENT TO WITHSTAND THE MOTION TO DISMISS.**

Plaintiffs' Amended Complaint alleges causes of action arising under the Help

America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA").  HAVA

and the NVRA operate in tandem to ensure that all state programs aimed at maintaining

accurate and current voter registration lists include adequate safeguards against erroneous

disenfranchisement of eligible registered voters.  Defendants argue that the NVRA and

HAVA require all of the laws and procedures challenged in this action.  Def. Br. at 17-18.  As

argued more fully below, far from permitting each of the challenged procedures, the NVRA

and HAVA squarely prohibit all of them.  As a general matter, Defendant's effort to portray

the NVRA and HAVA as a series of permissions and mandates for purging the voter rolls is

fundamentally wrong.  The NVRA was enacted in recognition of the fact that the franchise is

a fundamental right; that "the duty of the Federal, State and local governments is to promote

the exercise of that right"; and that "discriminatory and unfair registration laws and

procedures can have a direct and damaging effect" on that right.  42 U.S.C. § 1973gg(a).  To

be sure, the statute requires list maintenance and allows states to remove the names of voters

who are ineligible or who have changed residences.  But these provisions are specific and

carefully circumscribed by the NVRA's unambiguous prohibitions on certain practices,

including those challenged in this action.

HAVA explicitly leaves the NVRA's protections in place.  It is true that HAVA

requires states to create computerized voter databases and to conduct certain list maintenance

procedures relating to those databases.  *See* 42 U.S.C. § 15483(a).  But HAVA explicitly

---

[15]   Of course, the Court need only find that one Plaintiff has standing for the case to
proceed.  "Only injunctive relief is sought, and for that only one plaintiff with standing is
required."  *Crawford*, 472 F.3d at 951.

provides that removal of any names from the rolls "shall be in accordance with the provisions of the [NVRA]."  42 U.S.C. § 15483(a)(2)(A)(i).  Far from weakening the NVRA's restrictions or giving states additional latitude to cancel the eligibility status of registered voters, HAVA reiterates the NVRA's overriding mandate for voter protection.  In addition, HAVA imposes a new requirement of its own, requiring states to impose safeguards "to ensure that eligible voters are not removed in error from the official list of eligible votes."  *Id.* § 15483(a)(4)(B).  In sum, HAVA and the NVRA in no way contradict one another; instead, they are mutually reinforcing.

A.   ***20-Day Rule:  Plaintiff's Amended Complaint States A Viable Claim That Colorado's "20-Day Rule" Violates The NVRA.***

Count I of the Amended Complaint alleges that Colorado's statutory 20-day rule violates Section 8 of the NVRA.  *See* 42 U.S.C. § 1973gg-6; Am. Compl. ¶¶ 15-22, 72-76. The 20-day rule requires election officials to cancel a voter's registration if a disposition notice, which is sent to the voter after his or her registration application is deemed valid and complete, is returned as undeliverable within 20 days after being mailed.  *See* COLO. REV. STAT. § 1-2-509(3) (2008).  The Rule violates Section 8 of the NVRA, which prohibits states from removing registrants from the rolls based on return mail except under very limited conditions, none of which the Rule satisfies.

The only argument offered by Defendant in support of its motion to dismiss this claim is that those affected by the 20-day rule are not "registrants" under Colorado law and are therefore not protected by the NVRA.  This argument is both irrelevant and wrong.  *First,* the question of who qualifies as a "registrant" protected by the NVRA is a question of federal law, not state law.  *Second,* The Amended Complaint alleges, and Colorado law makes clear, that prospective voters are registered and eligible to vote—and therefore that NVRA

protection is triggered—even before the notification letter is mailed pursuant to the challenged statute.  Colorado's 20-day rule, which causes eligible and registered voters to lose their eligibility status, thus violates the NVRA's explicit protections.

1. <u>Colorado's 20-Day Rule Violates The NVRA.</u>

Section 8 of the NVRA sets forth the basic framework for state voter registration for federal office.  Am. Compl. ¶¶ 15-22, 72-76.  Subsection (a) requires states to "insure that any eligible applicant is registered to vote" if a "valid voter registration form" is timely submitted and to send notice to the applicant of the disposition of the application.  42 U.S.C. § 1973gg-6(a)(1)-(2).  Once a valid and timely registration application is received and the disposition notice is sent, the NVRA treats the prospective voter as a "registrant" and explicitly prohibits states from removing the "registrant . . . from the official list of eligible voters" except for narrowly defined reasons and pursuant to specific procedures.  *Id*. § 1973gg-6(a)(3).

Specifically, the NVRA carefully limits the circumstances under which states may change a voter's eligibility status should the state believe the voter does not reside at the address listed in the voter registration application.  In particular, the NVRA prohibits states from removing a registrant from the list of eligible voters based on a change of address unless the registrant (A) has confirmed in writing his or her change of address to a place outside the prior jurisdiction; or (B) has both (1) failed to respond to a <u>forwardable</u> notice <u>and</u> (2) has not appeared to vote in two consecutive general federal elections following that notice. 42 U.S.C. §§ 1973gg-6(d)(1).  This notice and waiting procedure is the <u>only</u> mechanism contemplated by the NVRA for changing a registrant's eligibility status on the basis of returned mail.

Plaintiffs allege that Colorado's 20-day rule violates these provisions of the NVRA by cancelling registrants believed to have changed addresses without affording them the required

statutory protections of the notice and-waiting period provisions.  Colorado law requires county clerks and recorders, upon receipt of a voter registration application, to "verify that the application is complete and accurate."  COLO. REV. STAT. § 1-2-509(2).  Once the clerk and recorder finds that the application was timely submitted and that the applicant meets the eligibility criteria set by Colorado law (*i.e.*, being 18 years of age, a citizen of the United States, and a resident of the jurisdiction for 30 days, *see* COLO. REV. STAT. § 1-2-101), the clerk "notif[ies] the applicant of the registration" by sending a nonforwardable notification letter.  COLO. REV. STAT. § 1-2-509(2).  The clerk also enters the voter's information into the SCORE database and designates the registration record as "Active—20-day."  Am. Compl. ¶ 17.  At that point, a voter is eligible to cast a regular ballot in any election and, therefore, is a "registrant" within the meaning of the NVRA.  Am. Compl. ¶ 16, 19.  The NVRA thereafter prohibits Colorado officials from removing the registrant from the "list of eligible voters" except under specific and narrow circumstances.

