IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **08-cv-2321-JLK**

**COMMON CAUSE OF COLORADO, et al.,**

      Plaintiffs,

v.

**BERNIE BUESCHER, in his official capacity as Secretary of State for the State of Colorado,**

      Defendants.

_____

**ORDER**
_____

Kane, J.

After a series of Colorado Election Rule amendments and changes resulted in a

stipulated dismissal of three of Plaintiffs' five federal challenges to Colorado's voter

registration laws and list maintenance practices,[1] this case is before me on cross-motions

for summary judgment on Plaintiffs' sole remaining claim.  A request for interim

(preliminary injunctive) relief filed by Plaintiffs was denied in a written Order on October

---

[1]      Under the terms of a settlement reached in January 2010 citing relevant changes to Colorado's Election Rules 2.18, 2.20, 2.21, 2.22, and 2.23, the parties stipulated to the dismissal of Counts (claims) II, III, and IV of Plaintiffs' Amended Complaint (Doc. 46).  Count II challenged Colorado registration laws and practices governing the removal of names from the list of eligible voters within 90 days of federal elections; Count III challenged practices related to the removal of "duplicate" registration records; and Count IV challenged the removal of names based on infrequency or sporadic history of voting (Count IV).  *See* 1/22/10 Order Regarding Settlement of Counts II, III, and IV (Doc. 14)(and attached Settlement Agreement and Mutual Release).  Count V of the Amended Complaint, challenging the removal of names of individuals with prior felony convictions who were no longer incarcerated or on parole, has also been withdrawn.

18, 2010.  *Common Cause of Colorado v. Buescher*, 2010 WL 4156486 (D. Colo.).

In Count I of the Amended Complaint in this case, Plaintiffs Common Cause of Colorado ("Common Cause"), Mi Familia Vota Education Fund ("Mi Familia"), and Service Employees International Union ("SEIU"), challenge that portion of Colorado's voter registration application review statute mandating the cancellation of a new registration if, within 20 days of having placed the voter's registration notice in the mail to the address provided on the voter's application, the notice is returned as "undeliverable."  *See* C.R.S. § 1-2-509(3).  Because this "20-day Rule" has the effect of "removing" technically active "registrants" from Colorado's official list of eligible voters on the basis of returned mail, Plaintiffs invoke the majority opinion in *United States Student Association Found. v. Land*, 546 F.3d 373 (6th Cir. 2008) to assert it contravenes § 8(d) of the National Voter Registration Act of 1993 ("NVRA").[2]

NVRA § 8(d) provides the exclusive means by which states may remove the name of any "registrant" from "the official list of eligible voters . . . on the ground that the registrant has changed residence."  42 U.S.C. § 1973gg-6(d).  The statute permits removal only if the registrant (1) confirms in writing that he has moved outside the jurisdiction in which he is registered or (2) fails to return a postage prepaid, pre-addressed address confirmation card and then also fails for two consecutive federal election cycles to appear to vote.  *Id.* § 1973gg-6(d)(1)(A) & (B).  Plaintiffs contend § 8(d)'s changed residence

_____

[2]     Pub. L. 103-31, May 20, 1993, 107 Stat. 77, *codified at* 42 U.S.C. § 1973gg  to 1973gg-10.

provisions apply equally to "removals on grounds of returned mail" and to 20-day Rule cancelled voters under *Land* because new registration applicants become "registrants" the moment their application information is entered into a state's computerized voter registration database. Plaintiffs assert there are thousands of Colorado voters whose registrations have been cancelled under the 20-day Rule in contravention of § 8(d), harming both their interests as organizations engaged in voter registration and advocacy efforts within the ambit of the NVRA as well as their individual members' fundamental voting rights. Plaintiffs seek a declaration that C.R.S. § 1-2-509(3) violates the NVRA and an order permanently enjoining and restraining the Secretary from implementing it to cancel or "remove" any newly registered Colorado voter from the active voter rolls.

The Secretary denies § 8(d) applies to C.R.S. § 1-2-509(3) and contends Plaintiffs misapprehend Colorado's voter list maintenance practices and how the 20-day Rule works. The Secretary contends § 1-2-509 prescribes county clerk duties with regard to registration *applicants*, not "registered" electors, whose removal from Colorado's list of eligible voters on the basis of undelivered mail is governed by a different statute, C.R.S. § 1-2-605. There is no dispute in this case that § 1-2-605, which authorizes county clerks to cancel the registration records of duly registered electors on the basis of undelivered mail only if that elector fails to return a follow-up confirmation card and then fails for two consecutive general elections to vote, comports with the removal restrictions set out in § 8(d). *See* C.R.S. § 1-2-605(a) & (b) *and* § 1-2-605(b)(7)("[i]f the county clerk and recorder receives no response to the confirmation card and the elector has been

designated 'Inactive' for two general elections since the confirmation card was mailed . . . the county clerk and record shall cancel the registration record of the elector.") According to the Secretary, Plaintiffs' claims turn on the mistaken belief that a Colorado registration applicant becomes conclusively "registered," and therefore a "registrant" for purposes of NVRA § 8, the moment he is added to Colorado's electronic voter ("SCORE") database and sent a notice of disposition of his registration application.  To the extent the Sixth Circuit in *Land* invites a different conclusion, the Secretary contends the case was "wrongly decided."

While I agree that a close reading of Colorado's statutory scheme for confirming voter registrations by mail supports the Secretary's view in this case, I disagree that view turns on the definition of "registrant" or a rejection of the majority's analysis *Land*.  The salient issue under the NVRA is less a voter's presence or designated registration status on a state's federally-mandated statewide electronic voter registration database, but on his actual, de jure, "eligibility" to vote.  It is clear under *Land* and otherwise that state law informs this analysis.  Congress's mandate in the NVRA was for states to register "all *eligible* applicants," and to maintain the accuracy of the resulting "official lists of eligible voters" by removing the names of those who are not actually *eligible* or who have become *ineligible* over time.  Colorado's 20-day Rule is directed to Colorado's obligation under the first part of this mandate, providing election officials with a tool to confirm the initial residential eligibility of a new registrant whose mail is undeliverable to the address given in his application.  It does not apply to previously eligible voters who may have *become*

ineligible based on a change of residence or inactivity.