Colorado law, however, requires the purging of registrants in violation of the NVRA. Specifically, if the non-forwardable notification letter mailed to a new registrant is returned as undeliverable within 20 days, COLO. REV. STAT. § 1-2-509 provides that the voter "shall not be registered" and the voter's SCORE designation is changed to "C-Canceled" on the grounds of "failed 20-day."  Am. Compl. ¶ 18.  No forwardable notice is sent to the voter, and the voter is purged without waiting two federal elections, in clear violation of Section 8 of the NVRA.

As set forth in the Amended Complaint, at least 1,136 voters were purged from the rolls by operation of the 20-day rule in the months preceding the November 2008 general election.  Am. Compl. ¶ 21.  The practice began long before that period and has continued since then.

2.       Colorado Law Cannot And Does Not Define "Registrant" To
         Circumvent The NVRA's Protections.

Defendant offers only one argument in response to Plaintiffs' 20-day claim.  In rather
circular fashion, Defendant argues that under Colorado's 20-day rule, a voter registration
applicant does not become a "registrant" for purposes of state law until the applicant's
address is actually confirmed by the registrant.  Def. Br. 27-30.  Defendant's interpretation of
the NVRA and the term "registrant" must be rejected because it would effectively allow the
state to circumvent the NVRA's protections and would lead to the absurd result of effectively
allowing unregistered people to cast ballots.

a.       *The Meaning Of "Registrant" Is Governed By Federal Law, Not State
         Law.*

The unstated premise of Defendant's argument is that the State of Colorado is entitled
to define the meaning of "registrant" by way of state law and that only when a person
becomes a "registrant" under state law is he or she entitled to the protections accorded to a
"registrant" under the NVRA.  Defendant cites no authority for his argument—and with good
reason, because this exact argument was recently rejected and repudiated by the only federal
appellate court to have considered the issue thus far.  *See Land*, 546 F.3d at 381-83 (finding
that "state law cannot control the definition of 'registrant,' and holding that Michigan law
providing for cancellation of a voter's registration whenever the voter's original disposition
notice is returned as undeliverable likely violates the NVRA").

In *Land*, as in this case, the State argued that its version of the 20-day rule, which
likewise involved voter ID cards returned as undeliverable, did not violate the NVRA
because under state law the individuals whose registrations were cancelled were not
"registrants":

> Defendants contend that, because the NVRA does not define "registrant,"
> state law must provide the definition.  Defendants also assert that, under

Michigan law, an individual is registered to vote only after he or she has received an original voter ID card.  Defendants argue that an individual whose original voter ID card was returned as undeliverable was never a registrant in Michigan such that the protections of the NVRA apply.

*Id.* at 382.

In rejecting Michigan's argument, the Sixth Circuit concluded that "making the question of who is a 'registrant' a matter of state law would frustrate the NVRA's purpose of regulating state conduct of elections by essentially permitting states to decide when they will be bound by the NVRA's requirements."  *Id.* (citations and internal quotation marks omitted). Rather, whether someone is a "registrant" for purpose of the NVRA is a question of federal law.  *Id.* at 383.  And under federal law, a person becomes a "registrant," entitled to the protections of the NVRA "from the first moment that he or she is actually able to go to the polls and cast a regular ballot . . . regardless of what label state law may attach to that individual."  *Id.* at 383.  A notice of disposition, the court said, merely alerts the individual that the state has made an eligibility determination; it is not an eligibility criterion.  *Id.* at 384.

b.    *The 20-Day Rule Impacts "Registrants" Who Are Fully Entitled To NVRA Protection.*

In this case, Plaintiffs have alleged that, as a practical matter, in Colorado, an individual is able to "appear at the polls and cast a regular ballot" as soon as the non-forwardable notification letter is sent and the registration record is entered into the SCORE database and designated as "Active—20-day."  Am. Compl. ¶¶16-17, 19.  Individuals to whom the notice is mailed are also registered because, before mailing the notification, election officials confirm that the eligibility requirements are met and the application is complete.  Accordingly, under federal law, these individuals are "registrants" whose removal based on the return of their notification letters as undeliverable is prohibited by the NVRA. As was the case in Michigan, the disposition notice that Colorado county officials send

pursuant to COLO. REV. STAT. § 1-2-509(2) merely serves to notify applicants of the eligibility determination that has already been made; such notices are not a part of the eligibility determination.

These allegations must be accepted as true at this stage of the case, and they are fatal to Defendant's motion to dismiss.[16]  If prospective voters are eligible to cast a regular ballot when county officials designate their records as "Active—20-day" and mail the notification letters, they are at that point "registrants" under federal law and, as such, cannot be stricken from the list of eligible voters unless certain conditions are met.  The 20-day rule does not fit within those narrow conditions; it fails to grant the voter the applicable notice and waiting period protections, and Defendant cannot assert otherwise.

Defendant's contention that individuals remain "'applicants' . . .during the 20-day window in which the State awaits confirmation of that applicant's address" (Def. Br. at 30) is inconsistent with their eligibility to vote during that time period.  Under Colorado law, there is functionally no difference, in terms of eligibility to cast a ballot, between voters who are designated as "Active—20-Day" and voters who have already "passed" the 20-day rule or are otherwise fully active and eligible to vote.[17]  Most importantly for purposes of the *Land*

---

[16]    Defendant does not and cannot dispute these allegations.  In fact, Hilary Rudy, a legal analyst for the Secretary of State called by Defendant as a witness at the Preliminary Injunction hearing, testified that a person classified in SCORE as "Active—20-Day" can cast a regular ballot either on Election Day or in early voting.  Prelim. Inj. Hr'g Tr. 75:12-76:12, Oct. 29, 2008.  Defendant's representatives confirmed this during informal discovery meetings with Plaintiffs' counsel.  In the event that Defendant is unwilling to stipulate to these facts, Plaintiffs will obtain these admissions through formal discovery in due course.

[17]    Colorado's administrative rules explicitly provide that where a voter's status designation is "Active," there are "no conditions or restrictions on the voter's eligibility."  8 COLO. CODE REGS. § 1505-1, Rule 2.20.1(a).  The rule regarding "Active" designation was adopted on May 21, 2009, after other revised rules that expressly address aspects of the 20-day rule, yet draws no distinction between categories of "Active" voters.  *See* Colo. Dep't of State, Notice of Adoption (May 21, 2009) available at

analysis, as Plaintiffs allege in the Amended Complaint, all such voters may vote by mail-in ballot, in early voting, or by appearing at the polls on Election Day.  Am. Compl. ¶¶ 16, 19.