Given the concomitant mandates under the NVRA that states register "eligible" applicants and maintain "accurate" voter registration rolls, I decline to adopt the narrow reading of NVRA § 8(d) urged by Plaintiffs. Plaintiffs' reading interferes with Colorado's ability to confirm a registration applicant's initial residential eligibility and prevents it from moving voters who refuse or fail to confirm their initial eligibility out of "active" status in SCORE for two federal election cycles. This interference is neither mandated by § 8 nor consistent with the NVRA's overall purposes. Moreover, Plaintiffs' characterization of the 20-day Rule's operation as an eligible voter "purge" is overstated and unsupported by the Rule's actual operation in Colorado's voter registration scheme. While the Rule technically moves voters from "active" to "cancelled" status in SCORE, it does so temporarily and solely for the purpose of confirming a new registrant's initial residential eligibility. Cancelled electors are sent confirmation cards which, if returned, will finalize their registrations and return them to "active" status as of the date of their original applications. Even those who fail to return confirmation cards and discover their "cancellations" only when they appear at the polls on election day may vote by provisional ballot, and, if the ID voters are required to present whatever their status confirms the address used in a cancelled voter's original application, that ballot will be counted. Because Colorado's 20-day Rule actually conforms to Congress's mandates in the NVRA and does not violate § 8(d), the cross-Motions for Summary Judgment are resolved in the Secretary's favor.

## I. FACTS AND STATUTORY BACKGROUND.

The following recitation of facts and statutory/regulatory voter registration framework is undisputed unless otherwise stated.[3]

Voter registration in Colorado is achieved when an individual completes an application, which requires prospective voters, or "electors," to affirm they meet the basic criteria for voter eligibility.  *See* C.R.S. §§ 1-2-101, 102.  Registration may be achieved in person (§ 1-2-202), online (1-2-202.5), by federal postcard application (1-2-208), at driver's license facilities (1-2-213), in high schools (1-2-402), by voter registration agencies (1-2-501), and by mail (*id.*)  "Review of voter registration applications," including application of the 20-day Rule, is delegated to county clerks in § 1-2-509, in relevant part as follows:

> (2)  Upon receipt of an application, the county clerk and recorder shall verify that the application is complete and accurate.  If the application is complete and accurate, the county clerk and recorder shall notify the applicant of the registration . . . .

> (3)  Within ten business days after receipt of the application, the county clerk and recorder shall notify each applicant of the disposition of the application by nonforwardable mail.  If within twenty business days after receipt of the application the notification is returned to the county clerk and recorder as undeliverable, the applicant shall not be registered.  If the notification is not returned within twenty business days as undeliverable, the applicant shall be deemed registered as of the date of the application. . . .

---

[3]     Finding the status and application of Colorado's voter registration scheme was unclear based on the parties' briefing and intervening administrative rules changes, I prepared a list of specific questions (*see* Order (Doc. 181)) to which counsel provided a Joint Response (Doc. 183).  This recitation is consistent with the Joint Response and the October 16, 2010 oral argument held on Plaintiffs' Motion for Interim Relief (Doc. 171).

C.R.S. § 1-2-509 (2010).

Once the county clerk for the county in which an individual purports to reside receives an individual's voter registration application, the clerk enters information from the application into the computerized Statewide Colorado Registration and Election ("SCORE") database.  Electors whose registration applications are deemed complete under § 1-2-502 are entered into SCORE with a registration status of  "active," and a status reason of "active – 20-day period."  Electors in "active – 20-day period" status are sent a notice of the disposition of their individual applications in the form of a new voter information card ("New Voter Card"), informing them of their registration and their individual polling places.  After the expiration of the 20-day period without the New Voter Card being returned as undeliverable, the elector assumes regular "active" status. If a New Voter Card is returned within the 20 day period as "undeliverable," however, the elector is deemed "not registered" by operation of C.R.S. § 1-2-509(3) and his registration status in SCORE is changed from "active – 20-day" to "cancelled – Failed 20-day."

In Rules made effective on February 19, 2010, individuals deemed "not registered" by operation of § 1-2-509(3) must be sent an address confirmation card by forwardable mail, and may be deemed definitively registered returned to "active"  status in SCORE as of the date of their original application either by returning the card within 90 days or, during the 28 days before an election, by appearing in person at their county clerk's office to complete a certificate of registration.  *See* Election Rule 2.17, 8 CCR 1505-1.  Voters

7

in "cancelled – Failed 20-day" on election day may also vote by provisional ballot and, if their voter ID confirms the address on their original application, that ballot will be counted.

Before turning to the specifics of Plaintiffs' claims in this case, a few words generally about SCORE and Colorado's voter list maintenance practices:

Within SCORE, electors are listed as "active," "inactive," or "cancelled." Election Rule 2.20. "Active" status means there are no conditions or restrictions on the voter's eligibility to vote. "Inactive" status means the voter was active at one point in the SCORE system but that his status has changed as a result of a failure to vote ("inactive – failed to vote" status); because of returned mail ("inactive – returned mail"); or because of an undeliverable ballot ("inactive – undeliverable ballot"). "Cancelled" or "cancelled record" status means an elector's registration has been cancelled or revoked based upon a determination that he is either ineligible to vote or has been statutorily deemed "not registered," as per C.R.S. § 1-2-509(3). Rule 2.20.1(b). "Inactive" voters remain "eligible" to vote and their names will appear with "active" voter names in the "poll book" prepared for each county before a federal election. Rule 2.20.2(c), (d) & (e). "Cancelled" voters, by contrast, are not "eligible" to vote and their names will not appear in the "poll book." Rule 2.20.(b). The "poll book," then, which is made up of electors in SCORE currently designated in "active" or "inactive" registration status, constitutes the "official list of eligible voters" for each county in any given election.

The crux of the dispute in the instant case is that voters whose new registrations

8

are cancelled by operation of § 1-2-509(3) will have been in "active – 20-day" status for up to 20 days before the change.  Because they would technically have been on Colorado's "official list of eligible voters" for an election held during that time, Plaintiffs contend a cancellation mandated by § 1-2-509(3) is a "removal" from the "official list of eligible voters" in contravention of § 8(d).

Between  January 1, 2008 and November 2, 2008, approximately 3,123 Colorado registration applications fell subject to Colorado's 20-day Rule, and the prospective electors placed in "Cancelled – Failed 20-day" status in SCORE.  As of October 21, 2009, approximately 5,531 individuals were listed in Colorado under cancelled, failed-20 day status.

*The Complaint.*

On October 9, 2008, in response to local and national media reports of voter purges in Colorado, the Colorado Secretary of State issued a press release disputing the overall accuracy of the reports but specifically acknowledging that cancelled Colorado voters included "1,136" in the "Failed 20-day" category.  *See* Ex. 12, Pl.'s Mot. Partial Summ. J. (Doc. 119-13).  Plaintiffs, national non-profit voting rights and service union entities, filed their Complaint on October 25, 2008, naming the Colorado Secretary of State as Defendant and claiming Colorado's voter registration laws violated the NVRA. Plaintiffs simultaneously moved for both temporary and preliminary injunctive relief to prohibit any further violations of federal law leading up to the November 2008 federal election.  After a hearing on the requests for injunctive relief on October 29, 2008, the

parties negotiated a stipulated preliminary injunction order setting forth various procedures covering the treatment of provisional ballots cast by individuals in "cancelled" 20-day status, which I signed the same day. *See* Order Approving Parties' Stipulated Preliminary Injunction (Doc. 14).