Defendant's assertion that such voters are merely "applicants" and do not become "registrants" until they confirm the validity of their address—either by the passage of 20 days without the return of their notification letter or by casting an in person or mail-in ballot—is unsupported by any logic and inconsistent with Colorado elections practices.  Under Colorado law, all eligible voters must, prior to voting, reconfirm their address, whether they cast mail-in ballots or appear to vote in person.  *See* COLO. REV. STAT. § 1-8-114(1) (affirmation required on mail-in ballots); § 1-7-110(1) (affirmation required at the polling place).  There is no exception for prospective voters who have "passed" the 20-day rule, that is, whose notification letters have not been returned as undeliverable within 20 days of mailing.  Contrary to Defendant's contention, therefore, the non-return of the disposition notice under the 20-day rule does not divide mere "applicants" from fully eligible "registrants" who no longer need to confirm their addresses.

Defendant's contrary reading would lead to absurd results.  Defendant asserts persons who "fail" the 20-day rule "never become registered voters," (Def. Br. at 29), but nonetheless, under Colorado law, they may cast ballots and have their votes counted before the 20 day period has passed.  The only reading of the Colorado statute that makes sense is one that is consistent with actual practice and the remainder of the statutory and regulatory

---

http://www.elections.colorado.gov/WWW/default/ Rule%20Making/2009/notice_adoption_election_rules_05_21_09.pdf; Colo. Dep't of State, Notice of Adoption (March 20, 2009) (Am. Compl., Ex. 1).  By contrast, the same sets of rules require varying treatment of different categories of "Inactive" records (e.g., "Inactive—failed to vote," "Inactive – NCOA," and "Inactive – returned mail").  *See* 8 COLO. CODE REGS. § 1505-1, Rule 2.20.

scheme:  A person becomes a registrant when her application is complete, verified, and entered into SCORE.

      B.     ***Plaintiffs Have Stated A Claim That Colorado's Systematic Purges Within 90 Days Of A Federal Election Violate The NVRA.***

Count II of the Amended Complaint alleges that Defendant violated and will continue to violate the NVRA by systematically removing voters from the rolls during the 90-day period preceding federal elections.  As described throughout this brief, the NVRA and HAVA impose a number of limitations upon states' list maintenance processes.  The limitation at issue in this claim is the NVRA rule, often called the "90-day rule," which prohibits states from systematically purging certain voters within 90 days of a federal primary or general election.  See 42 U.S.C. § 1973gg-6(c)(2).

Defendant concedes that tens of thousands of voters were removed from the State's rolls during the 90-day periods prior to the 2008 federal primary and general elections.  Def. Br. at 3.  Defendant defends these cancellations on grounds that are wholly without merit and, in any event, inappropriate at this motion to dismiss stage.

      1.    <u>The NVRA Limits Defendant's Removal of Voters In The 90 Days Before A Federal Election.</u>

The 90-day rule prohibits states from systematically removing certain voters within 90 days of a federal primary or general election.  The rule ensures that states complete specific list maintenance efforts well in advance of any federal election so that a voter has ample opportunity to correct errors made during such efforts before it is too late for the voter to cast a regular ballot.  Specifically, Section 8(c)(2) of the NVRA provides:

> (2)(A)  A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to

systematically remove the names of ineligible voters from the official lists of eligible voters.

(B)   Subparagraph (A) shall not be construed to preclude -

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or

(ii) correction of registration records pursuant to this subchapter.

42 U.S.C. 1973gg-6(c)(2).  The narrowing clause of Paragraph 3(B)(i) refers to removals "at the request of the registrant," removals based on criminal conviction or mental incapacity, and removals by reason of death of the registrant.  *Id.* §§ 1973gg-6(a)(3)(A)-(B), -6(a)(4)(A).Conspicuously absent from the 90-day rule's narrowing clauses is any mention of removals based on changes of address.  Indeed, change of residence is the only removal category recognized by Section 8(a) of the NVRA but <u>not</u> mentioned in the clauses that narrow the 90-day rule.  *Compare* 42 U.S.C. 1973gg-6(c)(2)(B).   The Amended Complaint alleges, and Colorado statutes make clear, that removals based on change of address are part of a systematic removal program.  Colorado's purge program consists of, among other things, identifying (through computerized matching programs and other means) records belonging to voters who might have changed residence; reviewing those records according to various criteria; cancelling some records and, for others, sending out confirmation cards and tracking which ones are returned and whether voters cast ballots in subsequent elections.  Because that procedure is by its nature systematic, states are barred wholesale from cancelling registrations on the grounds that a voter has moved within 90 days of a federal election.[18]

---

[18]   Of course, when an individual voter expressly tells the election office that she has moved, such a removal is not part of the systemic process for removing voters on account of changes of address because such an event is a "confirmation in writing" addressed in an entirely different provision of the NVRA, namely Section 8(d)(1)(A).  42 U.S.C. § 1973gg-6((d)(1)(A).  .

The narrowing provisions to the 90-day rule do permit removal of individuals who requested removal; these provisions also permit the removal of individuals who became ineligible on account of a criminal conviction, mental incapacity or death of the registrant, but only when those events occurred within the 90 days of a federal election. This reading of the statute only makes sense because, when the disqualifying event occurs within 90 days of a federal election, an election official's only opportunity to remove the individual from the rolls occurs within 90 days of an election.

  2.  Defendant Has Admitted That Thousands Of Voter Records Were Removed During The 90 Days Prior To The 2008 Federal Elections.

The allegations in the Amended Complaint amply establish a claim that Defendant violated this provision of the NVRA. As a starting point, Defendant admitted on October 9, 2008, that more than 14,000 voter records had been cancelled since July 21, 2008—removals that fell within 90 days of the 2008 federal primary and general elections. *See* Am. Compl. ¶ 30. Defendant further admitted (and admits again in his motion to dismiss) that more than 38,000 voters were removed between May 13, 2008 and September 25, 2008, also within 90 days of a federal election. *Id.* ¶ 29; Def. Br. at 2. The removals disclosed by Defendant fell into several categories, including "Moved," "Duplicated," "Deceased," "Failed 20-Day," "Felon," and "Inactive."