The stipulated injunction required the Secretary of State to issue an order directing all clerks and recorders for the November 2008 election, with regard to individuals who arrived at polling places in cancelled "Failed– 20 day" status and voted provisionally,[4] to treat those provisional ballots as follows:

1)   The provisional ballots of voters on the cancelled 20 day list were to be verified before other provisional ballots.

2)   Voters on the cancelled 20 day list were to be presumed eligible to vote and their ballots were to be counted. Only upon a showing by clear and convincing evidence that a voter was not eligible, would a provisional ballot be rejected by the county.

3) No ballot was to be rejected unless there was a review of all of the applicable records in the SCORE database, including but not limited to, the scanned original registration application, sources provided by the Colorado Secretary of State or law enforcement agencies regarding individuals with felony convictions serving a sentence of confinement or parole, and the Division of Motor Vehicles motor voter database.

---

[4] Voters appearing at their presumed voting places would have learned they were not registered and would therefore only have been able to cast a provisional ballot. Since February 2010, those voters would have been sent a confirmation card in accordance with Rule 2.17, and notified of their options with regard to confirming their eligibility and finalizing their registrations.

4) For any voter on the 20 day cancelled list whose provisional ballot had been rejected at the county level, the clerk was to contact the voter in writing by forwardable mail and by telephone, where provided, stating that his/her ballot had been rejected at the county level, stating the reason for the rejection, and the clerk was to provide a copy of that letter to the Secretary of State.

5) For all ballots rejected at the county level for persons on the 20 day cancelled list, the clerk was to provide the Secretary of State with a copy of the provisional ballot affidavit no later than the end of the 14-day provisional ballot review period.

6) Upon the receipt of each ballot affidavit, the Secretary was to conduct an independent review of rejected ballots and order the clerk to count any that are revealed, on that review, to have been rejected incorrectly, no later than two weeks before the certification of the statewide results.

After the November 2008 election, only three ballots were ultimately contested. Plaintiffs moved to enforce the Stipulation, and on June 26, 2009, in accordance with the Stipulation and its presumption of validity, I ordered the Secretary of State to count the votes. *See* Order (Doc. 85). Plaintiffs now move for summary judgment (Doc. 117), arguing that the 20-day Rule continues to impact Colorado voters, removing active "registrants" from the rolls and risking the disenfranchisement of voters who wait in line on election day to vote only to find out their registrations have been cancelled and their fundamental voting rights infringed.

The State cross-moves for summary judgment (Doc. 115), citing a lack of evidence

11

that any Colorado voters have been disenfranchised as a result of the 29-day Rule and arguing Plaintiffs lack standing – either on behalf of themselves or their members – to challenge the Rule under the circumstances presented.  I reject the Secretary's standing arguments, but conclude Colorado's 20-day Rule, as applied, conforms with, and does not violate, the NVRA.

## II. DISCUSSION.

Summary judgment is appropriate "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In applying this standard, I examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *See Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1227 (10th Cir. 1999).  Where, as here, the parties file cross motions for summary judgment, "[I am] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (10th Cir.1997), *cert. denied,* 523 U.S. 1048 (1998).  In this regard, each party as the nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas,* 147 F.3d 1220, 1228 (10th Cir.1998) (quoting *Ulissey v. Shvartsman,* 61 F.3d 805, 808 (10th Cir.1995)).

## A.  Standing.

12

Because it concerns the justiciability of Plaintiffs' claims, I consider first whether Plaintiffs have standing to bring this suit, either on their own behalf as organizations or as representatives of their individual members. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)(standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims). The standing inquiry has two components, involving "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490 (1975). Constitutional standing requirements stem from the case or controversy requirement of Article III and are premised on concepts of injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Prudential limitations on standing concern whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked, whether the complaint raises abstract questions more properly addressed by the legislative branch, or whether plaintiff is asserting his or her own legal rights and interests rather than the interests of third parties. *See Bennett v. Spear*, 520 U.S. 154, 162 (1997). While the Secretary urges the applicability of prudential limitations on Plaintiff's standing to sue in this case, I adopt the reasoning of the Fifth Circuit in *ACORN v. Fowler*, 178 F.3d 350, 363-64 (5th Cir. 1999) rejecting that argument and address it only briefly before turning to the question of Article III standing below.

Unlike constitutional requirements, Congress can modify or even abrogate prudential limitations. *See Fowler*, 178 F.3d at 363 (citing *Bennett*). In *Fowler*, the Fifth

Circuit considered the NVRA's legislative history, judicial interpretations of the specific

language Congress used, and the inclusion of a provision for attorney fees indicating

support for enforcement actions by private attorneys general, and held that Congress

intended the NVRA's private-right-of-action provision to eliminate prudential limitations

on standing.  *Id.* at 365.  The Secretary takes issue with this holding in *Fowler* and argues

the NVRA's private-right-of-action provision actually evinces an intent to limit standing

to individuals, and to exclude organizations.  I disagree.

The NVRA's private-right-of-action provision authorizes "person[s] . . . aggrieved

by a violation of this subchapter" to sue for its enforcement.  42 U.S.C. § 1973gg-9(b)(1).

Because "person" is not otherwise defined by the NVRA, the *Fowler* court looked first to

1 U.S.C. § 1, the default provision for defining terms used in federal statutes.  178 F.3d at

365.  Section 1 states that "[i]n determining the meaning of any Act of Congress, unless

the context indicates otherwise . . . the word 'person' . . . include[s] corporations,

companies, associations, firms, partnerships, societies, and joint stock companies, as well

as individuals."  Looking to the NVRA's legislative history and construing its

enforcement provisions consistently with its states purpose, the Court concluded the term

"person . . . aggrieved" in § 1973gg-9 (b) "extend[s] standing under [the NVRA] to the

maximum allowable under the Constitution" and specifically includes organizations like

ACORN.  *Accord Charles H Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th

Cir. 2005)(because the NVRA impliedly encourages organized voter registration

programs, voter registration organizations may have standing to sue to enforce provisions

14

impacting their ability to perform their core functions); *ACORN v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997).

Because the NVRA's provisions are consistent with an intent to encourage and facilitate organized voter registration programs, I agree that organizations whose core functions include the registration of new voters and the protection of voter rights are "persons" within the meaning of 42 U.S.C. § 1973gg-9(b) such that any prudential standing concerns to their ability to seek enforcement of the NVRA may be said to have been abrogated by Congress.