  3.  Defendant's Purges Included "Systematic" Removals.

Defendant broadly asserts that each of these tens of thousands of cancellations was not "systematic" because they purportedly "involve hands-on, *individualized* review by a human being examining specific voter records in the SCORE system to determine whether a particular record should be cancelled." Def. Br. at 25. (emphasis in original). Defendant does not define "systematic" but apparently interprets the term to mean "without human

involvement."  These mere assertion finds no support in the NVRA.  In the absence of a statutory definition, "systematic" must be given its ordinary meaning:[19] "methodical in procedure or plan."  Merriam-Webster's Collegiate Dictionary 1269 (11th ed. 2003)).  To be "systematic," a removal program need not be fully automated:  it merely needs to be routinized, planned, and methodical, as these removals clearly were.

The Amended Complaint alleges, and Colorado law makes clear, that Colorado's voter cancellation procedures are based on computer database matching programs that periodically and systematically generate lists of records for review and potential removal. *See* Am. Compl. ¶¶ 37a, 37b; COLO. REV. STAT. §§ 1-2-604.  In fact, the Colorado statute in effect during the 2008 election cycles not only called for ongoing, systematic removal programs, but specifically *initiated* additional such programs immediately before elections. COLO. REV. STAT. §§ 1-2-604(2).  Even if "individualized review" were the feature that divided "systematic" from other purges, Defendants' contention that each of the more than 38,000 records removed in the hectic period leading up to the federal elections received individualized review by an election worker is an unsubstantiated (and unlikely) assertion that is not relevant on a motion to dismiss.  At a minimum, discovery is needed to determine what procedures were followed with respect to these voters (and the unknown number of other voters impacted by Defendant's practices before and after the removal of those 38,000 records).

4.   Defendant's Other Defenses Of The 90-Day Removals Are Wholly Without Merit.

---

[19]   *See Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564, 569 (10th Cir. 1996) ("[a] term not defined in a statute must be construed in accordance with its ordinary and natural meaning").

Defendant contends that all removals he admitted conducting within the 90 day period fell within one of the narrowing provisions set forth in section 8(c)(2)(B).  His argument lumps together broad but distinct classes of voters, assumes without basis that certain categories of removal are permitted, and is inconsistent with incontrovertible facts.

*"Moved," "Duplicate," and "Withdrawn" Removals*:  Defendant first asserts that "all 'moved,' 'duplicate' and 'withdrawn' cancellations fall within the 'request of the registrant' exception noted in § 1973gg-6(c)(2)(B)(i)."  Def. Br. at 26.  Elsewhere in his brief, Defendant argues that all voters who change residence and re-register at their new address have thereby "requested" that their old registration record be removed.  As discussed below in Section II.C.2.C, this argument flatly misinterprets the "request of the registrant" exception.  Only one of these categories on its face falls into the "request of the registrant" provision, namely "withdrawn."  *See* infra at pp. 52-54.  *Compare* COLO. REV. STAT. 1-2-601.

In addition, as noted, the removals that most evidently do <u>not</u> fall within the exceptions to the 90-day rule are those based on change of address.  The 90-day rule and the NVRA's other restrictions on removal of voters based on change in residence are two sides of the same coin:  a forceful and extensive set of protections against the erroneous removal of voters, including voters who states believe (but have not confirmed) may have moved and re-registered at a new address.  Under Defendant's view, however, states are free to do away with those protections precisely when the potential for erroneous or unfair removals is most acute.  Defendant's central defense thus defies logic.

The same arguments apply to ostensibly "duplicate" records removed within the 90-day period.  Defendant elsewhere asserts that all "duplicates" belong to voters who have moved and re-registered, and by that logic their removal – for change of residence – is prohibited under the 90-day rule for the reasons set forth above. Moreover, as noted,

Colorado statutory provisions in effect during the 2008 election cycle included a specific program for systematic removal of purportedly "duplicate" records within the 90-day period during which the NVRA prohibits such removals.  And as explained in Section C below, the old statutory and regulatory regime lacked adequate safeguards to ensure that purportedly "duplicate" records in fact belonged to the same voter.  In addition to violating HAVA's requirement that states ensure accurate rolls and create safeguards to avoid erroneous removals, removals under that scheme violated the NVRA's 90-day rule.

_"Inactive" Removals_:  The Secretary defends the purge of "inactive" voters as being in compliance with the NVRA's notice and waiting requirements.  Def. Br. at 26.  The NVRA prohibition at issue in this claim is the 90-day rule, not the notice and-waiting requirements.  In addition, having observed those requirements is not a defense to violating the 90-day rule:  removal based on the notice and waiting period process is the very exemplar of a systematic purge under the NVRA.  Another class of voters classified as "Inactive" (and presumably included in the cancellations under that category within the 90-day period) are infrequent voters, as described in Section D below.   Defendant freely admits that such voters are cancelled as part of a "'systematic' cancellation 'program,'"  Def. Br. at 25, and cannot plausibly justify their removal within the 90-day period.

_"Failed 20-Day" Removals_:  Plaintiffs have stated a claim that cancellation of records pursuant to the procedures in Colorado's 20-day rule is impermissible at any time.  See supra Part II.

_"Deceased" and "Felon" Removals_:  Finally, Defendant's claim that the "deceased" and "felon" cancellations were authorized by §1973gg-6(c)(2)(B) is mistaken, because that provision authorizes individual removals only if the disqualifying events occurred within 90

days of a federal election.[20]  As discussed, the 90-day rule ensures that states will complete routine and systematic list maintenance efforts at a time when their resources and attention are not fully devoted to managing federal elections.  Although the statute places a categorical prohibition on such systematic removals during the 90-day period, it provides that the prohibition "shall not be construed" to prevent the removal of individual "names" from the rolls for certain specified reasons.  The narrowing clause does <u>not</u> permit the <u>systematic</u> removal of names for these limited purposes.  The blanket prohibition of such systematic removals remains in place, so that states may not leave list maintenance work – including systematic removal of names of persons who request removal, are convicted of felonies, or die – until the critical pre-election period.  Instead, states are permitted to act on ensure that voters who become ineligible to vote during the 90-day period are removed from the rolls. To read the statute as permitting wholesale removal of names pursuant to systematic list maintenance procedures during the 90-day period subverts the meaning and purpose of the provision.