Accordingly, Common Cause, SEIU, and Mi Familia need only satisfy Article III standing requirements to pursue their claim that the 20-day rule violates NVRA § 8(d), i.e., that each has suffered a redressable injury in fact that is fairly traceable to the Secretary's continued application and enforcement of that rule.

*Summary Judgment Standard.*

The party invoking federal jurisdiction bears the burden of proving standing. *Summers v. Earth Island Inst.*, __ U.S. __, 129 S. Ct. 1142, 1149 (2009).  Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation.  *Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998) .  If still in contention, "those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). When standing is challenged in a motion for summary judgment that is made and

15

supported as provided by Rule 56(c), a plaintiff may not rest upon the allegations of

injury, causation, and redressability in its complaint, but must respond, with affidavits or

as otherwise provided in the rule, with facts demonstrating a genuine issue for trial.  *See*

*Dept. of Commerce v. United States House of Representatives*, 525 U.S. 316, 329

(1999)(citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883-884 (1990)).

Presented on cross-motions for summary judgment, however, the question is whether

plaintiff can demonstrate there are no genuine issues of fact as to justiciability.  *See id.*


*Organizational Standing.*

An organization has standing to sue on its own behalf if it has been injured as an

entity.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Just like an

individual, an organization must demonstrate a concrete and particularized injury giving it

a "personal stake in the outcome of the controversy."  *Baker v. Carr*, 369 U.S. 186, 204

(1962).  *See also Warth v. Seldin*, 422 U.S. 490, 508 (1975).  An organization has

standing to sue on its own behalf if the "defendant's illegal acts impair its ability to

engage in its projects by forcing the organization to divert resources to counteract those

illegal acts."  *Florida State Conference of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1165

(11th Cir.2008) (citing *Havens*, 455 U.S. at 379).   An independent basis for

organizational standing exists when a defendant's conduct makes it difficult or impossible

for the organization to fulfill one of its essential purposes or goals.  *See Charles H.*

*Wesley Educ. Found., Inc. v. Cox*, 408 F.3d at 1353-54 (11th Cir. 2005)(an organization

16

conducting voter registration has a protected interest under the NVRA in having individuals it registers be processed properly and a state's actions negatively impacting that interest confer standing on the organization to bring suit on its own behalf).  All three Plaintiffs in this case assert *Havens*-style standing on grounds they diverted substantial resources in 2008, and will likely do so again in this election, dealing with phone calls related to pre-election voter list "purges"/cancellations.  SEIU and Mi Familia also contend they have standing independently of *Havens* because their work includes registering members of their organizations to vote, and that some of their registrants were cancelled under the 20-day rule before the 2008 election.

Addressing the SEIU/Mi Familia contention first, both organizations submit registration applications of members whose registrations were later cancelled by operation of the 20-day Rule.  *See* Pls.' Br. Support Mot. Summ. J. (Doc. 118), Stm. of Facts ¶¶ 147-48, 157-58  & Decl. of James M. Finberg (Doc. 119)(and relevant attachments).  The Secretary "disputes" this evidence only by denying these voters were actually "registered" at the time of the cancellations.  *See* Def's Resp. (Doc. 144), Stm. of Facts ¶¶ 1-4, 5-9).  The "dispute" goes to the merits of Plaintiffs' claims, not their standing, and for purposes of the injury-in-fact analysis, I assume the merits in Plaintiffs' favor.  *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008).  Accordingly, the fact that individual "registrations" submitted by SEIU and Mi Familia were cancelled by operation of the 20-day rule is sufficient to establish organizational injury-in-fact under *Cox*, and the Secretary's assertion to the contrary is rejected.

17

All three Plaintiffs, moreover, claim injury-in-fact under *Havens* and *Browning* as a result of having had to divert substantial resources from their normal election activities in 2008 to counteract the actual and threatened effects of the 20-day Rule.  In support, Common Cause, Mi Familia, and the SEIU submit testimony and documentary evidence from organizational representatives describing how each organization experienced dramatic increases in hotline calls in the wake of media reports of voter registration purges and had to divert a substantial amount of their limited resources to deal with them rather than their voter outreach, registration and monitoring activities.  *E.g.* Flanagan Decl. and Flanagan Dep. (Exs. 20 & 34, attached to Finberg Decl. (Doc. 119) in Support of Pls'. Mot. Partial Summ. J.) (Common Cause);  Deps. of Ury, Webb (Exs. 30 & 38)(SEIU); Lopez Ramirez Dep. (Ex. 27) and Decl. of Salazar (Ex. 53) (Mi Familia)(described at pp. 37-41 of Pls' Br. in Resp. Def's Mot. Summ. J. (Doc. 146)). The Secretary counters that this evidence demonstrates only that Plaintiffs diverted resources to deal with "purge"-related media attention, and that without linking that media attention specifically to the 20-day Rule, Plaintiffs have not established an injury in fact traceable to the Rule.  Reply (Doc. 154) at 19.   The argument is somewhat facile given the nature of these proceedings and, with respect to Common Cause in particular, factually inaccurate.

Standing is determined at the time the action is brought,  and courts generally look to when a particular complaint was first filed, not to subsequent events.  *Mink v. Suthers*, 482 F.3d 1244, 1253 -1254 (10th Cir. 2007)(citing *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs.*, 528 U.S. 167 at 180, 184 (2000) and *Nova Health Sys. v. Gandy*, 416 F.3d

1149, 1153 (10th Cir. 2005)).  Here, Plaintiffs filed suit to challenge a suite of Colorado

statutory provisions, including C.R.S. 1-2-509(3), and the organizational injury they

asserted was the impact Colorado's application of those provisions had on their

organizational purposes and ability to engage in their normal work in the month leading

up to the 2008 elections.  The fact that the parties have resolved all but one of the

statutory challenges to Colorado's voter registration laws does not alter or otherwise

heighten the evidentiary standard for standing.  If Plaintiffs had standing to challenge the

20-day Rule as part of their initial lawsuit challenging the collection of Colorado voter

registration laws that resulted in the cancellation of members' voter registrations in

violation of the NVRA, I am hard-pressed to agree that they lack standing now that the

Secretary has agreed to resolve the other challenges informally and Plaintiffs are unable

to parse their evidence to deal solely with the one challenge remaining.

Even if it were incumbent on Plaintiffs to tailor their standing evidence to the

remaining statutory challenge, at a minimum Common Cause has done so.  Specifically,

Common Cause asked for, and obtained from the Secretary in discovery, a list of

prospective voters whose registrations were cancelled under the 20-day Rule before the

2008 elections and has identified at least four of its 2008 hotline callers who were on that

list.  *See* Decl. of S. Gale Dick in Support of Pls' Reply in Support of Mot. Summ. J.