> *Allegation of Actual Injury:*  The assertion that Plaintiffs have not shown any actual disenfranchisement is addressed in Part II of this brief.

C.   ***Plaintiffs Have Stated A Claim That Colorado's Procedures For Removing Duplicates Violate HAVA And The NVRA.***

Count III of the Amended Complaint alleges that Colorado's procedures for cancelling voter registration records identified as "duplicates" violate HAVA and the NVRA. To be sure, HAVA mandates that states perform list maintenance on the statewide

---

[20]   Defendant has offered "conversion" as an explanation for the removal of thousands of voters during the 90 day periods of the 2008 election cycle.  Defendant claims that conversion cancellations fall outside of the 90-day window entirely because they were conducted prior to April 2008.  Additional discovery is needed to determine whether those earlier removals were conducted in violation of the 90 day rule.

computerized list of registered voters "on a regular basis," 42 U.S.C. § 15483(a)(2)(A), and that, as part of that regular list maintenance, states must ensure that "duplicate names are eliminated from the computerized list," 42 U.S.C. § 15483(a)(2)(B)(iii).  Equally as important, however, HAVA also cautions that list maintenance is to be performed in a manner that complies with the NVRA and that ensures that "(i) the name of each registered voter appears in the computerized list; [and] (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list."  42 U.S.C. § 15483(a)(2)(B). Further, HAVA requires states to implement "minimum standards of accuracy," including "safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 42 U.S.C. § 15483(a)(4)(B).

Plaintiffs allege in their Amended Complaint that Colorado's procedures for removing duplicates are unclear, inconsistent, and vulnerable to error and abuse; that the matching criteria used to identify purported "duplicates" is not sufficient to ensure that the registrations actually relate to the same person and that there is a lack of appropriate supervision of the duplicate removal process by state election officials; and that these unlawful duplicate removal procedures have caused harm and disenfranchisement to Plaintiffs, their members, and constituents in the past, and threaten to cause continued harm and disenfranchisement to them in the future. (Am. Compl. ¶¶ 35-44, 51-54, 83-89.)  Put another way, Plaintiffs have alleged that the State of Colorado has failed to establish the requisite minimum standards of accuracy and safeguards in their list maintenance programs and procedures to ensure that purportedly "duplicate" registration records actually relate to the same person (in violation of 42 U.S.C. § 15483(a)(4)(B) and that, as a result, eligible voters (including Plaintiffs' members and constituents) are being removed from the rolls, in violation of 42 U.S.C. § 15483(a)(2)(B).

Accepting these allegations as true, as the Court must on a motion to dismiss, Plaintiffs have clearly stated a claim upon which relief can be granted.  Of course, the extent of past harm, nature and adequacy of Defendant's match criteria and procedures, and risk of future harm are all currently disputed issues of fact that will need to be developed during the course of discovery and are wholly inappropriate to resolve on a motion to dismiss.

Plaintiffs have also argued that Defendant is prohibited from removing purportedly "duplicate" registrations without following the notice-and-waiting provisions of Section 8(d) of the NVRA, since Defendant's duplicate removals are actually removals on the basis of a change in residence.  Contrary to Defendant's assertions, not all of these purported "duplicate" removals relate to the same voter, and not all of them are justified under one of two narrow exceptions that the NVRA allows (i.e., "request of the registrant" and "confirmation in writing").  Accordingly, Defendant's motion to dismiss Count III under Fed. R. Civ. P. 12(b)(6) should be denied.

1. <u>Colorado's Practices For Removing Records Do Not Establish Minimum Standards Of Accuracy And Lack Sufficient Procedural Safeguards, In Violation Of Section 303(a)(4) Of HAVA.</u>

Colorado's duplicate removal procedures are set forth in two separate sections of the Colorado election code, Sections 1-2-603 and 1-2-604.  These provisions were amended after Plaintiffs filed the Amended Complaint, and the revised versions will take effect on August 5, 2009 (*see* Def. Br., Attachment 4, at p. 6).

▪ Colo. Rev. Stat. § 1-2-603 governs cancellation and/or transfer of records from one county to another where a voter has purportedly moved to a different county and submitted a new voter registration application.  The existing version allows the clerk in the voter's prior county of residence to cancel the voter's registration in that county if there is a match with the new registrant's name and date of birth, or name and Social Security Number.  In the amended version, the clerk in the voter's new county of residence may transfer the voter's SCORE record from the voter's prior county if there is a match of (1) name, date of birth, and prior residence address, or (2) name, date of birth, and driver's license or Social

Security Number.[21]  In existing and amended versions, the statute requires election officials in the county of prior residence to cancel the existing registration if they believe there is a match in certain information in the two records – without observing the notice-and-waiting requirements required by the NVRA.  *See* Colo. Rev. Stat. § 1-2-604 and Attachment 4 to Def. Br.; Am. Compl. ¶¶ 36, 37, 47-48, 50.

▪ Colo. Rev. Stat. § 1-2-604 governs cancellation of "multiple" registration records relating to the same voter.  Similar to § 1-2-603, the existing version allows of § 1-2-604 county clerks to cancel purportedly "multiple" registration records whenever there is a match with the name and date of birth, or name and Social Security Number. In the amended version of § 1-2-604, the clerk may cancel purportedly "multiple" registrations if there is a match of (1) name, date of birth, and prior residence address, or (2) name, date of birth, and driver's license or Social Security Number. The existing and amended versions each require counties to generate automated lists of records that appear to correspond to the same or similar names, and, if they believe there is a match in certain information in the records, to cancel all but the most recent record – again without observing the notice-and-waiting requirements.  *See* Colo. Rev. Stat. § 1-2-604 and Attachment 4 to Def. Br.; Am. Compl. ¶¶ 36, 37, 47-48, 50.

As currently enacted, Colorado law allows for two or more different voter registration records to be declared "duplicates," and the older record cancelled, whenever there is a match between the name and date of birth, or name and Social Security number.  The process is handled entirely by local county clerks and is unsupervised by state election officials, and there is little written guidance from the state.  The current versions of the governing statutes were enacted at a time when Colorado's 64 county clerks and recorders maintained separate voter registration databases and generally acted more autonomously.