(Doc 157)(attaching a list of Common Cause hotline callers (Ex. 76, filed under SEAL),

provided by the Secretary in response to interrogatory requests in this case).  This linking

19

of hotline calls to cancelled – 20-day voters is sufficient, even under the Secretary's

heightened standard, to demonstrate a cognizable injury to the organization as would

support Article III standing.

I conclude that each of the Plaintiffs Common Cause, Mi Familia, and the SEIU

have established an injury-in-fact to their own organizational interests under *Havens* and

*Browning* sufficient to to challenge C.R.S. § 1-2-509(3) under the NVRA.

*Associational Standing*.

In addition to standing to file suit on its own behalf, an organization may also have

standing to file suit on behalf of its members when (1) "its members would otherwise

have standing to sue in their own right"; (2) the interests it seeks to protect are "germane

to the organization's purposes"; and (3) "neither the claim asserted nor the relief

requested requires the participation of the individual members in the lawsuit." *Hunt v.

Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).   Plaintiffs SEIU

and Common Cause claim to have associational standing to challenge Colorado's 20-day

rule under the NVRA because they are membership organizations who satisfy these

requirements.

The Secretary disputes the existence of associational standing, arguing no

members of Plaintiffs' organizations can establish standing to sue in his or her own right

because none can demonstrate an actual constitutional injury.  (Def. Br. in Support Mot.

Summ. J. at 20.)  As an initial matter, Defendant's argument again conflates the standing

inquiry with a merits determination. *See Initiative &Referendum Inst. v. Walker*, 450

20

F.3d 1082, 1088 (10th Cir. 2006)(en banc)("For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional [or statutory] violation.  That is the issue on the merits.").  Defendant's assertion that cancellation by operation of the 20-day rule is a mere "inconvenience" or that "minor burdens [on the right to vote]. . . violate neither the Constitution nor the NVRA" (Def. Br. at 23) are irrelevant to the question of standing.  *See ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008)("standing is not a proxy for the merits").

Next, the Secretary wrongly implies that actual "disenfranchisement" is the only injury alleged by Plaintiffs and because voters removed from active voter rolls under the 20-day Rule may still vote provisionally on election day, none can demonstrate actual disenfranchisement.  (Def. Br. at 8-9.)  The fact that Plaintiffs seek to prevent their members' potential disenfranchisement, however, does not mean that a complete deprivation of the right to vote is the only cognizable injury-in-fact for purposes of standing.  Any burden on the right to vote, even if it is no more than the cancellation of a voter's records in violation of the NVRA, constitutes an injury-in-fact for standing purposes.  In *Cox*, the court found that a voter had standing where she alleged that the state had rejected her federal voter registration form in violation of the NVRA, despite the fact that she remained registered to vote.  408 F.3d at 1352.  The court expressly rejected the argument that "the franchise [must] be wholly denied to suffer injury. . . .  Where an alleged injury is to a statutory right, standing exists 'even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.'"  *Id.* (quoting *Warth*,

422 U.S. at 514). *See also Common Cause of Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)(holding that the burden on the right to vote posed by the requirement that a voter secure or produce identification at the polls was sufficient for purposes of standing). Here, where the 20-day Rule has caused the cancellation of registrations of SEIU and Common Cause members, those members would have standing in their own right to challenge that rule and Plaintiffs, as associations representing those members on matters germane to those registrations, have standing to challenge the rule on their behalf.

*Redressability.*

Even assuming Plaintiffs can establish injury-in-fact sufficient to support organizational or associational standing, the Secretary argues Plaintiffs' claims are not redressable because the relief they seek will actually result in fewer, not more, successful registrations.   (Reply in Support of Mot. Summ. J. (Doc. 154) at 19, 24-28). The Secretary's argument is that the logical "fix" to § 1-2-509(3), if it is deemed unlawful under § 8(d), would be to require election officials to wait 20 days to place any new registrant in "active" status in SCORE.  While this process would prevent all new registrants, even those whose New Voter Information Cards are delivered within that 20 day period, from voting in any election that takes place within that initial 20 day period, it would avoid the problem raised by Plaintiffs because no one in "active" status would be "cancelled" by operation of the 20-day Rule.  While the point is well taken and was discussed recently at oral argument (*see* Minutes, 10/15/10 Oral Argument (Doc. 185)), it is beyond the scope of the question presented and does not affect the justiciability of

Plaintiffs' challenge to the 20-day Rule as it exists today.  The harm alleged – that the 20-day Rule risks the erroneous cancellation of voters and infringes on fundamental voting rights – is redressable, in the short term, by an order requiring the Secretary to return existing "Failed-20 day" voters to active status and prohibiting him from applying § 1-2-509(3) as currently implemented.  Accordingly, the fact the Secretary's next move after the issuance of such an order may be to alter the manner in which new registrants are entered into SCORE under § 1-2-509 to the detriment of new registrants generally is a practical matter for Plaintiffs to consider in pursuing their challenge.  It is not something that affects their standing to sue.

B. <u>Merits - Does the 20-day Rule Violate the NVRA</u>.

*The Land decision*.

Plaintiffs contend NVRA § 8(d)'s procedural limitations on removing voters from a state's mandatory electronic registration database on grounds of changed residence apply to Colorado's 20-day Rule and preclude the cancellation of new registrations on the basis of returned mail.  Plaintiffs rely heavily on the Sixth Circuit's decision in *Land*, which was decided on an expedited basis shortly before the 2008 federal election and preliminarily enjoined Michigan election officials from applying a statute similar to Colorado's 20-day Rule that required them to deactivate new registrants if their voter ID cards were returned as undeliverable. Over a vigorous dissent, the *Land* majority agreed § 8(d) applied to the "deactivations" and ruled federal, rather than state, law determined whether recent Michigan registration applicants were "registrants" for purposes of § 8(d).

23

Because Michigan applicants were "registered" the moment they were added to the statewide voter registration database in "active" status, the Sixth Circuit concluded any deactivation of a recent applicant's registration constituted a "removal" of a "registrant" under § 8(d), and could only be effected in accordance with its terms.  546 F.3d at 381. As I stated in comments at oral argument and in my October 18, 2010, decision on Plaintiffs' request for a preliminary injunction, Plaintiffs' almost exclusive reliance on *Land* to support their argument that Colorado's 20-day Rule violates the NVRA is unpersuasive.