Recent regulatory and statutory amendments and written procedures — implemented after the filing of this lawsuit and the Amended Complaint herein — add additional search criteria and include increased supervision of the process by state election officials.  The parties have discussed these recent amendments during the course of their informal discovery sessions, and will likely continue to do so. Defendants have provided certain documents and

---

[21] The Secretary of State's Election Rule 2.15, which is currently in effect, also incorporates these match criteria.

demonstrations of the SCORE database.  This informal process has been cordial and

informative, but certain questions remain.  In addition, the parties will likely engage in some

formal discovery, including depositions, with respect to these new procedures, to determine

whether and to what extent there may exist an ongoing risk of harm related to these

procedures.

      The so-called "merge" or "voter information consolidation effort" ("VOICE") process

has now been underway for more than a month.  The process was planned to result in the

removal of millions of purportedly duplicate records.  *See* Am. Compl. ¶ 43-44.  Although

Defendants have represented in informal discovery that this process will be governed by the

matching criteria provided in the new statues' versions of Colo. Rev. Stat. § 1-2-603 and 604,

even though these new provisions do not take effect until August 2009, Plaintiffs cannot be

sure of that fact at this stage of the case, nor is there any enforceable requirement mandating

the state to do so.

      To summarize, the existing versions of COLO. REV. STAT. §§ 1-2-603 and 1-2-604

clearly do not include these safeguards and minimum standards of accuracy required by

Section 303(a)(4) of HAVA.  Defendant's earlier guidance and oversight of the cancellation

procedures pursuant to these provisions was wholly insufficient and likely led to thousands of

unlawful purges, including purges of Plaintiffs' members and constituents.  Likewise, the

amended versions of §§ 1-2-603 and 1-2-604 and the Defendant's new procedures do not, in

and of themselves, necessarily include sufficient safeguards under Section 303(a)(4) of

HAVA.  Thus, Plaintiffs have alleged claims for relief relating both to the current, pre-

amendment practices, as well as to the new, post-amendment practices.

      Defendant's motion to dismiss is based solely on the sufficiency of the pleadings;

thus, the information exchanged by the parties during informal discovery, in addition to being

preliminary and incomplete, is not properly before the Court or ripe for consideration. Suffice it to say at this stage that there still remain factual disputes to be resolved by the parties as to the adequacy of Defendant's duplicate removal safeguards and accuracy standards pursuant to Section 303(a)(4) of HAVA.

        2.    <u>Colorado's "Duplicate" Removal Process Violates the NVRA.</u>

        a.    *The NVRA Carefully Limits When And How States May Cancel Registrations Of Voters Who May Have Moved.*

The NVRA was enacted in large part to combat "discriminatory and unfair registration laws and procedures that can have a direct and damaging effect on voter participation in elections for Federal office." 42 U.S.C. § 1976gg(a). The first listed purpose of the NVRA is "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 42 U.S.C. § 1973gg(b)(1).

Consistent with these findings and purposes, the NVRA carefully limits the circumstances under which states may remove voters from the registration rolls. *Id.* § 1976gg-6. States "may not" remove names from the rolls except on narrow grounds and following the specific procedures. *Id.* § 1976gg-6(a)(3).

States are permitted to remove the names of voters who have changed residence, including as part of a general list maintenance program. *Id.* § 1976gg-g(a)(3) and -6(a)(4). But as to this grounds for removal, the NVRA's restrictions are especially stringent: a state "shall not" cancel a registration on this ground unless the voter either (A) "confirms in writing" that he or she has moved outside the registrar's jurisdiction, or (B) both (*i*) fails to respond to a notice mailed by election officials and (*ii*) does not vote in two general elections after the notice is sent. *Id.* § 1976gg-6(d).

Colorado's procedures for cancelling registration records because election officials believe the voter has moved to another county or appears to have multiple registrations bypass and undermine the safeguards create by the NVRA.  Specifically, Sections 1-2-603 and 1-2-604 do not give the statutorily required notice-and-waiting-period protections to certain voters the state believes have moved.  Its legislative predecessors did not either.

Defendant attempts to justify all of its cancellation of records under §§ 1-2-603 and 1-2-604 as "duplicates" — that is, records belonging to a voter who has moved and re-registered in a different location.  Defendant argues that cancellation of such "duplicates" is justified under two exceptions to the NVRA notice-and-waiting requirement:  one for situations where a registrant "requests" that his name be removed; the other where the voter "confirms in writing" that he or she has moved to a new address.  42 U.S.C. § 1976gg-6(a)(3)(A), (a)(4)(A).  As discussed below, however, neither of these contentions finds support in the plain text of the NVRA.

> b.  *Not All Of the Cancellations Can Be Justified Under The "Confirmation In Writing" Exception To The Notice-And-Waiting Requirement.*

The only exception to the notice-and-waiting period requirement for cancellation based on change in residence does not apply here, at least not in the blanket fashion urged by Defendant.  The NVRA allows states to remove a voter's name from the rolls on the ground of change of address if the voter "confirms in writing" that he or she has moved outside the county of prior registration.  42 U.S.C. § 1976gg-6(d)(1)(A).  Defendant argues that the mere act of registering to vote at a new address constitutes "confirmation in writing" for purposes of this provision.

The NVRA does not define such "confirmation in writing."  However, under Defendant's view, a voter has confirmed in writing that he or she has moved simply because

the SCORE database contains two or more records associated with similar names at two different addresses.  This reading of the statutory language is overly broad, especially in the context of the clear intent of the NVRA and HAVA to prevent erroneous purging of voters who may have moved.

A voter who re-registers after moving residence can specify his or her prior address on the registration application.  In doing so, the voter clearly communicates, in writing, that she has moved from one jurisdiction to another.  By contrast, a voter who includes only his or her current address in a registration form has only confirmed in writing that he currently resides at that address; the voter has *not* confirmed in writing that he or she has "changed residence."[22]  In these circumstances, officials can only *infer* that any two records belong to the same person and the voter has moved based on the new address.  Such an inference simply cannot constitute written confirmation under 8(d)(1)(A).  Moreover, to the extent that Defendant is merging intra-county movants, he must seek statutory permission elsewhere because Section 8(d)(1)(A), on its face, only applies to moves outside the jurisdiction.  42 U.S.C. § 1973gg-6(d)(1)(A).