First, neither the district court nor the court of appeals majority explored the question of whether § 8(d)  – prescribing how states must go about removing voter names from their registration lists on grounds that a voter has *moved out of the voting jurisdiction* – actually applies to statutes that temporarily deactivate *new* registrations when there is an indication that the address at which the registrant bases his initial eligibility to vote may be wrong.  Instead, the courts simply took at face value plaintiffs' assertion that § 8(d) applied anytime a registered voter was "removed" from active voting status, and thus focused their attention exclusively on the question of when new Michigan registration applicants became "registrants."

Despite this narrow focus, the Sixth Circuit's rejection of Michigan election officials' view that state, rather than federal, law defines the term "registrant" for purposes of § 8(d) was bafflingly circular.  Holding that federal law applied, the majority first determined that a Michigan voter registration applicant becomes a "registrant" under

federal law "the first moment that he or she is actually able to go to the polls and cast a

regular ballot." 546 F.3d at 382. As for when that "moment" occurs, however, the court

stated "we must look to state law defining when an individual can first go to the polls and

cast a regular vote." *Id.* at 383. Clearly state law informs the question, and the majority's

ultimate conclusion that Michigan voters are "registered" immediately upon being added

to the statewide electronic database in "active" status required no federal law imprimatur

to reach.

Second, both *Land* courts focused so narrowly on § 8(d) that they failed to

consider it in the overall context of the NVRA, federal voter rights legislation generally,

or Congress's dual mandate in the NVRA that states not only expand their voter

registration lists, but do so accurately. This failure is understandable given the nature of

the proceeding and the exigencies of deciding the issue, on a preliminary basis, weeks

before the hotly contested 2008 Presidential election. Because *Land* involved a request

for preliminary injunctive relief, the need to avoid the accrual of irreparable harm was

paramount and no dispositive ruling on the merits of plaintiffs' legal challenge was

necessary. Even then, the district court's findings that Michigan's undeliverable-voter-

ID-card practice "likely" violated the NVRA; that plaintiffs had made a "substantial but

not overly strong showing of irreparable harm"; and that relief in the form of a temporary

reactivation of recently deactivated new registrants "would work very little hardship on

the defendants and would be in the public interest," 546 F.3d at 379, are not particularly

persuasive here, where Plaintiffs seek permanent relief and a declaration that Colorado's

registration review statute is contrary to applicable federal law and invalid.

Finally, I note the majority's analysis in *Land* was met with a vigorous dissent in which JudgeVinson rejected the notion that Michigan registration applicants were "registrants" simply by virtue of having been added to Michigan's electronic voter registration database. 546 F.3d at 390. (Vinson, J. dissenting). Instead, Judge Vinson looked to the NVRA's dual mandate to increase the voter rolls but do so accurately, and determined Michigan's deactivation statute was focused on the precondition that a voter reside within the precinct in which he is registering before he is qualified to cast a vote, and was therefore not concerned with "removals" of already-eligible "registrants" for purposes of § 8(d). I agree, and because the exigencies of emergent relief and irreparable harm have been resolved, I take the time to set forth in detail § 8(d)'s place in the overall context of the states' federally mandated obligations under the NVRA and its progeny.

### *The NVRA and HAVA.*

Congress enacted the NVRA in 1993 in response to the "unfinished business" that remained in the wake of the historic Voting Rights Act of 1965. *See* H.R. Rep. No. 103-9, at 3 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105, 106-07 ("[The VRA] eliminated the more obvious impediments to registration, but left a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices, through which eligible citizens had to navigate in order to exercise their right to vote."). Citing its "Constitutionally based authority to enact national registration standards for elections for Federal office," Congress articulated specific additional requirements for state registration

26

schemes aimed at overriding discriminatory and unfair registration laws and increasing

electoral participation generally.  *See id.*; *see* 42 U.S.C. § 1973gg(a)(3).

Congress's stated purposes in enacting the NVRA were

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. § 1973gg(b).  These purposes counterpose two general, sometimes conflicting,

mandates:  To expand and simplify voter registration processes so that more individuals

register and participate in federal elections, while simultaneously ensuring that voter lists

include only eligible, current voters.

To effect these goals, the NVRA provides first for the expansion of voter

registration opportunities and requires states to facilitate and assist all eligible individuals

in that effort.  42 U.S.C. § 1983gg-2, -3, -4, -5.  In 1973gg-6, the codified version of

NVRA § 8, Congress articulated standards for the implementation and content of

enhanced voter registration administration and list maintenance procedures, designed to

protect the integrity of the voter rolls.[5]  Concerned about reports about the purging of

voter rolls before elections, *see* H.R. Rep. No. 103-9 at 16, Congress required states to

conduct "uniform and nondiscriminatory" programs for the identification and removal of

names from voter lists so that duly registered voters are removed for legitimate reasons

only, i.e., at the registrant's request (-6(a)(3)(A)), by reason of criminal conviction or

mental incapacity (-6(a)(3)(B)), the death of the registrant (-6(a)(4)(A)), or because of a

change of residence (-6(a)(4)(B), (c)(1)(B)(ii), (d), & (e)).  Congress also explicitly

prohibited the removal of names based solely on a failure to vote (-6(b)(2)) or because a

voter has changed his address within the same registrar's jurisdiction (-6(f)).

In 2002, in the wake of the disputed 2000 federal election and extensive public

outcry over the Florida ballot and voting issues that threw the results of that election in

doubt for weeks, Congress again took aim at voter registration and voter list purging

problems and augmented its 1993 mandate to states.  On October 29, 2002, President

Bush signed the Help America Vote Act of 2002 (HAVA),[6] a comprehensive law creating

a new federal agency, the Election Assistance Commission, to oversee election

administration and establishing standards for voting systems, electronic voter-registration

lists, voter information, identification of voters, and absentee ballots.  *See generally*, Kim,

Brian, Help America Vote Act, 40 Harv. J. on Legis. 579 (2003).  Continuing concerns

---

[5]        NVRA § 8 was codified at 42 U.S.C. § 1973gg-6.  I use the codified section citation to refer to § 8 from here forward.

[6]        Pub. L. No. 107-252, 116 Stat. 1666, 1666-1730, *codified at* 42 U.S.C. §§ 15301-15545.

about voter purges resulting in voters being turned away at polling stations on election

day on grounds they were improperly registered led to the creation of the provisional

ballot and a congressional mandate for its use.  42 U.S.C. § 15482,  H.R. Rep. No. 107-

329, pt. 1, at 37-38 (2001).[7]  HAVA also mandated that by 2006, each state was to create

and implement a "single, uniform, official, centralized, interactive computerized

statewide voter registration list defined, maintained, and administered at the State level

that contains the name and registration information of every legally registered voter in the

State and assigns a unique identifier to each legally registered voter in the State."  42

U.S.C. § 15483(a)(1)(A).  SCORE is that list in Colorado.  *See* C.R.S. § 1-2-301 (re

Master List of Electors).