There is no way to determine on this motion how many of the ostensibly "duplicate" records cancelled pursuant to the challenged procedures belong to voters who confirmed their change of address in writing by providing their prior address in their new registration form, and whose prior records election officials could therefore cancel without going through the

---

[22] Colorado's "Combination Voter Registration & Mail-In Ballot Application" includes a section entitled "Previous Residence," with the instruction:  "Complete only if you are registered to vote at a different legal residential address."  Available at http://www.elections.colorado.gov/DDefault.aspx?tid=547.  Under Defendant's interpretation, even registrants who do <u>not</u> complete that portion of the form are deemed to have "confirmed in writing" that they have moved, are registering at a new address, and wish to have their old registrations cancelled.  That is plainly an unsupportable result.

notice-and waiting process.  Defendant's motion to dismiss on this basis must therefore be rejected.

        c.     *Not All Of The Cancellations Can Be Justified As Being At The "Request Of The Registrant."*

Defendant also maintain that its procedures for cancelling purportedly "duplicate" registrations fall within the NVRA provision that allows cancellation "at the request of the registrant," 42 U.S.C. § 1976gg-6(a)(3)(A), and are therefore exempt from the notice-and-waiting requirements applicable to cancellations based on change in residence.  (Def. Br. at 21-22.)  A "request of the registrant" is those instances where a registrant affirmatively asks that that his or her name be withdrawn from the rolls.  Colorado law specifically contemplates such a practice.  *See* Colo. Rev. Stat. § 1-2-601 (allowing a "self-affirmation of withdrawal of registration" filed by a registrant to serve as "the record of evidence to cancel the elector's registration record.").  Indeed, the Secretary himself recognizes these particular categories of requests as a category on its own, consistent with the NVRA's text.  In the press release regarding voter purges issued before the November election, and in the lists of cancelled voters provided to Plaintiffs, the Secretary lists "duplicates," "moved" and "withdrawn" as separate categories.

At this stage of the case, Plaintiffs simply do not know how many of Defendant's purported "duplicate" removals would potentially fall into one of the permitted exceptions under the NVRA.  It is reasonable to presume, however, that all of them will not.  Further discovery into the issue will be necessary.  But at the motion to dismiss stage, Plaintiffs' allegation, on information and belief, that some of the Defendant's purported duplicate removals constitute improper removals on the ground of suspected change of residence without adhering to Section 8(d) of the NVRA, must be accepted as true.  Conversely, Defendant's self-serving contention that all duplicate removals fall within the "request of the

registrant" or "confirmation in writing" exception to the NVRA must be rejected, and

Defendant's motion to dismiss should be denied.

> d.   *Defendant's Administrative Concerns Of Double Voting And Election Management Are Unsubstantiated And Irrelevant.*

Defendant raises the spectre of "fraud" to defend its practices, but offers no evidence

that a single person has used registration records in different counties to vote more than once

time in a single election.  Similarly, Defendant provides no concrete basis, in the pleadings or

otherwise, for its stated concern that complying with the NVRA's safeguards against

erroneous purging would the "clog state's election management system."  Weighed against

the very real risk (and Plaintiffs' factual allegations) of mistaken cancellation of ostensibly

"duplicate" records, Defendant's contentions have no merit.

Plaintiffs are confident the factual issues regarding Count III of the Amended

Complaint can soon be identified and narrowed, and that this claim can properly be submitted

summary judgment or fact finding.  However, Defendants' present motion is based solely on

the pleadings, and the information exchanged in informal discovery, in addition to being

incomplete, is not properly before the court at this stage or ripe for consideration.  Plaintiffs

submit that the Amended Complaint clearly states a claim for relief, and that the motion to

dismiss should therefore be rejected.

> D.   *Plaintiffs' Amended Complaint States A Viable Claim That Colorado's Purging Of Infrequent Or Sporadic Voters Violates The NVRA.*

Count IV of the Amended Complaint alleges that certain provisions of Colorado law

violate the prohibition, contained in Section 8(b)(2) of the NVRA and Section 303(a)(4)(A)

of HAVA, on removing voters from the rolls based on their failure to vote. Am. Compl. ¶¶

55-65, 90-96.  Pursuant to COLO. REV. STAT. § 1-2-605(2), a voter who is classified as

"Active" in the SCORE system but fails to vote in a general election is reclassified as

"Inactive" for failure to vote.  COLO. REV. STAT. § 1-2-605(2) (2008).  Such "Inactive" voters are then mailed forwardable residency confirmation notices not later than 90 days after the general election, initiating a procedure that can result in removal of the voter from the voter rolls.  COLO. REV. STAT. § 1-2-605(6)-(7).  If a voter fails to respond to the residency confirmation notice and also fails to vote in two succeeding federal general elections, the voter's registration is cancelled and the voter is removed from the rolls, pursuant to COLO. REV. STAT. § 1-2-605(7), without regard to whether the residency confirmation notice was returned by the post office as undeliverable or whether any other evidence exists (such as National Change of Address ("NCOA") data) to indicate that the registered voter has changed residences.

Section 8(b)(2) of the NVRA provides, however, that states may not use a person's failure to vote as the basis for removal from the official list of registered voters.  42 U.S.C. § 1973gg-6.  Similarly, Section 303(a)(4)(A) of HAVA expressly provides that that states may not use NVRA residency confirmation procedures to remove voters from the rolls solely because of their failure to vote.  42 U.S.C. § 15483(a)(4)(A).  Nevertheless, Colorado law currently requires exactly what the NVRA and HAVA prohibit:  the commencement of a statutory removal process against voters solely because of their failure to vote, and not based on any permissible indication of those voters' change in residence.

Defendant recognizes that Colorado's current statutory scheme violates the NVRA because it allows for the commencement of removal proceedings against voters solely because of their failure to vote..  After receiving Plaintiffs' NVRA violation notice in February 2009, Defendant proposed  regulatory changes to address the issue and adopted new election rules.  *See* Colo. Dep't. of State, Notice of Adoption (May 21, 2009); 8 COLO. CODE REGS. § 1505-1, Rules 2.18, 2.19, 2.20 (effective June 30, 2009).

Defendant contends that Count IV should now be dismissed for failure to state a claim "because the Secretary's Rule 2.18.3 now clarifies that a voter designated as 'inactive—failed to vote' will not be cancelled under [COLO. REV. STAT.] § 1-2-605(7)."  Def. Br. at 30. Without the interpretation of § 1-2-605(6)-(7) offered by the rule, the statutory provision would violate the NVRA.[23]

Even with the rule in place, however, Colorado's practices violate the NVRA, and Plaintiffs are still entitled to relief for prior and future unlawful conduct.