 Critical for our purposes in this case is an understanding that Colorado's obligation

under HAVA and the NVRA is to register and include all *eligible* voters in its SCORE

database while ensuring its accuracy by removing *ineligible* voters.  *See* 42 U.S.C. §

15483(a)(2)(B); C.R.S. § 1-2-302.

*Eligibility is the definitive criterion for registration and list maintenance obligations under the NVRA and HAVA.*

 Under the NVRA, states must ensure that "any eligible applicant is registered to

vote."  § 1973gg-6(a)(1).  In the case of registration by mail, this means applicants must

submit a "valid" voter registration form no later than 30 days before an election or even

closer to an election, if state law permits.  § -6(a)(1)(C).  This form, which is developed

---

[7] Colorado's provisional ballot statute is found at C.R.S. § 1-8.5-101 *ff.*

by the federal Election Assistance Commission, is to include "only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to *assess the eligibility* of the applicant and to administer voter registration and other parts of the election process." § 1973gg-7(b)(emphasis mine). Concomitantly, § 1973gg-6 requires states to conduct a general program and make a reasonable effort "to remove the names of ineligible voters from the official lists of eligible voters." § 1973gg-6(a)(4)(general program to remove names by reason of death or change in residence). Further support that "eligibility" is the linchpin of a state's obligations regarding voter registration and list maintenance practices is found in HAVA, where Congress explicitly requires state or local election officials to perform list maintenance with respect to their newly mandated statewide electronic voter registration databases "on a regular basis," *id.* at § 15483(a)(2)(A), and to ensure that "duplicate names" and the names of any voters "who are not registered or who are not eligible to vote are removed." *Id.* at (1)(2)(b). This is precisely what Colorado's 20-day Rule sets out to do.

The sum total of Plaintiffs' argument in this case is that a voter's mere presence, in SCORE, in "active 20-day" status means the voter is "eligible" to cast a vote and is therefore not subject to cancellation or "remov[al]" from the "official list of eligible voters" under 42 U.S.C. § 1973gg-6(d) unless or until he confirms he has moved to a "place outside the registrar's jurisdiction" (-6(d)(1)(A)) or has failed to return an address confirmation card and also failed, for two consecutive federal election cycles, to appear to

vote (-6(d)(1)(B) and (d)(2)).  The argument requires a complete misreading of § 1973gg-6(d) and Congress's mandate to the states under the NVRA and HAVA.

*Entry into SCORE is mandatory under HAVA*
*and is not, by itself, a residential "eligibility" determination.*

"Eligibility" is the cornerstone of states' concomitant obligations under the NVRA and HAVA to increase the number of registered voters on their computerized voter registration databases while maintaining the accuracy of those lists:  States must strive to add eligible voters to their lists and to remove ineligible ones.

In Colorado, voter "eligibility" is inextricably linked to a voter's address.  The Colorado election statute defines an "eligible" elector as a "registered" elector under subparagraph (35) of C.R.S. § 1-1-104, *see* § 1-1-104(16), and defines "registered elector" as one "who has complied with the registration provisions of this code *and who resides within . . . the jurisdiction of the political subdivision calling the election.*"  *Id.* § 1-1-104(35) (emphasis mine).[8]  It is at the juncture of eligibility and address that the 20-day Rule, and an individual's removal from the list of eligible voters in SCORE as a result of his New Voter Information Card being returned as "undeliverable," reveal themselves to fall outside the purview of § 1973gg-6(d).  Individuals are deemed "not registered" and "removed" from "active 20-day" status in SCORE based on concerns they

---

[8]     I note that the ability to document a "current and valid" address is the also the *only* prerequisite to voting mandated under HAVA for mail-in registrants.  *See* 42 U.S.C. § 15483(b)(individuals who have registered by mail must present "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.").

31

do not reside within the jurisdiction in which they are attempting to register, and the mere presence in SCORE under "active 20-day" status is not determinative of that voter's residential eligibility.

Under HAVA, "all voter registration information obtained by any election official in the state shall be electronically entered into the computerized list on an expedited basis *at the time the information is provided to the local official.*"  42 U.S.C. § 15483(a)(1)(A)(emphasis mine).   Accordingly, Colorado law requires county clerks to enter a voter's registration information, specifically including his voting address, into SCORE, and send the voter a New Voter Information Card, immediately upon receipt of a completed registration application.  C.R.S. § 1-2-509(2).  The mandatory and expedited entry of a Colorado voter's registration information in SCORE upon receipt of his completed application precludes any substantive determination that the voter actually resides within the jurisdiction in which he is purporting to register.  If that voter's initial residential eligibility is called into question because his New Voter Card is returned as undeliverable to the address provided in his registration application, the 20-day Rule provides that he shall not yet be deemed registered and the voter is temporarily removed him from eligible ("active") status in SCORE until such time as the voter confirms his address or otherwise clarifies his residential eligibility.  This practice is consistent with Congress's mandate to states under HAVA.

By requiring states to enter voter registration information on computerized voter lists as soon as state officials receive it, Congress specifically contemplated that those

lists might include voters who are not actually eligible or not actually "registered" as a matter of state law at the time they are added.  HAVA therefore delegates to states the obligation not only to conduct list maintenance with respect to the computerized list on a regular basis, but to do so in a manner that "ensures that . . . voters who are *not registered* or who are not eligible to vote are removed."  42 U.S.C. § 15483(a)(2)(B)(emphasis mine).  It is precisely this obligation that Colorado's 20-day Rule is intended to fulfill.

As previously described, Colorado county clerks charged with reviewing voter registration applications under C.R.S. § 1-2-509 add a voter's name, address, and other registration information to SCORE immediately upon receipt of a completed, facially accurate application, place him in "active 20-day" status, and send a New Voter Card to the address provided on the application by nonforwardable mail.  If the residential prerequisite to a valid registration is subsequently called into question by the return of that Card as "undeliverable," C.R.S. § 1-2-509(3) operates to "cancel" that "active" registration status and the voter is deemed "not registered" until he returns a prepaid, pre-addressed confirmation card which the county clerk immediately sends out in accordance with Election Rule 2.17, or otherwise appears in person to confirm or correct his address.  The cancellation or "removal" of that voter from "active 20-day" status in SCORE is therefore the result of a determination that the voter's final registration status under C.R.S. § 1-1-104(35) must be deferred because he has yet to confirm that he "resides within  . .  the political subdivision calling the election."  It is not a "removal" of a voter whose residential eligibility to vote at the address provided in his registration application

may be any longer presumed.  To read the NVRA as prohibiting state officials from reclassifying individuals on their computerized databases even temporarily to confirm their initial eligibility to vote in the jurisdiction in which they applied is not only a hypertechnical and overreaching application of § -6(d), but antithetical to the NVRA and HAVA's countervailing mandate that states ensure the accuracy of their lists of registered voters.