*First*, the revised rules (which took effect on June 30, 2009) are of no help to infrequent voters improperly purged pursuant to § 1-2-605(7) before the rules were adopted. *See* Am. Compl. ¶¶ 61-62, 92-93.  Those cancellations violated the NVRA for the reasons set forth in the Amended Complaint and above, and Defendant has offered no argument to the contrary. The motion to dismiss this claim must be rejected on that basis alone.

*Second*, even under the revised regulations, the Colorado statute at issue will still result in the disenfranchisement of certain eligible voters because they did not vote in a federal election, in violation of the NVRA.  The new regulation requires county election officials to periodically compare the list of voters designated in SCORE as "Inactive—Failed To Vote" with the NCOA database.  8 COLO. CODE REGS. § 1505-1, Rule 2.18.2 (2009). According to the rule, if the NCOA data reflects a change of address (whether inside or outside of the jurisdiction), the voter's record is redesignated as "Inactive—NCOA," and the voter is sent a residency confirmation notice.  *Id.*  These actions trigger the federal election

---

[23]    Plaintiffs do not here challenge the validity of the new rule, but note that the rule is valid only insofar as it is consistent with the existing statute.  *See, e.g., Miller Int'l, Inc. v. State, Dep't of Revenue*, 646 P.2d 341, 344 (Colo. 1982) ("[A]ny regulation which is inconsistent with or contrary to a statute is void and of no effect."); *accord McCool v. Sears*, 186 P.3d 147, 151 (Colo. App. 2008).

countdown clock that could lead to the voter's cancellation under COLO. REV. STAT. § 1-2-605(7).

The revised regulation does not fully comply with the NVRA provisions governing use of NCOA data to cancel registrations on the basis of change of address.  Specifically, the NVRA requires registrars who receive change-of-address information reflecting a change *within* the same jurisdiction to correct the voter's records and send the voter a notice of the change or correction—not to commence the removal process against them.  *See* 42 U.S.C. § 1973gg-6(c)(1)(B)(i).  In addition, those voters designated as "Inactive—NCOA," while remaining eligible to vote, will not be sent mail-in ballots or election notice mailings.[24]

In sum, the Defendant's new rule, by ensuring that a voter's failure to vote is not used as a basis for cancelling a voter's registration, is necessary to avoid a direct conflict with the NVRA.  However, in permitting certain voters to be designated "Inactive—NCOA" even if they have moved within a county and remain eligible to vote, the rule nonetheless conflicts with the NVRA's procedures for use of the NCOA database, and its prohibition on cancelling voters for inactivity.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss Amended Complaint.

---

[24]   This NVRA violation only arose upon Defendant's adoption of new rules governing "inactive" voters on May 21, 2009, and Plaintiffs notified Defendant of this ongoing NVRA violation shortly thereafter, on June 10, 2009.  Plaintiffs are hopeful the parties will be able to resolve this claim, partially or in its entirety, through negotiations with Defendant.  Plaintiffs offered to engage in such negotiations prior to the deadline for responding to the Secretary's motion to dismiss; however, Defendant declined to engage in such discussions at least until after the filing of this brief.

Dated: July 15, 2009                     Respectfully submitted by:

                                         /s/ S. Gale Dick
                                         James E. Johnson
                                         S. Gale Dick
                                         Semra Mesulam
                                         Elaina Loizou
                                         Stuart Naifeh
                                         DEBEVOISE & PLIMPTON LLP
                                         919 Third Avenue
                                         New York, New York 10022
                                         Tel: 212-909-6000
                                         Fax: 212-909-6836
                                         jejohnsn@debevoise.com
                                         sgdick@debevoise.com

                                         Richard Rosenblatt, Esq.
                                         RICHARD ROSENBLATT &
                                         ASSOCIATES, L.L.C.
                                         8085 East Prentice Avenue
                                         Greenwood Village, Colorado 80111
                                         Tel: 303-721-7399 x11
                                         Fax: 720-528-1220
                                         rrosenblatt@cwa-union.org

                                         Penda D. Hair
                                         Elizabeth S. Westfall
                                         Bradley E. Heard
                                         ADVANCEMENT PROJECT

                                         1220 L Street, NW, Suite 850
                                         Washington, DC 20005
                                         Phone: (202) 728-9557
                                         Fax: (202) 728-9558
                                         phair@advancementproject.org
                                         ewestfall@advancementproject.org
                                         bheard@advancementproject.org

                                         Wendy Weiser
                                         Myrna Pérez
                                         BRENNAN CENTER FOR JUSTICE
                                         AT NYU SCHOOL OF LAW
                                         161 Avenue of the Americas
                                         12th Floor
                                         New York, New York 10013
                                         Tel: 212-998-6284
                                         Fax: 212-995-4550

wendy.weiser@nyu.edu
myrna.perez@nyu.edu

Karen Neuman
Sarah Brannon
FAIR ELECTIONS LEGAL
NETWORK
1730 Rhode Island Avenue, NW
Suite 712
Washington, D.C. 20036
kneuman@fairelectionsnetwork.com
sbrannon@fairelectionsnetwork.com

Stephen P. Berzon
James Finberg
Stacey M. Leyton
Barbara J. Chisholm
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel: 415-421-7151
Fax: 415-362-8064
sberzon@altshulerberzon.com
jfinberg@altshulerberzon.com
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com

*Attorneys for Plaintiffs Common Cause
of Colorado, Mi Familia Vota Education
Fund and Service Employees
International Union*

## **CERTIFICATE OF SERVICE**

I, S. Gale Dick, of the law firm of Debevoise & Plimpton LLP, herein certify that on July 15,

2009, I caused Plaintiffs' Opposition to Defendant's Motion to Dismiss Amended Complaint

to be served by CM/ECF upon:

Maurice G. Knaizer
Colorado Attorney General's Office-State Services
1525 Sherman Street
Denver, CO 80203
303-866-5380
Email: maurie.knaizer@state.co.us

Monica M. Márquez
Assistant Solicitor General
Public Officials Unit
Office of the Attorney General
1525 Sherman St., 5th Fl.
Denver, CO 80203
303-866-5163
Email: monica.marquez@state.co.us

Melody Mirbaba
Colorado Attorney General's Office
1525 Sherman Street
7th Floor
Denver, CO 80203
303-866-4224
Email: melody.mirbaba@state.co.us

/s/ S. Gale Dick

*[Remainder of this page intentionally left blank]*