*The proscription against removal under § -6(d) cannot be divorced from the predicate of an established or suspected change of residence.*

As previously stated, the bald assertion that 42 U.S.C. § 1973gg-6(d) applies to the "cancellation" of a new voter registration based on returned mail is an elision that should not simply be posited as truth without closer examination.  Upon closer examination, the assertion fails.

Section 1973gg-6(d) prohibits states from removing names from the official list of eligible voters "on the ground that the registrant has changed residence" until that registrant either (A) confirms, in writing, that he has "changed residence to a place outside the registrar's jurisdiction in which the registrant is registered" or (B)(i) fails to respond to a prepaid, pre-addressed confirmation request sent to his address of record and then (ii) fails, thereafter, to vote in two consecutive general election cycles.  42 U.S.C. § 1973gg-6(d)(1)(A) & (B).  The first prerequisite for removal clearly presumes that the affected voter "is registered" at an address within the registrar's jurisdiction and has moved "to a place outside the registrar's jurisdiction," a presumption that by itself

34

demonstrates the inapplicability of § -6(d) to the new registrants impacted by the 20-day Rule. Section -6(d) moreover is part and parcel of the NVRA's requirement that states "conduct a general program that makes a reasonable effort to remove the names of ineligible voters [from their lists of registered voters] . . . by reason of . . . death . . . or . . . change in residence," § 1973gg-6(a)(4), which requirement states may be deemed to have met by establishing a program that uses "change-of-address information supplied by the Postal Service . . . to identify registrants whose addresses may have changed" since the time they registered originally. § 1973gg-6(c). The 20-day Rule in Colorado is not concerned with a move from an address at which a voter was previously registered (which moves are the subject of detailed provisions at C.R.S. §§ 1-2-216, 216.5, 217, 217.5), but with the address on which his initial eligibility to register and to vote is premised. To ignore the "changed residence" language in § -6(d) is to expand it far beyond its explicitly stated purpose.

That § -6(d) does not apply to removals on the basis of a returned New Voter Card card is underscored by the fact that Colorado has an entirely separate and closely tailored statute specifically addressing the removal of duly registered voters from the master list on the basis of returned mail. That statute, C.R.S. § 1-2-605, requires election officials to communicate with all duly registered voters by voter information card and prescribes the detailed process with which they must comply before cancelling the registration records of anyone in SCORE on the basis of an undeliverable or undelivered voter information card. *See id.* § 1-2-605(b). The process mandated by § 605(b) closely mirrors that of §

1973gg-6(d), calling for the provision of a confirmation card to any voter whose information card is returned before any election and prohibiting the cancellation or removal of that voter from active status in SCORE based on his failure to return the confirmation card for two federal election cycles.  Because Colorado already has a statute governing the removal of registrants from the master list of registered voters on the basis of returned mail, § -6(d) should not be read to turn C.R.S. § 1-2-509(3) into an overly inclusive and less precise duplicate.

*The NVRA's reference to § -6(d) in § -4(d) regarding undeliverable mail registration notices does not compel a contrary conclusion.*

Section 1973gg-4 of the codified NVRA is a short provision pertaining to "Mail registration."  It prescribes the content of the registration form states are required to accept and use, authorizes states to require first-time voters who have registered by mail to appear in person to vote, and provides, in subparagraph -4(d), that state registrars "may proceed in accordance with § 1973gg -6(d)" when a notice of disposition of a mail registration application "is sent by nonforwardable mail and is returned undelivered."  Plaintiffs acknowledge the 20-day Rule is a registration confirmation provision untethered to an indicia of a "change" in residence, but argue § -6(d) applies to 20-day Rule-active-status-cancellations by operation of § 1973gg-4(d).  I disagree.

Section 1973gg-4(d) is permissive, not mandatory, and is best read as directing state registrars to the example in § -6(d) of how states may go about notifying and confirming the address of a new registrant when the undeliverability of his voter

36

information card suggests the address on his registration application may be incorrect. According to § -6(d)(2), a compliant notice informs the voter of a problem with his registration address is in the form of a "postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the . . . effect . . . [that] the registrant should return the card . . . [and] [i]f the card is not returned, [that] affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote." 42 U.S.C. § 1973gg-6(d)(2).  Colorado Election Rule 2.17 conforms to this recommended approach, requiring county clerks to send, by forwardable mail, a notice to recent mail-in registrants whose original New Voter Cards were returned as undeliverable in the form of a "confirmation card," which informs them of a problem with their registration.  Colorado confirmation cards are to have a "postage prepaid returnable portion that is preaddressed to the sending county clerk and recorder" which, if returned, will serve to affirm or confirm the registration address and result in the individual being "deemed registered as of the date of the original application." Election Rule 2.17.1.  Viewed thusly, § 4-(d) does not upend Colorado's residential eligibility confirmation procedures or supplant them it with § -6(d)'s other provisions prohibiting removal on the basis of changed residence.  It simply refers states to an example of how to notify a voter of a problematic mailing address and get him to confirm or otherwise correct it.

## III. <u>CONCLUSION</u>.

In Colorado, a new elector is actually and duly "registered" once he complies with

Colorado's registration provisions *and* resides within or is otherwise eligible to vote in the jurisdiction calling the election. The 20-day Rule is aimed at confirming the latter where an undeliverable initial registration notice calls a new registrant's residential eligibility into question. It has no application to removals or cancellations of voters whose initial residential eligibility has already been established, which are governed by the entirely separate and NVRA § -6(d) compliant C.R.S. § 1-2-605. The fact that new registration applicants are added to SCORE in temporary "active – 20-day" status is not dispositive of their eligibility or registration status under Colorado law and does not compel a different result.

Colorado's 20-day Rule, as implemented and applied by county clerks and registrars under Election Rule 2.17, conforms with Congress's mandates under the NVRA and HAVA to facilitate and ensure that all eligible registration applicants are added to Colorado's statewide voter registration database on an expedited basis and that the database be monitored and maintained so that ineligible or "not registered" voters are removed from it. The Rule provides a means for confirming the initial residential eligibility of recent registration applicants without implicating 42 U.S.C. § 1973gg-6(d) and its provisions regarding the removal or cancellation of duly registered voters. Because C.R.S. § 1-2-509(3), as implemented, does not violate the NVRA generally or 42 U.S.C. § 1973gg-6(d) in particular, summary judgment must enter in favor of the Secretary and against Plaintiffs on their cross-Motions for Summary Judgment.

Dated this 3d day of November, 2010.          **s/John L. Kane**
                                              SENIOR U.S. DISTRICT JUDGE